## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of Chun-ko Chang, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, from Hongzhi Li, Rui Li a/k/a Sandy Rebecca Lee, Shen Yun Performing Arts, Inc., and Dragon Springs Buddhist Inc, Respondents. | Case No. _ |

## EX PARTE APPLICATION FOR DISCOVERY
## IN AID OF FOREIGN LITIGATION PURSUANT TO 28 U.S.C. § 1782

1.      Petitioner, Chun-ko Chang, applies *ex parte* for an order pursuant to 28 U.S.C. § 1782 authorizing her attorneys to issue subpoenas, pursuant to Federal Rule of Civil Procedure 45, upon Respondents Hongzhi Li, Rui Li a/k/a Sandy Rebecca Lee, Shen Yun Performing Arts, Inc., and Dragon Springs Buddhist Inc., to produce documents and provide testimony for use by Petitioner in defending two civil defamation lawsuits brought against her in Taiwan (the "Taiwanese Proceedings"). The requested evidence is located in this district, would be welcomed by the Taiwanese courts in evaluating her defense, and is beyond the reach of those courts.

2.      One of Petitioner's defenses in the Taiwanese Proceedings is that they were brought in violation of Article 148 of the Taiwan Civil Code, which prohibits litigation brought in bad faith and for the primary purpose of harming others. Specifically, Petitioner has asserted the defense that the Taiwanese Proceedings were filed against her in retaliation for her bringing a U.S. lawsuit accusing Shen Yun, an international dance company based in New York, of forced labor and wage violations. *See* Exhibit A, Declaration of Chun-ko Chang ("Chang Decl.") ¶ 3. There is evidence that the plaintiffs in the Taiwanese Proceedings were directed to sue her by Hongzhi and Rui Li, the leaders of Shen Yun and Falun Gong, an exercise and meditation practice practiced by the plaintiffs in the Taiwanese Proceeding. Petitioner further contends that the Lis and Shen Yun are

1

paying the legal fees in the Taiwanese Proceedings and potentially paying or otherwise compensating the plaintiffs themselves for bringing those proceedings. Exhibit B, Declaration of Yen-jong Lee ("Lee Declaration") ¶ 19. If true, these facts could constitute a complete defense to the Taiwanese Proceedings under Article 148. *See infra* ¶¶ 37, 49.

3.      Petitioner seeks, through this petition, to obtain otherwise unavailable evidence—deposition and document discovery from the Lis, Shen Yun, and Dragon Springs relating to the Taiwanese Proceedings—in support of her Article 148 defense. The proposed document requests to each of the proposed discovery targets is attached here as Exhibit F, and the proposed Rule 30(b)(6) deposition topics for the organizational targets is attached here as Exhibit G. The proposed subpoena forms themselves are attached here as Exhibit H.

## BACKGROUND

### I.      The Taiwanese Proceedings

4.      The Taiwanese Proceedings were both filed on February 10, 2025, by Formosa Transnational, one of Taiwan's largest and most expensive law firms. *See* Exhibit B ¶ 21. The plaintiffs in both lawsuits sued over comments Petitioner made on a YouTube show that was published on or around June 29, 2024.

5.      The YouTube show was hosted by a prominent figure in the Chinese-speaking world, Wang Zhi'an. Exhibit A ¶ 6. The episode's topic was Petitioner's experience as a high-level dancer for Shen Yun, which she joined when she was thirteen (13) years old. During the episode, Petitioner discussed her relationship with the Lis, and especially Rui Li, with whom she was close. *Id.* She also described how she came to realize that she had been abused by Shen Yun, Falun Gong, and the Lis. *Id.*

6.      A very small portion of her comments, taking up only a minute or two of an approximately hour-long show, relayed rumors that circulated within the Shen Yun and Falun Gong

communities about two deaths. *Id.* One of those deaths was that of the son of a Shen Yun instructor and Falun Gong practitioner known as Xian Yuan, with the legal name Juanjuan Wei. *Id.* The rumor, which Petitioner said she believed, was that the son had died from choking or asphyxiation and that a contributing factor was that there'd been a delay in calling an ambulance, which Petitioner attributed to Hongzhi Li's discouragement of medical treatment. *Id.* The other death was that of Bojian Li's fiancée in a car crash at a California restaurant; there was a rumor that his death was not an accident. *Id.*

7.      The Taiwanese Proceedings are nominally about Petitioner's statements as they relate to those two deaths. But there are strong indications that the main purpose of the proceedings is to retaliate against Petitioner for suing the Lis, Shen Yun, and Dragon Springs in the U.S. for trafficking and wage violations. The Taiwanese Proceedings were filed less than three months after Petitioner filed the U.S. lawsuit. Exhibit B ¶ 21. They named only Petitioner and her husband as defendants, despite the involvement of other individuals and entities in publicizing the statements at issue. Exhibit B ¶ 22. The plaintiffs in the Taiwanese Proceedings do not appear to be wealthy. Yet they both hired the same law firm—Formosa Transnational—which is one of the largest and most expensive law firms in Taiwan, and they are likely paying expensive hourly fees.  Exhibit B ¶ 21. The plaintiffs' litigation conduct in the Taiwanese Proceedings also has been focused on identifying Petitioner's role *in the U.S. lawsuit*—even though the U.S. lawsuit has nothing to do with the purported defamatory statements made on the YouTube show. For example, the plaintiffs in the Taiwanese Proceedings have asked the Taiwanese courts to investigate how Petitioner is paying *for the U.S. lawsuit*, despite that topic having nothing to do with Petitioner's comments on the June 2024 YouTube show. Exhibit B ¶ 23. That the plaintiffs in the Taiwanese Proceedings have close ties to Shen Yun, Hongzhi Li, and Rui Li, contextualizes these facts, demonstrates a

motive for the Taiwanese Proceedings, and helps give rise to a reasonable basis for seeking the information sought in this petition.[1]

## II.    The Lis Control Shen Yun and Those Associated With It

8.    Hongzhi Li—referred to as Master Li—is the founder of Falun Gong, an exercise and meditation practice. Exhibit C, Nicole Hong & Michael Rothfeld, *Behind the Pageantry of Shen Yun, Untreated Injuries and Emotional Abuse*, N.Y. Times (Aug. 15, 2024), https://www.nytimes.com/2024/08/15/nyregion/shen-yun-dance-abuse.html. He is also the de facto leader of Shen Yun, which is primarily made up of Falun Gong practitioners and their children. *Id.*

9.    Li has decision-making authority for all significant matters pertaining to Shen Yun and Falun Gong. Exhibit C; Exhibit D, Nicole Hong & Michael Rothfeld, *How Shen Yun Tapped Religious Fervor to Make $266 Million*, N.Y. Times (Dec. 29. 2024), https://www.nytimes.com/2024/12/29/nyregion/shen-yun-money-falun-gong.html. He shares that authority with his wife, Rui Li, who serves in a chief operating officer role for Shen Yun.

10.    The Lis' control also extends to entities such as Dragon Springs Buddhist Inc., Fei Tian Academy for the Arts, Fei Tian College, and The Epoch Times, and NTD Television. Exhibit C; Exhibit E, Kevin Roose, *How the Epoch Times Created a Fiant Influence Machine*, N.Y. Times (Oct. 24, 2020), https://www.nytimes.com/2020/10/24/technology/epoch-times-influence-falun-gong.html.

11.    Dragon Springs is a secretive compound in Cuddebackville, New York. It is where Shen Yun's administrative and rehearsal facilities are located. Exhibit A ¶ 5. It is also where the two Fei Tian schools are located, which is Shen Yun's performers are required to attend. *Id.*

---

[1] On November 11, 2025, the trial court in the proceeding brought by Bojian Li entered judgment in Petitioner's favor. Exhibit 1 ¶ 14; Exhibit 2 ¶ 27. However, Bojian Li can still appeal, and the other proceeding is ongoing.

12.     The Epoch Times and NTD Television are media organizations founded and run by Falun Gong practitioners. Exhibit E. Senior executives from all these organizations travel to the Dragon Springs compound to receive instructions from the Lis on major decisions affecting these organizations and Falun Gong. *Id.*

13.     Each person who lives or works within the Dragon Springs compound or for the affiliated entities is subject to the authority and directives of the Lis. *See* Exhibits C, D, E. The Lis are not only their employers and/or responsible for their housing, but the Lis establish themselves as the arbiters of how to live properly. Exhibit C. These instructions extend to the mundane, such as the type of media to watch, or the extremely intimate, such as who to marry. *Id.* And Shen Yun performers regularly work grueling schedules for little or no pay, all for the benefit of the Lis. *Id.*

14.     The Lis also have considerable influence and power over practitioners that live outside the Dragon Springs community but who have active associations with it or ties to it. For example, the Lis direct Falun Gong followers to support Shen Yun by paying millions of dollars to cover upfront costs of the performances, regularly going into debt to do so. Exhibit D. They are reimbursed only enough in ticket sales to cover their expenses. Every penny of profit goes to Shen Yun. *Id.*

15.     Followers are also instructed to buy into other commercial enterprises, such as jewelry, clothing, or online video platforms, that fund the Lis' lifestyle. *Id.* Other followers have directly subsidized Hongzhi Li and Rui Li's personal lives and desires. *Id.* For instance, one administrator at Shen Yun was found to have personally funded the payment for premium pianos, Wi-Fi hot spots, the monthly cellphone bills of the Lis, and even tens of thousands of dollars in luxury items like watches, designer clothing, and jewelry. *Id.*

16.     These examples demonstrate the incredible level of authority and control that Hongzhi Li and Rui Li have over those in the Dragon Springs community and Falun Gong practitioners in general. Falun Gong practitioners regard the Lis as ultimate authority figures.

17.     The plaintiffs in the Taiwanese Proceedings are subject to this authority and influence. They are not only Falun Gong practitioners, but they have close ties to and have worked directly for the Lis. Exhibit A ¶ 4. Indeed, one of the plaintiffs is an instructor at Shen Yun, and another is a former dancer who maintains close ties to the Lis, whose daughter used to be his significant other. *Id.* ¶ 10-11.

18.     The plaintiffs in the Taiwanese Proceedings would not take an action as significant as initiating the Taiwanese Proceedings without the Lis' approval. To do so would go against the strict hierarchy of the Shen Yun and Dragon Springs. And if the Taiwanese plaintiffs were directed by the Lis or Shen Yun to pursue litigation against Petitioner, they would do so, even if they did not want to. Indeed, Practitioners regularly put the interests of the Lis above all else.

III.    **The Trafficking Litigation Threatened the Lis' Commercial Enterprise**

19.     Among the organizations directed by the Lis, Shen Yun is the most financially successful. Since 2006, it has staged thousands of performances worldwide under a grueling schedule that often requires performers to put on multiple shows a day with little rest in between. For example, in 2024, Shen Yun staged more than 800 performances across 209 cities in 22 countries. Exhibit C; Shen Yun Performing Arts, *"Curtain Call: A Record-Breaking Tour,"* (May 12, 2024), https://www.shenyun.org/news/view/article/e/s0d1cpxWkvY/shen-yun-2024-record-breaking-world-tour.html.

20.     Combined with an average ticket price of over $200, this has resulted in Shen Yun generating hundreds of millions of dollars in revenue. *See* CheapTickets, *Shen Yun Performing Arts Tickets* (last visited Nov. 5, 2025), https://www.cheaptickets.com/events/performers/shen-

yun-tickets. For example, in 2023 alone, Shen Yun generated at least $39 million in ticket sales. Exhibit C.

21.     In recent years, Shen Yun has come under heightened scrutiny and has faced allegations that its commercial enterprise is powered by forced child labor, for the primary financial benefit of the Lis. *See* Exhibit C.

22.     Several former Shen Yun dancers and musicians have publicly alleged that they were brought to Dragon Springs as children, under the auspices of attending the Fei Tian schools. *Id*. There, they were subject to various methods of coercion and control, all designed to keep them performing as dancers and musicians for Shen Yun for little to no pay. *Id*.

23.     Petitioner was one of the individuals who publicly described her forced labor experience with Shen Yun. *Id*. As discussed above, she appeared on a Chinese-language YouTube show in June 2024. Exhibit A ¶ 6. She was also one of many former performers quoted by *The New York Times* in August 2024. Exhibit C. Petitioner subsequently became the first former performer to file a civil lawsuit against Shen Yun and several other affiliated defendants. Specifically, on November 25, 2024, she brought federal forced labor claims and New York wage claims on behalf of herself and a class of similarly situated performers (the "Trafficking Litigation"). *See Chun-ko Chang v. Shen Yun Performing Arts, Inc. et al.*, Dkt. 1, No. 7:24-cv-8980 (S.D.N.Y. Nov. 25, 2024). The lawsuit has since been joined by three other named plaintiffs. *See* Case No. 24-8980, Dkt. 91 (S.D.N.Y. June 30, 2025).

24.     This has put the Lis at the heart of a serious legal dispute. It also threatens, or has the potential to threaten, the Shen Yun business model that enriches the Lis. Multiple performance spaces have cancelled Shen Yun shows following the Trafficking Litigation and allegations.

IV.    **The Retaliation Campaign Against Petitioner**

25.    In response to Petitioner's allegations, the Lis, Shen Yun, and others in the Falun Gong community have launched a retaliation campaign against her.

26.    For example, on September 13, 2024, a close associate of the Lis and a teacher at the Fei Tian schools, Tianliang Zhang, spoke on a Taiwanese news show and accused Petitioner of being "brainwashed" into becoming agents of the Chinese Communist Party ("CCP") and of having accepted money from the CCP for her dance studio business in Taiwan. Exhibit A ¶ 7. Mr. Zhang repeated a similar allegation on his own YouTube show on November 17, 2024. *Id.* Given that Shen Yun members and Falun Gong practitioners are taught to regard the CCP as the world's greatest evil, Mr. Zhang's statements in this regard were aimed at smearing and discrediting Petitioner.

27.    Additionally, the Lis have convened large-scale meetings within Dragon Springs devoted to denouncing Petitioner and to turning current Shen Yun performers against her. *Id.* ¶ 8. Rui Li has even said that the Lis and their affiliates have agents in Taiwan who are keeping track of Petitioner's every move and that those agents are reporting back to the Lis. *Id.*

28.    Finally, on February 10, 2025, after Petitioner filed the Trafficking Litigation, the retaliation escalated with the filing of the Taiwanese Proceedings against not just Petitioner but also her husband. *Id.* ¶ 9. Both lawsuits were filed by individuals close to the Lis. *Id.* ¶ 4.

29.    The first lawsuit was filed by Juanjuan Wei, also known as Xian Yuan. Xian Yuan is a Falun Gong practitioner who lives at or near Dragon Springs and is under the direct supervision of Master Li. She is an Associate Professor at Fei Tian College and holds a position at a Shen Yun-affiliated institute called the Shen Yun Arts Proficiency Assessment Center. *Id.* ¶ 10.

30.     The second lawsuit was filed by Bojian "Golden" Li, a Falun Gong practitioner and former Shen Yun dancer who once dated the Lis' daughter and who remains close with the Lis. *Id.* ¶ 11.

31.     These individuals are immersed in the Shen Yun and Falun Gong community and are subject to the directives and authority of the Lis. Considering the strict hierarchy within the Shen Yun and Falun Gong community, it is plausible that the plaintiffs in the Taiwanese Proceedings would not take an action as significant as initiating the Taiwanese Proceedings without the Lis' approval or directives to do so.

32.     Despite being of apparently modest means, both Xian Yuan and Bojian Li are represented by the same lawyers at the same Taiwanese law firm, Formosa Transnational, which is one of Taiwan's largest and most expensive law firms. Exhibit B ¶ 21. Additionally, the notarizations they provided to authorize the lawsuits were both performed at the same time and place—on January 16, 2025, at the New York location of the Taipei Economic and Cultural Office (Taiwan's de facto embassy). *Id.* ¶ 21.

33.     Moreover, Xian Yuan and Bojian Li have not sued anyone else over the statements, such as the host of the YouTube show. Nor have they sued others who have made similar statements.

34.     The plaintiffs have used the Taiwanese Proceedings as a mechanism to investigate the Trafficking Litigation. Specifically, as part of the Taiwanese Proceedings, Xian Yuan and Bojian Li have asked the Taiwanese courts to investigate Petitioner's bank accounts, based on the supposition that Petitioner is likely receiving financial support to pay her attorneys in the Trafficking Litigation.  *Id.* ¶ 22. Of course, Petitioner's relationship with her attorneys in the Trafficking Litigation has nothing to do with the June 2024 comments that are nominally the

subject of the Taiwanese Proceedings. But they have everything to do with the Trafficking Litigation in which the Lis and Shen Yun are defendants.

35.    The Taiwanese Proceedings have also served as a tool to attack the Trafficking Litigation by burdening and intimidating Petitioner. They have harmed Petitioner financially, as she must pay to defend against the frivolous suits, and they have left her terrified to speak out about the Lis and Shen Yun.

36.    All this leads Petitioner to the reasonable conclusion that the Lis and Shen Yun directed the initiation of the Taiwanese Proceedings as retaliation for the Trafficking Litigation, for the purpose of inflicting harm on her, and in bad faith, all in violation of Article 148 of the Taiwan Civil Code, which Petitioner has formally asserted as a defense in the Taiwanese Proceedings.

## V.    Petitioner Chang Seeks Discovery for Use in Taiwanese Defamation Lawsuits

37.    Petitioner is filing this petition to gather evidence to support her defense in the Taiwanese Proceedings. Specifically, Petitioner seeks to gather evidence to support her defense under Article 148 in both Taiwanese Proceedings.

38.    Article 148 of the Taiwan Civil Code provides: "A right can not be exercised for the main purpose of violating public interests or damaging the others. A right shall be exercised and a duty shall be performed in accordance with the means of good faith."

39.    As explained in the accompanying declaration of Lee Yen-jong, an accomplished Taiwanese lawyer, under this provision, if Petitioner can prove that the Taiwanese Proceedings were filed in bad faith and for the main purpose of retaliating against or otherwise harming her, or that the lawsuits were filed against her in bad faith, that could be a complete defense. Importantly, that is true *even if* the Taiwanese Proceedings were otherwise meritorious—frivolousness is *not* required under Article 148. Article 148 focuses on the motivations, intentions, and purposes of the

10

person purporting to exercise the right in question, and not the merits of the asserted right itself. And, although Taiwan is a civil law jurisdiction that does not rely on case law, the Lee Declaration includes examples of Taiwanese courts applying Article 148 in a variety of ways, including to dismiss claims.

40.    Evidence that would help establish this defense includes: (1) evidence that the Taiwanese Proceedings were filed in retaliation against Petitioner for bringing the Trafficking Litigation; (2) evidence that Taiwanese Proceedings are being used as a means to burden and intimidate Petitioner by draining her resources, tarnishing her reputation, and making her fear speaking publicly about Shen Yun; (3) evidence that the plaintiffs in the Taiwanese Proceedings were directed to pursue them by others or are being compensated for doing so; or (4) evidence that the Taiwanese Proceedings are being funded by others.

41.    To develop such evidence, Petitioner seeks documents and communications from the Lis and Shen Yun relating to the June 2024 YouTube show, as well as documents and communications relating to the Taiwanese Proceedings, and especially relating to the Lis' and Shen Yun's knowledge, encouragement, direction, or funding of the Taiwanese Proceedings.

42.    Petitioner also seeks to depose the Lis, as well as a corporate representative of Shen Yun, because of their unique knowledge and ability to speak about any involvement or motive they had in the orchestration of the Taiwanese Proceedings. Indeed, while others in the Shen Yun and Falun Gong community may be aware of the Lis' involvement in the Taiwanese Proceedings, depositions of the Lis themselves are required because all others within their orbit are likely to be unwilling to speak against the Lis in any way, even under oath, and/or believe that they will face grave harm if they do so.

43.    Taiwanese civil litigation moves more quickly than in the U.S. Indeed, the proceeding brought by Bojian Li already reached a final, trial-level determination, on November 11, 2025. Exhibit A ¶ 14; Exhibit B ¶ 27. However, Bojian Li can still appeal, and the other proceeding is ongoing. As such, Petitioner needs this evidence now if it is to be brought to bear in the Taiwanese Proceedings.

## ARGUMENT

44.    Petitioner presents circumstances that fall well-within what courts describe as the two aims of Section 1782: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts[.]" *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (quotation omitted). Petitioner seeks targeted, narrow discovery for use in a foreign proceeding. She more than satisfies both the statutory factors as well as the discretionary factors considered pursuant to Section 1782.

45.    *Ex parte* also relief is appropriate. Discovery sought pursuant to 28 U.S.C. § 1782 may be authorized on an *ex parte* basis. *See, e.g.*, *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. July 3, 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *In re Hornbeam Corp.*, No. 17-658-CV, 2018 WL 416486, at *2 (2d Cir. Jan. 16, 2018) (same); *see also In re O'Keefe*, 650 F. App'x 83, 85 (2d Cir. May 26, 2016) (rejecting the argument that it was improper to bring application *ex parte*). If the subpoena is issued, the Respondents will have the opportunity to object and/or to move to quash the subpoena. *Gushlak*, 486 F. App'x at 217 (citing Fed. R. Civ. P. 45(c)(3)). Therefore, *ex parte* relief is justified.

## I.      The Application Meets Each of the Statutory Requirements for Discovery[2]

46.      Section 1782 authorizes this Court to order any person in the Southern District of New York to give testimony or produce documents for use in a foreign proceeding, upon the application of any person with an interest in that proceeding. Specifically, Section 1782(a) provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced . . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

47.      "Section 1782 applicants must meet certain statutory requirements: (1) the person from whom discovery is sought must reside or be found in the district in which the application was made, (2) the discovery must be for use in a foreign proceeding before a foreign tribunal, and (3) the applicant must be either a foreign tribunal or an interested person." *In re Accent Delight Int'l Ltd*., 869 F.3d 121, 128 (2d Cir. 2017) (quotations omitted). Petitioner satisfies each of these requirements.

48.      First, Hongzhi Li, Rui Li, and Shen Yun all reside in this District. Hongzhi Li and Rui Li have their primary residence at 140 Gallery Hill Road, Cuddebackville, New York. Shen Yun is physically located at the same address within this district and is headquartered

---

[2] As for the pleading standard or level of proof required, there does not appear to be controlling authority, but several district courts have said the applicant only needs to make a *prima facie* showing. *E.g.*, *In re Republic of Ecuador*, No. 1:10-MC-00040 GSA, 2010 WL 4027740, at *4 (E.D. Cal. Oct. 14, 2010) ("This Court is satisfied the ROE has made a prima facie showing that the information it seeks from Mr. Hansen has, generally speaking, some relevance to the international arbitration[.]"); *In re Veiga*, 746 F. Supp. 2d 8, 14 (D.D.C. 2010) ("Chevron has made a sufficiently particularized *prima facie* showing to justify the invocation of § 1782(a)."); *In re Yilport Holding A.S.*, No. CV 22-3028-ES-AME, 2023 WL 2140111, at *2 (D.N.J. Feb. 21, 2023) ("the Court found Yilport made a sufficient *prima facie* demonstration that Section 1782's requirements had been met"). There can be little question that Ms. Chang has made such a *prima facie* showing, including via the Lee Declaration as well as her own declaration.

here. *See, e.g., In re Kolomoisky*, No. M19-116, 06 WL 2494332, at *1 (S.D.N.Y. Aug. 18, 2006).

49.    Second, the requirement that the discovery sought is for use in a foreign proceeding before a foreign tribunal is satisfied. The Taiwanese Proceedings are pending in the Taiwan Shilin District Court, which qualifies as a foreign tribunal. *See*, *e.g.*, *In re Safra*, No. 21-MC-640 (GHW) (JLC), 2022 WL 3584541, at *3 (S.D.N.Y. Aug. 22, 2022) (foreign civil proceedings qualified as a foreign tribunal).[3]

50.    Additionally, the "term 'for use' is afforded a broad interpretation, and the sought-after evidence need not be admissible or even discoverable under the rules of the foreign jurisdiction." *In re B&C KB Holding GmbH*, No. 22-MC-00180 (LAK) (VF), 2023 WL 1777326, at *3 (S.D.N.Y. Feb. 6, 2023) ("*B&C I*") (cleaned up). Instead, to establish that the discovery is for "use" in a foreign proceeding, the applicant must "establish that he or she has the practical ability to inject the requested information into a foreign proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017). "[T]he term 'for use' in Section 1782 has only its ordinary meaning—that the requested discovery is 'something that will be employed with some advantage or serve some use in the proceeding.'" *Id.* "[D]iscovery sought pursuant to § 1782 need not be necessary for the party to prevail in the foreign proceeding in order to satisfy the statute's 'for use' requirement." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015).

51.    Petitioner easily demonstrates that the discovery sought meets this "for use" standard. Here, the documents and testimony sought will directly inform Petitioner's defense

---

[3] As mentioned above, on November 11, 2025, the trial court in the proceeding brought by Bojian Li entered judgment in Petitioner's favor. Exhibit 1 ¶ 14; Exhibit 2 ¶ 27. However, Bojian Li can still appeal, and the other proceeding is ongoing.

to the Taiwanese Proceedings. Specifically, they may provide evidence that the Taiwanese Proceedings were brought in bad faith and for the primary purpose of retaliating against Petitioner, in violation of Article 148 of the Taiwan Civil Code, which provides a complete defense. Lee Declaration ¶¶ 12-18. This satisfies the requirement that the discovery sought be of materials "that can be made use of in the foreign proceeding to increase [petitioner's] chances of success." *Id.* at 299; *In re Novalpina Cap. Partners I GP S.À.R.L.*, No. 23 MISC. 25 (PGG), 2025 WL 1160854, at *17 (S.D.N.Y. Apr. 21, 2025) (granting 1782 petition where discovery sought concerned "Petitioner's 'unclean hands' defense" and it was "plausible that Respondents have documents and information relevant to demonstrating [the foreign plaintiff's] alleged bad faith" which "could 'be employed with some advantage or serve some use'" in the defense).

52.    Third, Petitioner is an interested person within the meaning of the statute because she is a defendant in the Taiwanese Proceedings. *See, e.g., Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) ("No doubt litigants are included among . . . the interested persons who may invoke § 1782") (quoting *Intel Corp. vs. Advanced Microdevices Inc.*, 542 U.S. 241, 256 (2004)).

53.    Accordingly, Petitioner meets each of the statutory requirements set forth in Section 1782.

## II.    Each of the Discretionary Factors Weighs Strongly in Favor of Granting the Application

54.    Once the three statutory factors are satisfied, the district court determines, in its discretion, whether to order the requested discovery. *See Intel*, 542 U.S. at 264. In *Intel*, the Supreme Court enunciated four factors that a district court could consider in determining when or to what extent discovery is permissible under Section 1782. The four factors are: (1) whether

"the person from whom discovery is sought is a participant in the foreign proceeding" such that the "foreign tribunal has jurisdiction over [it]"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court juridical assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the requests are "unduly intrusive or burdensome" and if so, whether those requests can be "trimmed." *Id.* at 264-65; *see also Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015).

55.     In addition to these factors, the Court should also consider the overarching principles embodied in Section 1782. "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. While the legislation has undergone several amendments, these amendments have consistently provided more, not less, discovery for use in more, not fewer, judicial and quasi-judicial fora, in connection with more, not fewer, types of proceedings. *See id.* at 248-49.

56.     Section 1782 has two aims that guide the district court's discretion: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts[.]" *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (quotation omitted).

57.     To that end, "Congress intended . . . that 28 U.S.C. § 1782 would provide an avenue for judicial assistance to foreign or international tribunals whether or not reciprocal arrangements existed.   [Section 1782] is a one-way street." *Application of Malev Hungarian*

*Airlines*, 964 F.2d 97, 101 (2d Cir. 1992) (quotation omitted). "Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). Indeed, if a court fails to consider this backdrop, it risks abusing its discretion. *Malev*, 964 F.2d at 101-02.

58.    Applying these factors and considering the overarching principles behind the statute, this Court should permit Petitioner to obtain the requested discovery.

**A.    The Discovery Subjects Are Not Participating in the Taiwanese Legal Proceedings**

59.    The first *Intel* factor considers whether the respondent is a participant in the foreign proceeding because when a respondent is a party, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when the evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264.

60.    This factor weighs in favor of granting the requested discovery because the Respondents are not formal participants in the Taiwanese proceedings. The Supreme Court has recognized that "nonparticipants in the foreign proceeding may be outside of the foreign tribunal's reach; hence their evidence, available in the United States, may be unobtainable absent 28 U.S.C. § 1782(a) aid." *Intel*, 542 U.S. at 264; *see also In re Application Pursuant to 28 U.S.C. Section 1782 for an Ord. Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries & other non-participants for use in Actions Pending in the Norway*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (finding a respondent's "status as a non-party in the foreign actions weighs in favor of granting [the] application."); *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 292 (S.D.N.Y. 2008) (holding that the first discretionary factor favored granting of the application where the respondent was not subject to the jurisdiction of the foreign tribunals).

**B.    The Nature of the Court, the Character of the Proceeding, and the Receptivity of the Court Support Granting the Discovery Requested**

61.    The second *Intel* factor considers the nature of the foreign tribunal and its receptiveness to the requested discovery. This factor weighs in favor of granting the petition unless there is authoritative proof that a foreign tribunal would reject evidence obtained through a Section 1782 proceeding. *See Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, 2008 WL 3884374, at \*6-7 (N.D.N.Y. Aug. 18, 2008) (granting discovery request in absence of "neither any rejection nor offense taken by the German tribunals" to the discovery and finding this factor favors petitioner); *cf. In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at \*6 (S.D.N.Y. Dec. 29, 2006) ("[P]roof resting on equivocal interpretations of foreign policy or law generally provides an insufficient basis to deny discovery"). There is no such proof in this case.

62.    Applicants enjoy a presumption in favor of this factor.  In examining receptivity, a U.S. court should limit its inquiry "only [to] authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," and not engage in "speculative forays into legal territories unfamiliar to federal judges." *Euromepa I*, 51 F.3d at 1099–100.  This includes forays into whether the evidence is *discoverable* or *admissible* in the foreign proceeding.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) (explaining that "the Supreme Court rejected the so-called foreign-discoverability rule" and concluding that "there is no statutory basis for any admissibility requirement" as well); *Euromepa I*, 51 F.3d at 1101 ("[T]he drafters of section 1782 regarded it as both unnecessary and undesirable to let the propriety of discovery with the aid of an American court depend on discoverability and admissibility under foreign law.") (cleaned up).

63.    Authoritative proof that a foreign tribunal would reject evidence obtained with the aid of Section 1782 is limited to proof "embodied in a forum country's judicial, executive or

legislative declarations that specifically address the use of evidence gathered under foreign procedures." *Id.* at 1100. No such proof exists here.

64.     To the contrary, in the Taiwanese Proceedings, parties are free to present evidence that they have collected. Lee Declaration ¶¶ 10, 24-26. There would be no basis to challenge admissibility of the documentary or testimonial evidence before the Taiwanese courts. Lee Declaration ¶ 26 . Taiwanese courts would thus be receptive to the documentary and testimonial evidence sought in this application.

### C.     Petitioners Do Not Seek to Circumvent Proof-Gathering Restrictions of Other Policies

65.     The third *Intel* factor considers whether the Section 1782 petition is being used to circumvent foreign proof-gathering restrictions or is otherwise inconsistent with the policies of the foreign country or the United States. *Intel*, 542 U.S. at 264-65. Typically, courts weigh the third *Intel* factor against the applicant only where they find that an application is brought in bad faith. *See In re Application of Hill*, No. 05-CV-999996, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the applicant's] part, the Court is simply unwilling to weigh the request for 28 U.S.C. § 1782 assistance itself as a negative discretionary factor.") (internal quotations omitted); *see also In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19- 88 (BSJ), 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006).

66.     Accordingly, a "court may deny the section 1782 application where it suspects that the discovery is being sought for the purposes of harassment." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012). That is not the case here.

67.     Petitioner seeks limited discovery that would go directly to potential complete defenses to the claims that have been brought against her in the Taiwanese Proceedings. The

discovery Petitioner seeks pursuant to this Petition is targeted to evidence that will promote her defenses in the Taiwanese Proceedings.

68.    Since the application is brought in good faith and does not seek to circumvent any proof-gathering restrictions of the Taiwanese courts, the third factor also weighs in favor of granting the Petition.

**D.    The Requested Discovery Is Narrowly Tailored, and Is Not Unduly Intrusive or Burdensome**

69.    Courts may consider whether the discovery requests under Section 1782 are "unduly intrusive or burdensome" and should be "rejected or trimmed." *Intel*, 542 U.S. at 265.

70.    Section 1782 provides that discovery taken under the statute is governed by the Federal Rules of Civil Procedure. 28 U.S.C. § 1782(a). Thus, the Court "should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *See Mees*, 793 F.3d at 302.

71.    The documents and depositions that Petitioner requests are relevant and narrowly tailored to the Taiwanese Proceedings and her anticipated defenses to them. The documents sought will be simple to identify and corral, as they concern only Respondents' involvement with or discussion of the Taiwanese Proceedings or of the June 2024 YouTube show that is nominally the subject of those proceedings. The universe of responsive documents also is likely to be relatively small, thereby not constituting a significant burden. Moreover, if the subpoenas are determined to be overly broad, the proper course would be to modify them after they are issued rather than denying the petition to issue them outright. *See Euromepa*, 51 F.3d at 1101 ("because Section 1782 gives the court complete discretion in prescribing the procedure for parties to follow in producing requested materials, we think that it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a

closely tailored discovery order rather than by simply denying relief outright") (quotation and internal citation omitted).

72.     The fourth *Intel* factor thus weighs in favor of granting the instant Petition.

## CONCLUSION

73.     Petitioner respectfully requests that the Court issue an order authorizing Petitioner to initiate discovery and issue subpoenas in substantially the same form as set forth in Exhibits F, G, and H.

November 21, 2025                    Respectfully submitted,

                                    / s / Mariyam Hussain
                                    Mariyam Hussain (NY Bar No. 5492475)
                                    BERGER MONTAGUE PC
                                    1820 West Division Street
                                    Chicago, IL 60622
                                    Tel.: (773) 666-4316
                                    mhussain@bm.net

                                    Michael Dell'Angelo*
                                    Michaela Wallin*
                                    BERGER MONTAGUE PC
                                    1818 Market Street, Suite 3600
                                    Philadelphia, PA 19103
                                    Tel.: 215-875-3000
                                    mdellangelo@bm.net
                                    mwallin@bm.net

                                    Times Wang*
                                    Adam Farra*
                                    FARRA & WANG PLLC
                                    1300 I Street, N.W. Suite 400E
                                    Washington, D.C. 20005
                                    Tel.: 202-505-6227
                                    twang@farrawang.com
                                    afarra@farrawang.com

    * Pro hac vice forthcoming