## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of Chun-ko Chang, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, from Hongzhi Li, Rui Li a/k/a Sandy Rebecca Lee, Shen Yun Performing Arts, Inc., and Dragon Springs Buddhist Inc, Respondents. | Case No. _ |

### DECLARATION OF YEN-JONG LEE

I, Yen-jong Lee, hereby declare as follows:

1.      My name is Yen-jong Lee. I am an attorney in Taiwan, also known as the Republic of China (Taiwan). I submit this declaration in support of the application of Chun-ko Chang to obtain evidence relevant to two lawsuits (the "Taiwanese Lawsuits") against Ms. Chang and her husband, Che-wei Yeh, in Taiwan.

2.      I am a 2003 graduate of the National Taiwan University College of Law, where I double majored in law and social work, obtaining a Bachelor of Laws (also known as an LL.B.) and a Bachelor of Social Science in Social Work. I worked as a social worker in Taiwan between 2003 and 2005, and began practicing law in Taiwan in 2006. Between 2008 and 2012, I studied in France, where I obtained a Master of Science in Gender Studies and Sociology in 2011, and a Master of Laws (also known as an LL.M.) in Human Rights in 2012. I speak and read Mandarin Chinese, English, and French.

3.      Between 2015 and 2019, I worked at Themis Attorneys-at-law, a Taiwanese law firm that specializes in international and local family law, human rights, and gender-related legal

1

issues. In 2019, I founded Y.J. Lee & Associates, a law firm that specializes in human rights law, civil law, and family law.

4.     In my law practice, I have handled many cases involving claims like the ones brought against Ms. Chang, including defamation claims. For example, I have defended victims of sexual harassment in defamation civil lawsuits in 2023 during #MeToo movement in Taiwan.

**A.     Civil procedure and evidentiary principles under Taiwanese law.**

5.     Taiwan is a civil law jurisdiction, as opposed to a common law jurisdiction. Procedural law is contained in Civil Procedure Code.

6.     Article 244 of Civil Procedure Code stipulates that to initiate an action, a complaint shall be submitted to the court and indicate the following matters: (1) the parties and their statutory agents; (2) the claim and the transaction or occurrence giving rise to such claim; and (3) the demand for judgment and the relief sought. Such complaint shall be submitted to the court having jurisdiction determined by Chapter 1 of the same Code over the case in question.

7.     The court then reviews whether any procedural defects exist in the complaint. Examples include lack of jurisdiction or power of attorney, failure to pay court fees, or res judicata. If there are any defects, the court will invoke Article 249 of Civil Procedure Code and order the plaintiff to rectify them. If the plaintiff does not do so before the court-ordered deadline, the complaint will be dismissed.

8.     Once a complaint passes this procedural review, the court, in accordance with the nature of complaint, will either schedule a mediation or a trial date. If the mediation fails, the case will proceed to the adjudication phase.

9.     During the adjudication phase, both the plaintiff and the defendant have the right to request the court to subpoena evidence relating to their claims and defenses. Unlike the United States, lawyers in Taiwan do not have the authority to subpoena any evidence.

Exhibit A to Petition - p. 2 of 146

10.     As for admissibility, Taiwanese law does not contain strict requirements. The court is the finder of fact, and so long as the court deems the evidence relevant, it will consider all evidence put before it, with the only real question being what weight the court will assign the evidence. This is true even of illegally obtained evidence.

**B.      The evidence sought is relevant under Taiwanese law.**

11.     As stated before, Taiwan is a civil law jurisdiction, and substantive law is contained in the civil code.

12.     Article 148 of the Taiwan Civil Code provides: "A right cannot be exercised for the main purpose of violating the public interest or harming others. A right shall be exercised and a duty shall be performed in accordance with the principle of good faith."

13.     Article 148 is a flexible provision that can be used as a defense to a claim, or as a basis for an affirmative claim. Taiwanese courts invoke and apply it in a variety of contexts.

14.     For example, in a 2016 judgment, the Taiwan Shilin District Court rejected a plaintiff's request that a defendant's house be dismantled, even though the house encroached on the plaintiff's land, because after balancing the equities it concluded that doing so would be an abuse of rights under Article 148.

15.     As another example, in a 2025 judgment, the Taiwan Taichung District Court applied Article 148 to invalidate a condominium board's resolution based on its finding that the resolution's primary intent was to harm the plaintiff.

16.     As a final example, in a 2025 judgment, the Taiwan High Court applied Article 148 to reject a plaintiff's request for liquidated damages provision, even though the defendant had clearly breached the contract. In so doing, the court reasoned that the plaintiff's request was not in good faith and violated Article 148 because the breach was minor and did not cause the plaintiff any damages.

3

17.     True and correct copies of the above decisions, as well as machine-translated English translations of them, are attached here as Exhibits 1-6.

18.     These cases demonstrate the broad and flexible application of Article 148, allowing courts to adjust the balance of interests and ensure equity between parties on a case-by-case basis. Thus, under Article 148, if Ms. Chang can prove that the Taiwanese Lawsuits were filed in bad faith and for the main purpose of harming her, that would likely be a complete defense, and the Taiwanese Lawsuits will be dismissed. Notably, this is true even if the Taiwanese Lawsuits otherwise have legal or factual merit.

19.     Here, Ms. Chang has asserted that the main purpose of the Taiwanese Lawsuits is to punish her and to drain her resources in retaliation for a lawsuit she filed in the United States. She has also asserted that the plaintiffs in the Taiwanese Lawsuits did not really want to file the lawsuits but were directed to do so by others and are being compensated for doing so. In my view, if she can prove either of these assertions, that would result in, at a minimum, a dismissal of the Taiwanese Lawsuits.

20.     By way of background, it is my understanding that, on November 25, 2024, Ms. Chang filed a lawsuit entitled *Chang v. Shen Yun Performing Arts, Inc. et al.* ("Shen Yun Lawsuit") in the United States District Court for the Southern District of New York, with the case number 7:24-cv-08980, which is being presided over by The Honorable Judge Philip M. Halpern. It is additionally my understanding that the Shen Yun Lawsuit broadly accuses Hongzhi Li, the founder a movement called Falun Gong, as well as several others, of engaging in forced labor in connection with the performing arts show known as Shen Yun. And it is my understanding that the plaintiffs in both Taiwanese lawsuits, Xian Yuan and Bojian Li, were or are part of Shen Yun. Specifically,

4

it is my understanding that Xian Yuan is dance instructor at Shen Yun and that Bojian Li is a former dancer who once dated Hongzhi Li's daughter.

21.    The Taiwanese Lawsuits were both filed on February 10, 2025, in Taiwan Shilin District Court. Both include notarizations provided by the plaintiffs to authorize the lawsuits performed at the same time and place—on January 16, 2025, at the New York location of the Taipei Economic and Cultural Office, which is Taiwan's de facto embassy. Both plaintiffs are represented by the same law firm, Formosa Transnational Attorneys at Law. I am familiar with that law firm, which is one of the largest and most expensive law firms in Taiwan. Meanwhile, I am told that neither of the plaintiffs are particularly wealthy.

22.    Moreover, both Taiwanese Lawsuits were brought over statements that Ms. Chang and her husband made on a YouTube show. Those statements were highly critical of Hongzhi Li and Falun Gong, but they were not actually critical of either Xian Yuan or Bojian Li. Moreover, the plaintiffs did not sue anyone else involved in publicizing the statements, including the show's host. Finally, it is my understanding that the plaintiffs in the Taiwanese Lawsuits have asked the Taiwanese courts to investigate how Ms. Chang is paying for the Shen Yun Lawsuit, including by investigating their bank accounts, despite that having nothing to do with Ms. Chang's comments on the YouTube show.

23.    Given the foregoing, there appears to be a reasonable basis to believe that Hongzhi Li directed Xian Yuan and Bojian Li to file the lawsuits and is paying for them, and that Xian Yuan and Bojian Li may not be genuinely interested in pursuing those lawsuits in a jurisdiction far from the United States. Ms. Chang seeks evidence to prove that that belief is true, which, as discussed above, would provide a strong basis for dismissal under Article 148.

**C.    The Taiwanese courts will be receptive to the requested evidence.**

24.     As for the requested evidence, as mentioned above, Taiwanese courts have a flexible approach to admitting evidence and Taiwanese judges will typically consider anything that might logically support an assertion. The requested evidence fits that description. For example, Ms. Chang seeks documents relating to the Taiwanese Lawsuits from Hongzhi Li and related individuals and entities, none of which are the plaintiffs themselves, including documents relating to the initiation and financing of those lawsuits. If these documents show that these third parties to the Taiwanese Lawsuits ordered or directed the filing of the Taiwanese Lawsuits to punish Ms. Chang for filing the Shen Yun Lawsuit, the Taiwanese courts will almost certainly consider them in adjudicating Ms. Chang's Article 148 defense. Certainly, I know of no reason a Taiwanese court would not consider such evidence.

25.     Similarly, Ms. Chang seeks oral testimony from Hongzhi Li and related individuals and entities going to the same issues. If that testimony tends to show that these third parties to the Taiwanese Lawsuits are the driving forces behind those lawsuits, and that they were filed for the main purpose of retaliating against Ms. Chang over the Shen Yun Lawsuit, the Taiwanese courts will likely consider that testimony as well in deciding Ms. Chang's Article 148 defense. Again, I can think of no reason the Taiwanese court would not do so.

26.     Thus, based on my experience and understanding of Taiwanese law, the Taiwanese courts adjudicating the Taiwanese Lawsuits, and Taiwanese courts generally, will be receptive to the documentary evidence and testimony sought through this Application. To my knowledge, there would be no basis to challenge the admissibility of this evidence before the Taiwanese courts, and the proposed subpoenas do not circumvent any proof-gathering restrictions under Taiwanese law.

27.     Finally, it is my understanding that, on November 11, 2025, the trial court in the proceeding brought by Bojian Li entered judgment in Petitioner's favor. However, Bojian Li can

6

file an appeal within 20 days of being served with the judgment, and there is no indication he will not do so. Meanwhile, it is my understanding that, as of the date below, the proceeding brought by Xian Yaun is still ongoing at the trial-court level.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   November 20, 2025

_____
Yen-jong Lee

7

 Lawsnote

下載日期：114 年 8 月 18 日

臺灣士林地方法院 105 年度訴字第 1572 號

【裁判字號】105,訴,1572

【裁判日期】民國 106 年 3 月 29 日

【裁判案由】拆屋還地等

【裁判內文】

臺灣士林地方法院民事判決　　　　　105 年度訴字第 1572 號

原　　　告　陳暉澤

訴訟代理人　張克西律師

　　　　　　蔡宗合

複　代理人　陳宏彬律師

被　　　告　林維政

　　　　　　鄭志利

　　　　　　鄭劉美祝

共　　　同　郭德田律師

訴訟代理人　李荃和律師

　　　　　　林政豪律師

複　代理人　游宜華

上列當事人間拆屋還地等事件，本院於民國 106 年 3 月 8 日言詞辯論終結，判決如下：

主文

被告林維政應給付原告新臺幣壹萬貳仟捌佰貳拾柒元，及自民國 105 年 4 月 2 日起至清償日止，按週年利率百分之五計算之利息；暨自民國 105 年 4 月 2 日起，按月給付原告新臺幣貳佰壹拾肆元。

被告鄭志利、鄭劉美祝各應給付原告新臺幣壹萬貳仟捌佰貳拾柒元，及均自民國 105 年 4 月 1 日起至清償日止，按週年利率百分之五計算之利息；暨均自民國 105 年 4 月 1 日起，按月給付原告新臺幣貳佰壹拾肆元。

原告其餘之訴駁回。

**Exhibit 1 to Lee Declaration**

訴訟費用由被告負擔十分之一，餘由原告負擔。

本判決第一項、第二項得假執行。但被告如各於假執行程序實施前，以新臺幣壹萬貳仟捌佰貳拾柒元為原告預供擔保，得免為假執行。

原告其餘假執行之聲請駁回。

事實及理由

一、原告起訴主張：

(一)原告係為新北市○○區○○段 0000 地號土地（以下稱為系爭土地）之單一所有權人。而系爭土地遭門牌號碼新北市○○區○○路 000 巷 0 弄 00 號 1 樓、2 樓、3 樓之房屋所有權人，即 1 樓為被告林維政、2 樓為被告鄭志利、3 樓為被告鄭劉美祝分別以渠等所有房屋無權占用各 10.18 平方公尺。

(二)被告 3 人曾於民國 103 年 7 月 1 日出具同意書於原告表示：「雙方同意就汐止區崇德段 1297 號土地，進行拆除退地之事項，簽署同意書如下：甲方同意 103 年 12 月 31 日前將佔甲方上述土地之部分拆除完畢。」(三)關於拆屋還地部分：

1.被告簽署「拆除同意書」之意思表示，原告未有任何脅迫(1)按當事人主張其意思表示係因被詐欺或脅迫而為之者，應就其被詐欺或被脅迫之事實，負舉證之責任。查被告辯稱簽署「拆除同意書」係受原告脅迫，惟未見被告任何舉證。

(2)原告否認脅迫被告簽署「拆除同意書」。況且，拆除同意書係於 103 年 7 月 1 日在汐止區公所調解委員會作成。

再者，被告林維政、鄭志利、鄭劉美祝等，均在士林地檢署 104 年度偵字第 7105 號案件偵查庭表示，告訴人即原告所提出的協議書是伊等看過之後簽名的。

(3)因此，「拆除同意書」係兩造雙方之約定，被告 3 人自須依該拆除同意書約定將占用原告土地部分拆除返還。

2.兩造於簽訂「拆除同意書」雖有商議價購事宜，但雙方並無解除該拆除同意書之合意，亦未有任何新協議取代該拆除同意書(1)按如契約之當事人欲解除契約，除有法定解約事由外，端視兩造於契約中有無約定單方解除權利，或經由契約之當事人另行合意解除契約。經查，「拆除同意書」並未有約定被告可以單方解除之約定。其次，亦未見被告證明兩造另有合意解除「拆除同意書」之合意。

(2)又，刑事竊占罪名之認定與構成要件，核與民事之債務不履行，尚有所聞。經查，系爭同意書明確清楚載明被告 3 人同意於 103 年 12 月 31 日前將佔用原告土地之部分拆除完畢，因此，被告 3 人自應受該協議書所拘束。當初 103 年 7 月 1 日簽立系爭同意書，原告還寬厚予被告半年時間去為準備拆遷，詎料，被告在同年 10 月下旬均未履行，甚至不斷放出虛偽購買之協商意思，以規避刑事竊占罪名之要件。縱兩造於簽訂同意書之後，被告曾向原告為價購土地之意思，然並無被告所述兩造有合意於價購不成時，原告放棄該協議書上記載之拆屋還地請求

**Exhibit 1 to Lee Declaration**

2

**Exhibit A to Petition - p. 9 of 146**

權之意思。

(3)再者，被告訴訟代理人在土林地檢署關於系爭土地竊佔案件偵查中之下述表示：「103年4月接到屋子有越界建築的情形，才與地主協調，並沒有說不願意拆屋或購買，只是在價金有問題而已；亦曾在偵查中表示：「...被告等願意處理，但因為收購價格方面談不妥，且協議部分我們知道有這狀況，也願意配合（協議即指：拆除同意書），但後來因為談不妥，且告訴人也採刑事途徑。」又表示：「...如果有談成，就不用拆，不是要故意不拆，在有結果前本來就不會拆除，不是故意竊佔。

」職前開之事實可知，兩造縱有協商價購未成，但實際上在104年5月20日、9月17日、12月3日，被告訴訟代理人均都自承仍係願意拆除，仍係願意配合拆除同意書..等意思，並未見到有任何合意，因為雙方進行協商價購即有免除「拆除同意書」中所約定被告之拆除義務。

因此，何來被告仍辯稱雙方不受「拆除同意書」所約束之情形。

3.被告係故意、惡意占用系爭土地，詳如下述(1)被告等房屋室內面積增加有3.079坪之多（10.18平方公尺），被告等人在買受或取得系爭房屋時，不論從買賣契約、建物謄本、建物測量成果圖或其他現場客觀使用面積之事實，自可知有無權占用系爭土地之2次施工違建情形存在。

(2)系爭房屋所在建物，4樓並未如同像被告依序由地面至3樓而增建上去。換言之，系爭房屋同棟4樓，並未增建。故被告等由外觀上與4樓房屋比對之下，自可知悉等多出部分係屬違法增建。

(3)被告林維政甚至故意將系爭土地對外聯絡通路，全部以不鏽鋼鐵門把門，將系爭土地全部據為己有使用，完全排除原告占有，並且將1樓房屋後方占用系爭土地3.6坪搭建鐵棚。

(4)其次，被告主張悉等於103年6月以前係屬於善意占有人，並主張係基於所有之意思，善意占用，故核屬民法第952條規定，善意占有人於推定其為適法所有之權利範圍內..，故對原告不負返還義務云云。然按民法第943條規定（即占有權利推定之限制）：「(第1項)占有人於占有物上行使之權利，推定其適法有此權利。(第2項)前項推定，於下列情形不適用之：一、占有已登記之不動產而行使物權。..」民法第944條第1項規定：「占有人推定其為以所有之意思，善意、和平、公然及無過失占有。」經查，系爭土地業已登記係為原告之所有權，因此按前開民法第943條第2項第1款規定，對於已登記之不動產而為行使物權之主張者，並不受善意占有推定。次查，被告等人竟以所有之意思占用原告已登記之系爭土地，自不受民法第944條善意占用之推定。

再者，被告房屋室內無由多出3坪多，實際為之不知無權占用系爭土地。又悉等取得房屋時，均有建物測量成果圖之登記文件可稽，外加同棟4樓未如被告1至3樓有2次施工向外增建占用原告土地情形，從外觀比照之下，占用原告土地，至為顯然。被告等人誆稱不知占用原告土地，實難令人採信。

(5)末者，不當得利係為調和無法上原因之利益取得與變動，故而不當得利之成立要件，並無主觀認知之問題。因此，被告等人客觀上無權占用系爭土地至少有10年以上（最晚取得者，為被告林維政自95年4月18日取得

Exhibit 1 to Lee Declaration

Exhibit A to Petition - p. 10 of 146

所有權登記)。因此，原告請求起訴前之 5 年及至返還系爭土地之日止之不當得利，是為法許。

4.被告主張依民法第 796 條之 1，衡酌公共利益與當事人利益後拆除越界建物，並無理由(1)本件並非越界建築，自無民法地 976 條越界建築等規定之適用按民法第 796 條第 1 項規定：「土地所有人建築房屋非因故意或重大過失逾越地界者，鄰地所有人如知其越界而不即提出異議，不得請求移去或變更其房屋。」經查，縱退萬步言之，按被告等所述其取得房屋時占用系爭土地之部分，早已建築完成，非渠等所建。然而：

①系爭建物占用系爭土地之部分，均係為使用執照下來所為之二次施工。此可參原證 8，104 年 9 月 17 日土林地檢署 104 年偵續字第 275 號竊佔案件訊問筆錄：(檢察官問：所以當時建照上有無告訴人所稱之 9 平方公尺處？)辯護人答：以圖來看是沒有該處的；原證 9，104 年 12 月 3 日前開偵查訊問筆錄，被告訴訟代理人表示：我們認為 76 時，建商蓋好，就已存在。

②因此，從上述可知占用系爭土地部分係屬於二次施工，除係屬於違章建築外，興建人更係明知如再興建，自身已經超越建照、使用執照所定之基地範圍。故原興建之人 (不論係原始建商，抑或他人興建)，自係出於故意或重大過失逾越地界者，自非該當於民法第 796 條第 1 項之適用要件上之規定。更遑論，系爭占用部分，係於合法興建房屋完成及使用執照核發後，才為興建，亦非屬於原合法建築房屋興建當中持續繼續建築。換言之，係原合法建物建築完成使用執照核發後，才再為興建故意占用系爭土地部分。對此，除得以證明當初興建占用部分之人，不是出於故意；就是出於重大過失。而且，係原建照核准興建之建物興建完成後，始再為興建，故亦與民法第 796 條第 1 項規定「興建房屋 (原建物早已蓋好)」之際而致越界之情形有異。

(2)縱法院認定本件為越界建築，然本件並無民法第 796 條之 1 得免為拆除之適用①按關於鄰地所有人之忍受義務，係因土地所有人所建房屋，僅一部逾越疆界，倘予以拆除，則將損壞全部建築物之經濟價值。惟於土地所有人所建房屋外，在越界加建房屋，則鄰地所有人請求拆除，即無礙其所建房屋之整體。又鄰地所有人請求移去或變更時，法院得考量公共利益及當事人利益，免為全部或一部之移去或變更，但逾越地界行為係出自故意者，則不在此限。

I 承上述，系爭房屋越界部分係屬故意興建。使用執照核發後所為惡意侵占鄰地之違章建築，自行增建 1 至 3 樓。

II 查新北市工務局於 106 年 1 月 18 日函文之內容，並非正確。蓋查該函文表示：系爭土地領有 69 汐使字第 3213 號使用執照 (69 汐建字第 2649 號建築執照) …已無有申請建築等語。惟查，被告等之建物，其使用執照係為「台北縣政府工務局 74 汐使字第 1474 號」根本與前開工務局函文之使用執照 69 汐使字第 3213 號完全無任何關聯，故新北市工務局率斷表示系爭土地不能再為興建，實難令人採信。

III 其次，本件被告等無權占用部分係屬於二次施工，即係為使用執照核發後所為之建築。整體上，自係合法房屋完成後，再自為建築之違章建物，屬前開實務見解所指「所建房屋外，再越界加建房屋，則鄰地所有人請求拆

Exhibit 1 to Lee Declaration
4
Exhibit A to Petition - p. 11 of 146

除，即無礙其所建房屋之整理。

Ⅳ被告不斷陳稱，系爭土地係屬於「防火巷」。既如此，為了公共安全，更應拆除無權占用系爭土地之違章建築，以免造成火災之際，火勢蔓延。

②按民法第148條係規定行使權利，不得以損害他人為主要目的，若當事人行使權利，雖足使他人喪失利益，而苟非以損害他人為主要目的，即不在該條所定範圍之內。出租人出售租賃物，因承租人出價過低，乃轉售他人，圖多得售價3、4千元，其行為僅圖利己，要非以損害他人為主要目的，依上說明，顯無該條適用之餘地；按系爭建物嗷地之所有權屬於被上訴人，而上訴人占有該建物嗷地分別建蓋房屋，又無正當權源，則被上訴人提起請求拆屋還地之訴，自為法之所許，殊無權利濫用之可言；按民法第148條第1項所稱權利之行使，不得以損害他人為主要目的者，係指行使權利，專以損害他人為目的之情事而言，若為自己之利益而行使，縱於他人之利益不無損害，然既非以損害他人為主要目的，即無該條項規定之適用。

③承上所述，系爭土地遭被告林維政及其前妻卓鳳蘭無權占用從85年4月16日開始；被告鄭志利自93年8月30日開始；被告鄭劉美況自76年9月3日開始，即無權占用系爭土地迄於今日。甚至，被告林維政在系爭土地設置鐵門圍堵，排除原告使用，又於1樓屋後無權占用系爭土地而搭建鐵棚（均於刑案發回續偵中經檢察官命為拆除）。被告等人多年來惡意無權占用原告土地，然全部所有歷年地價稅卻均由原告繳納，原告如今起訴請求拆屋還地係基於所有權人正當權源，非以損害被告為目的，並無權利濫用情形。

(四)關於返還相當於租金之不當得利部分：

1.被告主張等於103年6月以前，係基於善意而占用系爭土地，因此不負返還不當得利之責任，並無理由(1)如前所述，被告等並非屬於善意占有人。

(2)系爭土地業已登記為原告之所有權，因此按前開民法第943條第2項第1款規定，對於已登記之不動產而為行使物權之主張者，並不受善意占有推定。

(3)不當得利係為調和無法上原因之利益取得與變動，故而不當得利之成立要件，並無主觀認知之問題。因此，被告等人客觀上無權占用系爭土地至少有10年以上（最晚取得者，為被告林維政自95年4月18日取得所有權登記）。因此，原告請求起訴前之5年及返還系爭土地之日之不當得利，是為法許。

2.被告主張於103年6月以後之不當得利，應由被告3人各依所得利益數額比例分擔，而非各負全部之不當得利，並無理由：

倘若被告如此主張係為之論，則實際上將造成民法第841條之1區分地上權之規定，將形成具文。再者，按民法第773條規定：「土地所有權，除法令有限制外，於其行使有利益之範圍內，及於土地之上下。」因此，系爭土地遭被告林維政現實占用1樓，2、3樓亦遭被告鄭志利等人無權占用，致原告無從使用自己土地，亦無法將層次2樓、3樓空間設定區分地上權使用。因此，被告3人應各自就其樓層無權占用面積，各負返還不當得利之

責。

3.相當於租金之不當得利應以土地法第 97 條第 1 項規定土地及建物申報總價年息百分之 10(1)系爭土地之地目係屬建地,恆具有市場上之經濟價值。

況查,從系爭土地步行數步,即可至茄萣路而有公車站牌與便利商店,附近生活機能方面。自非被告辯稱係屬防火巷、無商業活動云云之情。為此,其租金之計算仍係以百分之 10 為適當。

(2)另被告以被證 4「內政部不動產實價查詢崇德段 0000-0000 地號」之資料,稱 105 年 7 月之實價登錄為每坪 10 萬左右,而推估系爭土地每坪低於 10 萬元云云。惟查,被告所引上開出賣土地,其使用分區根本就是「道路用地」,被告故意隱瞞此事實,誤導系爭土地僅值 10 萬,甚至更低,自無法令人接受等語。

(五)聲明:

1.被告林維政應將坐落新北市○○段 0000 地號土地上面積 10.18 平方公尺之地上建物拆除,並將占有之土地返還予原告。

2.被告林維政應給付原告新臺幣(下同)42,756 元,及自起訴狀繕本送達翌日起至清償日止,按週年利率百分之五計算之利息;暨自起訴狀繕本送達翌日起至返還第一項聲明所示土地之日止,按月給付原告 713 元。

3.被告鄭志利應將坐落新北市○○段 0000 地號土地上面積 10.18 平方公尺之地上建物拆除,並將占有之土地返還予原告。

4.被告鄭志利應給付原告 42,756 元,及自起訴狀繕本送達翌日起至清償日止,按週年利率百分之五計算之利息;暨自起訴狀繕本送達翌日起至返還第一項聲明所示土地之日止,按月給付原告 713 元。

5.被告鄭劉美祝應將坐落新北市○○段 0000 地號土地上面積 10.18 平方公尺之地上建物拆除,並將占有之土地返還予原告。

6.被告鄭劉美祝應給付原告 42,756 元,及自起訴狀繕本送達翌日起至清償日止,按週年利率百分之五計算之利息;暨自起訴狀繕本送達翌日起至返還第一項聲明所示土地之日止,按月給付原告 713 元。

7.訴訟費用由被告等負擔。

8.對於第一項至第六項之聲請,願供擔保請准宣告假執行。

二、被告則以:

(一)關於拆屋還地,原告無論以契約請求權或物上請求權請求被告拆屋還地,均無理由:

1.被告簽署「拆除同意書」之意思表示係因受原告脅迫而有瑕疵:

(1)查本件自雙方發現有越界事情後,原告即積極與被告洽談價購越界部分土地事宜,然原告當初所提之價格為 800 萬元,以被告之資力顯無負擔之可能,且以越界部分之面積觀之亦不合理,雙方遂未達成價購合意。嗣後原告之代理人表示,若被告等人不願以該價格承購越界部分土地,即依法提出民刑事告訴,被告等人不諳法律,唯

Exhibit 1 to Lee Declaration

Exhibit A to Petition - p. 13 of 146

恐負擔龐大之民事賠償責任及受有牢獄之災，於此心生畏怖情形下，迫於無奈而簽署系爭同意書。

(2)再查系爭拆除同意書內容載明：「若於103年12月31日前未拆除完畢，乙方將提出占用賠償要求，並依刑法提告侵占之告訴」足見簽署同意書時，原告又再次以民刑事法律責任威逼被告等人就範。被告等人簽署系爭拆除同意書，確實係因害怕未知之法律責任，不得已而同意拆除，則被告人簽署拆除同意書之意思表示，確實係受原告脅迫而有瑕疵。

2.兩造於簽訂「拆除同意書」之後仍有商議價購事宜，即無受該同意書意思表示拘束之意：

(1)當事人互相表示意思一致者，無論其為明示或默示，契約即為成立，民法第153條第1項定有明文。是契約之成立，應以意思表示合致為其要件，倘雙方於締約後其意思表示均有變更而欲訂立新契約，應認為原契約已經意思表示不一致而失其拘束力，始符本條規範意旨。據此，於契約成立後，倘雙方就同一事情再商議而欲訂立新契約，應認為原契約已失其拘束力。

(2)本件雙方當事人於簽署系爭拆除同意書後，遂又就同一事件即購買越界部分土地再次商議承購方法及價格，且原告當時所提方案（分割出售）與原契約（拆除房屋）迥然不同，足認原告有消滅原契約而訂定新契約之意思，自應認為系爭拆除同意書已失其拘束力。

3.被告就其所有建物占用系爭土地之情，並無故意：

(1)民法第796條之1所謂「土地所有人故意逾越地界者」，係指土地所有人於建築房屋時，明知界址所在卻仍將其房屋逾越地界而建築者而言。

(2)查系爭房屋於74年8月9日即已建築完成，則被告等人於買受該房屋時，該越界狀態即已存在，難謂被告等人有故意逾越地界之情形。且倘原告主張被告等人於買受房屋後，有擴建房屋致逾越地界之情形，亦應由其負舉證責任，至今尚未見其舉證以實其說，則原告主張被告等人係故意逾越地界，並無理由。

4.被告主張依民法第796條之1，基於公共利益與當事人利益後免為拆除越界建物，應有理由：

(1)按新北市政府工務局新北工建字第10600701874號函所示：「是以，有關旨揭地號（即汐止區崇德段1297地號）涉及申請建築疑義部分，經查現行住宅區建蔽率業已調降至50%，爰此，旨揭地號土地以無法再申請建築。

(2)據此，因系爭越界部分土地既已無法再申請建築，且地處偏僻，空間狹小，亦難為其他經濟上利用，其經濟價值甚低。而原告請求被告等人拆除之部分，位於狹窄巷道之內，拆除工程勢必難以進行，亦可能損害原有建築及鄰近建築；且此項拆除工程之進行，勢必沿越界部分之牆壁切割而可能造成房屋結構及安全之危害；又此項拆除工程所需費用甚鉅，並顯高於被占用土地之價值。

故被告主張依民法第796條之1規定基於公共利益與當事人利益後免為拆除越界建物，應有理由。

5.原告請求被告拆屋還地應構成民法第148條之權利濫用：

(1)原告主張需專以損害他人為目的者，始構成權利濫用。

Exhibit 1 to Lee Declaration

7

Exhibit A to Petition - p. 14 of 146

然查民法第 148 條係規定「不得以損害他人為主要目的」，與德國民法第 226 條「專以損害他人為目的」不同，解釋上我國民法第 148 條之適用情形自較德國法為寬，且我國實務見解與學說亦多以「利益衡量說」作為判斷是否濫用權利之基礎。

(2)則本件原告請求被告拆屋還地，無論其請求權基礎係契約請求權或物上請求權，對被告所造成之損害甚大，而原告所取得之利益極少，兩者相較，自構成民法第 148 條之權利濫用。

(二)關於返還相當於租金之不當得利部分：

1.被告主張於 103 年 6 月以前，係基於善意而占用系爭土地，因此不負不當得利之責任，應有理由：

(1)民法第 943 條於 99 年修正前，係規定「占有人於占有物上行使之權利，推定其適法有此權利。」又本條雖於 99 年修正增定第 2 項之例外情形，然依民法物權編施行法第 1 條規定：「物權在民法物權編施行前發生者，除本施行法有特別規定者外，不適用民法物權編之規定；其在修正施行前發生者，除本施行法有特別規定外，亦不適用修正施行後之規定。」本件越界占用土地之情形，係於 99 年前發生，自應適用修正前民法之規定。

(2)被告等人於買受房屋時，該越界情形即已存在，然因當時未有鑑界成果圖，不知有占用他人土地之情形，故於 103 年 6 月知悉越界情形以前，自屬善意占有人。則被告等人於系爭土地上以所有之意思所行使之權利，依上開修正前民法第 943 條之規定，仍推定被告等人適法有此權利。復依同法第 952 條規定，被告等人於其推定適法所有之權利範圍內，得為占有物之使用、收益。則被告等人既然就占有物為使用、收益，自不負不當得利之返還責任。

2.被告主張於 103 年 6 月以後之不當得利，應由被告 3 人各依所得利益數額比例分擔，而非各負全部之不當得利，應有理由：

(1)按無權占有他人土地，可獲得相當於租金之利益，而土地所有人則受有相當於租金之損失，為社會通常觀念。

又相當於租金之利益，應係指土地出租後所能取得之租金而言。於一般租用基地建築房屋之情形，其租金數額多以土地面積、使用期間等作為計算之基礎，至於承租人之人數、所建房屋之樓層數，均不影響租金之計算。

(2)故被告等人雖分別為該建物 1、2、3 層樓之所有權人，但亦僅就原告土地被占用部分，各依所得利益數額比例分擔上開相當於租金之不當得利責任，而非各負全部之不當得利。

3.相當於租金之不當得利應以土地申報總價年息百分之三為標準：

(1)本件被占用土地，長期作為防火巷，且時常為街坊鄰居堆放雜物，且屬狹長型之畸零地，無法申請建築，亦無法為通常經濟上利用。且該地位於一般住宅區，幾無商業活動，難認有相當之經濟價值。依本件被占用土地之利用情形，被告等人認為應以土地申報總價年息百分之三為相當於租金之不當得利之計算標準為適當。

(2)故被告總共僅需返還自 103 年 6 月 1 日起至 105 年 2 月 1 日止共 1 年 8 個月之鄉當於租金之不當得利 3,943

元（計算式為：8,400元×9.37×0.03×1.67＝3,943元，小數點以下四捨五入），就繼續占用部分之償金，亦僅需每月支付197元（計算式：8,400元×9.37×0.03÷12＝197元，小數點以下四捨五入）。

(三)綜上所述，被告等人係因原告代理人之脅迫而簽署系爭拆除同意書，且系爭拆除同意書，亦因嗣後雙方重新意定價購土地方案而失其拘束力。又被告等人於買受系爭房屋時，該越界情形即已存在，難謂被告等人由故意逾越地界之情形，且原告被占用土地之價值極小而拆除房屋對被告所造成之損害甚鉅，則無論原告係依契約請求權或物上請求權請求被告拆除還地，均不應准許。另就被告人占用原告土地而應返還相當於租金之不當得利部分，於103年6月前，因被告等人係善意占有人，依法自不負不當得利之返還責任；於103年6月以後，被告等人亦僅依七例負擔不當得利返還責任；關於返還數額之計算基準，被告認為應以土地申報總價年息百分三為適當等語置辯。

(四)聲明：

1.原告之訴及假執行之聲請均駁回。

2.訴訟費用由原告負擔。

3.如受不利判決，願供擔保，請准宣告免為假執行。

三、本件爭執及不爭執事項：

(一)不爭執事項：

1.被告林維政、鄭志利、鄭劉美祝所有之新北市○○區○○段0000號、2817號、2818號建物（門牌號碼分別為新北市○○區○○路000巷0弄00號、20號2樓、20號3樓），占用鄰地即原告所有之前開同地段1297號土地（以下稱為系爭土地），面積10.18平方公尺（依據新北市汐止地政事務所105年6月8日複丈成果，詳如本院卷附複丈參考圖）2.被告取得前開建物之時間與原因：

(1)被告林維政：95年4月18日向前妻即訴外人卓鳳蘭購買。

(2)被告鄭志利：93年8月30日向訴外人李建興購買。

(3)被告鄭劉美祝：76年9月3日向訴外人李幸一購買。

3.原告於103年5月7日經新北市汐止地政事務所複丈後，知悉伊所有之上開土地遭占用事實。

4.原告於103年6月間向新北市汐止區調解委員會申請救前述占用土地之事進行調解，經該委員會通知被告。兩造於103年7月1日調解，並於同日簽訂「拆除同意書」，約定被告同意103年12月31日前將占用土地之部分拆除完畢。

5.兩造於調解後，曾就價購系爭土地事宜進行協調，惟未達成合意。

6.原告於104年2月13日以被告涉有竊佔、背信等罪嫌，向臺灣士林地方法院檢察署（以下簡稱為士林地檢署）提出告訴，經該署於104年6月8日以104年度偵字第7105號不起訴處分。原告不服聲請再議，經臺灣高

Exhibit 1 to Lee Declaration
9

Exhibit A to Petition - p. 16 of 146

等法院檢察署發回續查後，士林地檢署再於104年12月8日以104年度偵續字第275號不起訴處分。

(二)爭執事項：

1.關於拆屋還地部分：

(1)被告簽署「拆除同意書」之意思表示，是否因受原告脅迫而有瑕疵？

(2)兩造於簽訂「拆除同意書」之後仍有商議價購事宜，是否無受該同意書意思表示拘束之意？

(3)被告就其所有建物占用系爭土地之情，是否有故意？

(4)被告主張依民法第796條之1，基於公共利益與當事人利益後免為拆除越界建物，是否有理由？

(5)原告請求被告拆屋還地，是否構成民法第148條之權利濫用？

2.關於返還相當於租金之不當得利部分：

(1)被告主張渠等於103年6月以前，係基於善意而占用系爭土地，因此不負返還不當得利之責任，有無理由？

(2)被告主張於103年6月以後之不當得利，應由被告3人各依所得利益數額比例分擔，而非各負全部之不當得利，有無理由？

(3)相當於租金之不當得利應如何標準計算？

四、得心證之理由：

(一)原告基於兩造間契約關係，請求被告拆除渠等房屋占用系爭土地之部分為有理由：

1.查原告於103年6月間，以被告等有占用所有系爭土地之情，向新北市汐止區調解委員會聲請調解，嗣兩造於103年7月1日另行達成和解，並簽訂「同意書」，約定被告等於103年12月31日前將佔甲方（即原告）系爭土地部分拆除完畢等情，乃為兩造所不爭執，並有該同意書影本卷內可稽（105年度湖簡調字第106號卷，以下稱為調解卷，第45頁）。兩造間針對被告房屋占用原告所有系爭土地之部分，既已成立和解契約，原告依據該和解契約請求被告履行並拆除渠等房屋占用系爭土地之部分，自屬有據。

2.被告雖爭執該「同意書」係因原告訴訟代理人聲稱若不願價購即將提起民刑事訴訟之情況下，因遭脅迫所為有瑕疵之意思表示云云。

(1)然安所謂因被脅迫而為意思表示，係指因相對人或第三人以不法危害之言語或舉動加諸表意人，使其心生恐怖，致為意思表示而言；至於以提出告訴或告發犯罪為由，要求表意人為特定之意思表示者，應依個案客觀具體情況，基於「實施脅迫者」所欲實現之利益與手段間是否具有正當之內在關聯，以判斷是否屬不法之危害。查本件原告知悉被告房屋有占用系爭土地之事實後，乃由伊訴訟代理人蔡宗合代理與被告等進行協商，其間要求被告以每坪50萬元代價購買，惟因被告等無力負擔，原告乃稱欲透過訴訟途徑主張權利，雙方遂於103年7月1日合意簽署前開「同意書」等情，為被告於渠等被訴竊佔等刑事案件之警詢、偵訊中一致陳明（臺灣士林地方法院檢察署，以下簡稱為士林地檢署，104年度他字第779號，以下稱為他字卷，第23頁至第27頁、第88頁），經

Exhibit 1 to Lee Declaration

Exhibit A to Petition - p. 17 of 146

核與原告之代理人蔡宗合所為陳述亦可相符（前揭他字卷第28頁、第88頁），應可採信；而原告聲稱若不償購即進行民、刑事訴訟，經驗法則上固然可認對被告產生相當之心理壓力，惟系爭之房屋占用系爭土地既屬事實，原告本有主張所有權保障之立場；至於原告所提償購系爭土地之條件雖有嚴苛之嫌，然被告、原告訴訟代理人蔡宗合於上開偵查程序中亦均稱事後仍有繼續協商購地價格之情（前揭他字卷第88頁），本院審酌原告以訴訟為手段，要求被告等償購系爭土地，惟等則因無法負擔原告請求之高價而妥協簽定「同意書」，承諾願於103年12月31日拆除占用系爭土地之部分等情，被告等仍未達意思表示自由已經喪失之程度，被告抗辯稱於原告脅迫下始簽署「同意書」云云，遂不可採。

(2)另一方面，因遭脅迫而產生之意思表示瑕疵，依民法第92條第1項規定，其效力僅為得撤銷，而非無效，表意人並應於脅迫終止後1年除斥期間內行使撤銷權，復為同法第93條所明定。本件縱以被告等均遭原告脅迫，始於103年7月1日簽署「同意書」承諾願自行拆除占用系爭土地之房屋部分，然被告等其後迄於原告提起本件訴訟之105年2月間，均未有何主張撤銷遭脅迫意思表示之作為，顯然已逾前揭除斥期間，基於交易安全之保障，被告於「同意書」所為之意思表示，其效力已屬確定，是被告再主張有遭脅迫而為簽署之情，亦無足取。

3.被告又主張兩造於簽定「同意書」之後，事後仍有續行協商償購系爭土地之情，抗辯兩造已無受該「同意書」拘束之意云云。查原告原主張被告等應以每坪50萬元之代價購買系爭土地全部，且不得分割購買，嗣兩造於103年7月1日簽訂「同意書」後，針對系爭土地能否分割購買、以及土地單價等仍有繼續協商之情，有被告3人於偵訊中所為陳述可稽（前揭他字卷第88頁），原告訴訟代理人蔡宗合於偵訊中亦為相同之陳述，可見兩造簽署拆除占用部分之「同意書」後，仍確仍有繼續協商償購系爭土地之事實。

然而，兩造間既未就償購系爭土地達成合意，已不能謂果等間有以新契約取代原有「同意書」之情；其次，兩造所簽訂了之「同意書」就雙方所負權利義務關係，已有清楚約定，關於如何處理被告房屋占用系爭土地之節，意思表示乃相合致，因此成立之和解契約效力復無瑕疵，又該「同意書」中並未約定類如「若雙方繼續協商償購事宜」則喪約終止或失效之解除條件，被告復未舉證證明有何其他使該「同意書」終止失效的事實，自不能僅因兩造有洽談另一權利義務關係之作為，而認既存之契約關係已經消滅，被告此項抗辯自非可採。

(二)被告等主張應免為房屋之拆除，認屬有據：

1.按權利之行使，不得以損害他人為主要目的，為民法第148條所明定。而權利之行使，是否以損害他人為主要目的，應就權利人因權利行使所能取得之利益，與他人及國家社會因其權利行使所受之損失，比較衡量以定之。倘其權利之行使，自己所得利益極少而他人及國家社會所受之損失甚大者，非不得視為以損害他人為主要目的，此乃權利社會化之基本內涵所必然之解釋，最高法院71台上字第737號著有判例。查本件系爭土地係位於被告等房屋所坐落基地即新北市○○區○○段0000地號、與另一筆同段1298地號土地間，前開兩筆土地均有建物坐落其上，系爭土地乃成為兩建物間堆放雜物之狹窄空間，此有現場照片在卷可資比對（本院卷第69頁）；次經

Exhibit 1 to Lee Declaration

Exhibit A to Petition - p. 18 of 146

本院依職權向新北市政府工務局詢問系爭土地依規定能否建築房屋，則覆稱略以「…旨揭地號土地領有 69 汐使字第 3213 號使用執照（68 汐建字第 2649 號建築執照）在案…經調閱 69 汐使字第 3213 號使用執照（68 汐建字第 2649 號建築執照）檔卷，按卷附申請資料及面積計算表顯示，本案建造執照申請時之土地使用分區為住宅區，法定建蔽率為 60%，設計建蔽率為 60%。是以，有關旨揭地號土地涉及申請建築疑義部分，經查現行住宅區建蔽率業已調降至 50%，爰此，旨揭地號土地以無法再申請建築。」有該局 106 年 1 月 18 日新北工建字第 1060070184 號函卷內可稽。==是系爭土地之地目雖屬建地，惟依新北市政府工務局前揭說明，並無新建造房屋之可能，再審以該土地為兩建物間狹窄通道空間之客觀事實，足認系爭土地之經濟利用效益不大。另一方面，被告等之房屋有越界占用系爭土地，固為事實，然逾越界之部分乃為房屋增建之角落，面積僅為 10.18 平方公尺，姑不論拆除該越界部分在執行層面上是否困難或耗費甚鉅，衡量被告等房屋遭拆除後必須進行之修補、固定等工程以及相應之花費，與原告因此所得未有侵越、然使用價值甚低之系爭土地之利益，可認並不相當，是原告主張拆除被告等房屋越界占用系爭土地之部分，已有違民法第 148 條而構成權利濫用之虞。==

2.次按土地所有人建築房屋逾越地界，鄰地所有人請求移去或變更時，法院得斟酌公共利益及當事人利益，免為全部或一部之移去或變更。但土地所有人故意逾越地界者，不適用之。民法第 796 條之 1 第 1 項定有明文。又該條項之規定於其他土地、建築物利用人準用之，同法第 800 條之 1 亦規定清楚。本件被告 3 人分別於 76 年間（被告鄭劉美祝）、93 年間（被告鄭志利）及 95 年間向第三人購買而取得渠等房屋之所有權，均如前述，而門牌號碼即新北市○○區○○路 000 巷 0 弄 00 號建物於 74 年 8 月 9 日建築完成，則有該建物之登記第二類謄本可考（調解卷第 11 頁）；另依原告於偵查中所提供系爭土地周邊於 74 年、76 年、98、103 年，與 83 年間之空照圖（士林地檢署 104 年度偵續字第 275 號卷，第 77 頁、第 83 頁至第 85 頁，他字卷第 96 頁、第 97 頁）觀之，被告等房屋於 74 年 10 月 12 日與 76 年 11 月 1 日之空照圖，尚難辨識有增建之情形，而 83 年之後的空照圖（前開他字卷第 96 頁）則明顯可見該房屋已有增建，是該房屋之增建約晚於 76 年至 83 年間所為，當可推論；末衡諸起造人於房屋建造完成，送請地方政府建管單位審查通過並取得使用執照後，進行二次施工向外增建，藉此擴張室內可用面積並提高房屋售價之情形並非罕見，就購買增建後房屋之後手而言，其關注者僅為出賣人所宣稱之房屋面積是否正確，至於房屋之增建是否因出越界而侵入鄰地，當非買受人所關心者，故均非原始起造人之被告等係以現狀購買房屋，應符於情理，而渠等微使知悉房屋有二次施工增建之情，惟抗辯不知增建部分有越界而占用系爭土地等語，仍屬可採。而被告對於建物逾越地界既非故意，又基於前揭有關移去越界部分所涉公共利益、當事人利益之權衡，被告依據民法第 796 條之 1 第 1 項前段規定，請求免為越界部分之移去，亦屬可採。

(三)原告請求被告給付相當於租金之不當得利，為有理由。

1.按無權占有他人土地，可能獲得相當之租金之利益，此為社會通常之觀念，是被占用土地之所有權人依不當得利之法則請求返還不當得利，自屬有據，最高法院 61 年台上字第 1695 號民事判例可資參照。被告之房屋既有占

用系爭土地之事實，原告基於不當得利之法律關係，向被告請求相當於租金之不當得利，自屬有理。

2.被告雖主張渠等人住時均不知有占用之事實，然依民法第 182 條第 1 項規定，僅於所受利益已不存在之情況下，免負返還或償還價額之責任。渠等依據民法第 943 條規定，主張基於善意而為占有，縱或屬實，仍不解免因無權占有而受有利益之事實，且該占有狀態仍持續中，占有之利益仍然存在，自不能主張免負返還或償還價額之責任。

(四)相當於租金之不當得利數額之計算1.被告等分別係於 76 至 95 年間因購買取得現有房屋之所有權，且渠等購買時，該房屋之增建均已完成而有占用系爭土地之事實，故原告主張被告等占用期間均超過 5 年，乃可認定，伊請求被告等給付起訴前 5 年無權占有所產生相當於租金之不當得利，亦有理由。被告等抗辯於原告聲請調解並測量後始知有占用之事實，縱然為真，並不能解免返還責任，已如前述。

2.至於相當於租金之不當得利數額，除以申報地價為基礎外，尚須斟酌基地之位置、工商業繁榮之程度及占用人利用土地之經濟價值及所受利益等項，並與鄰地租金相比較，以為決定，並非必達申報地價年息百分之十之最高額。最高法院 88 年度台上字第 3331 號民事裁判可資參照。本件系爭土地之位置及現今利用情形，業如前述；再酌以系爭土地附近約為 3 層樓或 4 層樓區分所有權建物，屬於巷弄內之住宅，1 樓有少數店面，建物多屬老舊，巷口出去有崇德國小，最近公車站牌是位於茄苳路上及忠孝東路才有等情，亦據本院內湖簡易庭法官現場勘驗清楚，製有勘驗筆錄為憑（調解卷第 55 頁），可認系爭土地周邊尚非工商業繁榮之區塊，故原告主張依申報地價年息百分之十計算相當於租金之不當得利，認為過高，而以被告等所主張申報地價年息百分之三之計算方式較為可採。

3.又相當於租金之不當得利，應以對方所受之利益為度，非以請求人所受損害若干為準，最高法院前揭判例及判決意旨亦有闡明。被告等各自所有之 1 至 3 樓房屋，既均有占用系爭土地之事實，從被告等室內可使用空間因此擴大而受有利益之觀點而言，當認各自受有依占用面積為計算基準之利益，是原告主張被告應各自全額負擔，應有理由，被告等主張以所得利益比例分擔，則不採取。

4.計算方式：

(1)起訴前 5 年：申報地價每平方公尺 8,400 元×10.18 平方公尺×年息 0.03×5＝12,827 元（元以下四捨五入）

(2)起訴後每月：申報地價每平方公尺 8,400 元×10.18 平方公尺×年息 0.03÷12＝214 元（元以下四捨五入）五、末按給付無確定期限者，債務人於債權人得請求給付時，經其催告而未為給付，自受催告時起，負遲延責任。其經債權人起訴而送達訴狀，或依督促程序送達支付命令，或為其他相類之行為者，與催告有同一之效力；遲延之債務，以支付金錢為標的者，債權人得請求依法定利率計算之遲延利息；應付利息之債務，其利率未經約定，亦無法律可據者，週年利率為 5%，民法第 229 條第 2 項、第 233 條第 1 項前段及第 203 條分別有明文。查本件原告請求被告給付相當於租金之不當得利係屬無確定期限者，又係以支付金錢為標的，原告請求被告各自起訴狀

13

Exhibit 1 to Lee Declaration

Exhibit A to Petition - p. 20 of 146

繕本送達翌日即 105 年 4 月 2 日、4 月 1 日起（起訴狀繕本分別於 105 年 4 月 1 日送達被告林維政，3 月 31 日送達被告鄭志利、鄭劉美祝，參見調解卷第 21 頁至第 23 頁）至清償日止，按法定利率 5%計算之遲延利息，於法有據，應予准許。

六、又本件命被告給付之金額，未逾 500,000 元，依民事訴訟法第 389 條第 1 項第 5 款，應依職權宣告假執行；至於原告敗訴部份，其假執行之聲請即失所附麗，應予駁回。被告另陳明如受不利判決，願供擔保請求免為假執行，爰酌定相當金額，宣告免為假執行。

七、本件事證已臻明確，兩造其餘之攻擊或防禦方法及所用之證據，經本院斟酌後，認為均不足以影響本判決之結果，爰不逐一論列，附此敘明。

據上論結，本件原告之訴為一部有理由，一部無理由，依民事訴訟法第 79 條、第 85 條第 1 項、第 389 條第 1 項第 5 款、第 392 條第 2 項，判決如主文。

中　　華　　民　　國　　106　　年　　3　　月　　29　　日

　　　　　　　　民事第一庭法　官　吳坤芳

以上正本係照原本作成。

如對本判決上訴須於判決送達後 20 日內向本院提出上訴狀。如

委任律師提起上訴者，應一併繳納上訴審裁判費。

中　　華　　民　　國　　106　　年　　3　　月　　29　　日

　　　　　　　　書記官　翁仕衡

歷審裁判

相關法條

土地法第 97 條、民事訴訟法第 79 條、民事訴訟法第 85 條、民事訴訟法第 389 條、民事訴訟法第 392 條、民法第 92 條、民法第 93 條、民法第 148 條、民法第 153 條、民法第 182 條、民法第 203 條、民法第 226 條、民法第 229 條、民法第 233 條、民法第 773 條、民法第 796 條、民法第 796-1 條、民法第 800-1 條、民法第 841-1 條、民法第 943 條、民法第 944 條、民法第 952 條、民法物權編施行法第 1 條

Exhibit 1 to Lee Declaration

14

Exhibit A to Petition - p. 21 of 146

Taiwan Shilin District Court Case No. 1572 of 2016

【Case Number】 105, Su, 1572

【Date of Judgment】 March 29, 2017

【Subject Matter】 Demolition of Buildings and Return of Land, etc.

【Judgment Text】

Civil Judgment of the Shilin District Court, Taiwan

Case No. 1572 of 2016

Plaintiff: Chen Hui-Tse

Legal Representative: Attorney Chang Ke-xi, Tsai Tsung-ho

Additional Representative: Attorney Chen Hongbin

Defendants: Lin Weizheng, Zheng Zhili, Zheng Liumeizhu

Co-Representative Attorney Guo Detian

Attorneys for the Defendant: Attorney Li Quanhe, Attorney Lin Zhenghao

Additional Representative: Attorney You Yihua

Regarding the aforementioned parties' case involving demolition of structures and return of land, this Court concluded oral arguments on March 8, 2017, and hereby issues the following judgment:

Main Text

Defendant Lin Wei-cheng shall pay the plaintiff NT$12,827, plus interest calculated at an annual rate of 5% from April 2, 2016 until the date of full payment. Additionally, defendant Lin Wei-cheng shall pay the plaintiff NT$214 monthly starting from April 2, 2016.

Defendants Zheng Zhil and Zheng Liumeizhu shall each pay the plaintiff NT$12,827, plus interest calculated at an annual rate of 5% from April 1, 2016, until the date of full payment; and each shall pay the plaintiff NT$214 monthly starting from April 1, 2016. The plaintiff's remaining claims are dismissed.

The defendant shall bear one-tenth of the litigation costs, with the remainder borne by the plaintiff.

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 22 of 146

Paragraphs 1 and 2 of this judgment may be provisionally enforced. However, if the defendant provides the plaintiff with security in the amount of NT$12,827 prior to the commencement of each provisional enforcement proceeding, provisional enforcement may be waived.

The plaintiff's remaining applications for provisional enforcement are dismissed.

Facts and Reasons

I. Plaintiff's Claims:

(1) The plaintiff is the sole owner of the land parcel numbered 0000 in Section ○○, District ○○, New Taipei City (hereinafter referred to as the "Disputed Land"). The disputed land is unlawfully occupied by the owners of the buildings located at No. 00, Lane 00, Alley 00, ○○ Road, ○○ District, New Taipei City ( ), specifically: Defendant Lin Weizheng occupies the 1st floor, Defendant Zheng Zhili occupies the 2nd floor, and Defendant Zheng Liu Meizhu occupies the 3rd floor, each unlawfully occupying 10.18 square meters of the land.

(2) On July 1, 2014, the three defendants issued a consent letter to the plaintiff stating: "Both parties agree to proceed with the demolition and land return matters concerning the land at Chongde Section 1297, Xizhi District. The consent letter is signed as follows: Party A agrees to complete the demolition of the portion occupying the aforementioned land by December 31, 2014." (3) Regarding the demolition and land return:

1. The plaintiff did not coerce the defendants into signing the "Demolition Consent Agreement." (1) Where a party claims their declaration was made due to fraud or coercion, they bear the burden of proving the facts of such fraud or coercion. The defendant claims signing the "Demolition Consent Form" was coerced by the plaintiff, yet no evidence was presented.

(2) The plaintiff denies coercing the defendant to sign the "Demolition Consent Form." Moreover, the form was executed on July 1, 2014, at the Xizhi District Office Mediation Committee. Furthermore, defendants Lin Wei-cheng, Zheng Zhi-li, and Zheng Liu Mei-zhu all stated during the investigative hearing of Case No. 7105 of the 104th Year at the Shilin District Prosecutors Office that they signed the agreement presented by the complainant, i.e., the plaintiff, after reviewing it.

(3) Therefore, the "Demolition Consent Form" constitutes an agreement between both parties. The three defendants must comply with its terms by demolishing and returning the portion of the plaintiff's land they occupied.

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 23 of 146

2. Although both parties discussed purchasing the property during negotiations for the "Demolition Consent Form," they did not reach a mutual agreement to terminate the form, nor did any new agreement replace it. (1) If a party to a contract wishes to terminate it, aside from statutory grounds for termination, it depends on whether the contract grants unilateral termination rights or if the parties mutually agreed to terminate it. Upon examination, the "Demolition Consent Agreement" contains no provision allowing the defendants to unilaterally terminate it. Furthermore, the defendants have not demonstrated any evidence of a mutual agreement to terminate the "Demolition Consent Agreement."

(2) Moreover, the determination and elements of the criminal offense of unlawful occupation differ from the civil offense of breach of contract. The disputed consent form clearly stipulates that the three defendants agreed to complete the demolition of the portion of the plaintiff's land they occupied by December 31, 2014. Therefore, the three defendants are bound by this agreement. When the consent form was executed on July 1, 2014, the plaintiff generously granted the defendants six months to prepare for demolition. Unexpectedly, the defendants failed to comply by late October of the same year. They even repeatedly expressed false intentions to negotiate a purchase, attempting to evade the elements of the criminal offense of trespass. Although the defendants expressed an intention to purchase the land from the plaintiff after signing the agreement, there was no mutual agreement, as claimed by the defendants, that the plaintiff would waive the right to request demolition and return of the land as stated in the agreement if the purchase failed.

(3) Furthermore, the defendant's litigation representative stated during the Shilin District Prosecutors Office investigation into the disputed land's unlawful occupation: "In April 2014, upon learning of the house's encroachment, we coordinated with the landowner. We never refused to demolish or purchase; the issue was solely the price." The representative also stated during the investigation: "... the defendant and others were willing to resolve the matter, but because the acquisition price could not be agreed upon, and we were aware of the situation regarding the agreement (referring to the demolition consent agreement), we were also willing to cooperate. However, because negotiations later failed, and the plaintiff also pursued criminal proceedings." He further stated: "...if negotiations had been successful, demolition would not have been necessary. It was not intentional non-demolition. Demolition would not have occurred before a resolution was reached; it was not intentional trespass. The facts established prior to trial indicate that although negotiations for a purchase price failed, on May 20, September 17, and December 3, 2015, the defendants' legal representatives repeatedly acknowledged their willingness to demolish and comply with the terms of the Demolition Consent Agreement... No mutual agreement was evident, as the parties' price negotiation itself would have exempted the

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 24 of 146

defendant from the demolition obligation stipulated in the "Demolition Consent Form." Therefore, the defendant's argument that the parties were not bound by the "Demolition Consent Form" is unfounded.

3. The defendant intentionally and maliciously occupied the disputed land, as detailed below: (1) The interior area of the defendant's house increased by as much as 3.079 ping (10.18 square meters). When the defendant purchased or acquired the disputed house, whether from the sales contract, building abstract, building survey results, or other objective evidence of actual usage area, it was readily apparent whether they had the right to occupy the disputed land for the second construction violation.

(2) The building housing the disputed property did not have a fourth floor constructed sequentially upward from the ground floor to the third floor, as claimed by the defendant. In other words, the fourth floor of the building housing the disputed property was never added. Therefore, by comparing the exterior with the fourth-floor structure, it is evident that the additional portions constitute illegal additions.

(3) Defendant Lin Weizheng even deliberately sealed off all external access routes to the disputed land with stainless steel gates, appropriating the entire plot for his own exclusive use while completely excluding the plaintiff's possession. Furthermore, he occupied 3.6 ping of the disputed land behind the first-floor structure to erect a steel shed.

(4) Furthermore, the defendants claim they were bona fide possessors prior to June 2014, asserting their occupation was based on an intent to possess as owner. They argue this falls under Article 952 of the Civil Code, which states that a bona fide possessor is presumed to have lawful rights within the scope of such possession… and thus owes no obligation to return the property to the plaintiff. However, Article 943 of the Civil Code (limiting the presumption of possessory rights) provides: "(1) A possessor exercising rights over the possessed property is presumed to have lawful rights thereto. (2) The presumption in the preceding paragraph shall not apply in the following circumstances: (i) exercising property rights over registered immovable property…" Article 944(1) of the Civil Code provides: "A possessor is presumed to possess in good faith, peacefully, openly, and without fault with the intention of ownership." Upon investigation, the disputed land has been registered as the plaintiff's property. Therefore, pursuant to the aforementioned Article 943(2)(1) of the Civil Code, those asserting property rights over registered immovable property are not subject to the presumption of bona fide possession. Furthermore, the defendants occupied the plaintiff's registered disputed land with the intent to possess it as their own, and thus are not covered by the presumption of bona fide possession under Article 944 of the Civil Code. Furthermore, the interior of the defendants' house cannot reasonably account for the excess of over 3 ping (approximately 10 square

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 25 of 146

meters). It is difficult to believe they were unaware of their unauthorized occupation of the disputed land. Moreover, when they acquired the house, there were registered documents verifying the building survey results. Additionally, unlike the first to third floors of the same building, which underwent two construction phases to expand outward and occupy the plaintiff's land, the fourth floor did not. Comparing the exteriors, the occupation of the plaintiff's land is abundantly clear. The defendants' claim of ignorance regarding their occupation of the plaintiff's land is scarcely credible.

(5) Lastly, unjust enrichment serves to reconcile the acquisition and alteration of benefits arising from causes beyond one's control. Therefore, the establishment of unjust enrichment does not hinge on subjective knowledge. Objectively, the defendants have occupied the disputed land without right for at least 10 years (the latest acquisition being Defendant Lin Wei-cheng's ownership registration on April 18, 2006). Thus, the plaintiff's claim for unjust enrichment covering the five years prior to filing this lawsuit and extending until the disputed land is returned is legally justified.

4. The defendants' argument that they demolished the encroaching structure after balancing public and private interests under Article 796-1 of the Civil Code is unfounded. (1) This case does not involve encroaching construction, rendering Article 976 of the Civil Code inapplicable. Pursuant to Article 796(1) of the Civil Code: "Where a building constructed by a landowner does not exceed the land boundary due to intentional or grossly negligent conduct, the owner of an adjacent land who knew of the encroachment but failed to raise an objection promptly may not request removal or alteration of the building." Upon examination, even if we concede the point, the portion of the disputed land occupied by the building at the time of the defendant's acquisition had already been constructed long before and was not built by them. However:

① The portion of the disputed building occupying the disputed land was constructed during secondary construction undertaken after the building permit was issued. This can be referenced in Exhibit 8, the interrogation record of the land occupation case No. 275 of 2015, conducted by the Tulin District Prosecutors Office on September 17, 2015: (Prosecutor: So, was the 9-square-meter area mentioned by the complainant included in the building permit at that time? Defense Counsel replied: Based on the drawings, that area was not included.) Original Exhibit 9, the aforementioned interrogation record dated December 3, 2015, shows the defendant's litigation representative stating: We believe that by 1987, when the developer completed construction, it already existed.

② Therefore, it can be understood from the above that the portion of the disputed land occupied constitutes secondary construction. Not only is it an illegal structure, but the builder was also fully aware that any further construction would exceed the site boundaries

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 26 of 146

specified in the building permit and occupancy permit. Thus, the original builder (whether the original developer or another party) acted with intent or gross negligence in overstepping the property boundary, and thus does not meet the requirements for the application of Article 796, Paragraph 1 of the Civil Code ( ). Moreover, the disputed encroachment occurred after the lawful building was completed and the occupancy permit issued, not as a continuation of construction within the original lawful building. In other words, the intentional encroachment on the disputed land occurred after the lawful building was completed and the occupancy permit issued. In this regard, it can be demonstrated that the person who originally constructed the encroaching portion did so either unintentionally or through gross negligence. Moreover, since the construction occurred after the building approved under the original building permit was completed, it differs from the scenario described in Article 796, Paragraph 1 of the Civil Code, where encroachment occurs during the construction of a building (where the original building had already been constructed).

(2) Even if the court determines this case involves boundary-encroaching construction, Article 796-1 of the Civil Code, which exempts such structures from demolition, does not apply. Regarding the neighboring landowner's obligation to tolerate encroachment, this applies only when the landowner's building only partially encroaches on the boundary. Demolishing it would diminish the economic value of the entire structure. However, when a building is constructed beyond the boundary of the landowner's original structure, the adjacent landowner's request for demolition does not affect the integrity of the original building. Furthermore, when a neighboring landowner requests removal or alteration, the court may consider public interest and the parties' interests to exempt all or part of the removal or alteration. However, this exemption does not apply if the boundary encroachment was intentional.

I. Based on the above, the disputed building's encroaching portion was intentionally constructed. This constitutes a malicious encroachment on neighboring land through unauthorized construction, with the addition of floors 1 to 3 after the issuance of the occupancy permit.

II. The content of the letter issued by the New Taipei City Public Works Bureau on January 18, 2017, is not accurate. The letter states: The disputed land holds Occupancy Permit No. 69 Xishih Zi No. 3213 (Building Permit No. 69 Xishih Jian Zi No. 2649) …no further building applications are permitted." However, the building permit for the defendants' structure is "Taipei County Government Public Works Bureau 74 Xishih No. 1474," which bears no relation whatsoever to the aforementioned Public Works Bureau letter's permit 69 Xishih

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 27 of 146

No. 3213. Therefore, the New Taipei City Public Works Bureau's sweeping assertion that no further construction is permitted on the disputed land is hardly credible.

III. Secondly, the portion unlawfully occupied by the defendants constitutes secondary construction, i.e., building work undertaken after the issuance of the occupancy permit. Overall, it involves the construction of illegal structures after the completion of a lawful building. This falls under the practical interpretation that "where buildings are constructed beyond the boundaries of the original structure, the adjacent landowner's request for demolition does not affect the maintenance of the original building."

IV. The defendant repeatedly claims that the disputed land constitutes a "fire lane." If so, for public safety, the unauthorized structures on the disputed land should be demolished to prevent fire spread during a fire.

② Article 148 of the Civil Code stipulates that exercising rights shall not have causing harm to others as its primary purpose. If exercising a right causes another to lose benefits but does not have causing harm as its primary purpose, it falls outside the scope of this provision. When a lessor sells leased property because the lessee's offer is too low and instead sells it to another party to gain an additional 3,000 or 4,000 yuan in proceeds, such conduct seeks only personal gain and does not primarily aim to harm others. Based on the foregoing, Article 148 clearly does not apply. The ownership of the disputed building site belongs to the appellee. The appellant occupies the site and constructed buildings thereon without legitimate authority. Therefore, the appellee's lawsuit seeking demolition and return of the land is legally permissible and does not constitute an abuse of rights. The requirement in Article 148(1) of the Civil Code that the exercise of a right shall not have the primary purpose of harming others refers specifically to conduct where the exercise of the right is undertaken solely for the purpose of harming others. If the exercise is for one's own benefit, even if it causes some harm to others' interests, it does not fall under the primary purpose of harming others and thus the provision does not apply.

③ As stated above, the disputed land has been unlawfully occupied by Defendant Lin Wei-cheng and his former wife Zhuo Feng-lan since April 16, 1996; by Defendant Zheng Zhi-li since August 30, 2004; and by Defendant Zheng Liu Mei-zhu since September 3, 1987, continuing to the present day. Moreover, Defendant Lin Wei-cheng erected an iron gate to block access to the disputed land, preventing the Plaintiff's use, and constructed an unauthorized iron shed on the disputed land behind the first-floor house (both structures were ordered demolished by the prosecutor during the reinvestigation of the criminal case). The defendants have maliciously occupied the plaintiff's land without right for many years. However, all annual land value taxes were paid by the plaintiff. The plaintiff now sues to request the demolition of structures and return of the land based on the legitimate source

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 28 of 146

of ownership rights, not with the purpose of harming the defendants, and there is no abuse of rights.

(4) Regarding the claim for restitution of unjust enrichment equivalent to rent:

1. The defendants argue that their occupation of the disputed land prior to June 2014 was in good faith, thus exempting them from liability for restitution of unjust enrichment. This argument is without merit: (1) As previously stated, the defendants do not qualify as bona fide possessors.

(2) The disputed land has been registered as the plaintiff's property. Therefore, pursuant to Article 943, Paragraph 2, Item 1 of the Civil Code, those asserting property rights over registered immovable property are not protected by the presumption of bona fide possession.

(3) Unjust enrichment serves to reconcile the acquisition and alteration of benefits arising from unwarranted causes. Thus, the establishment of unjust enrichment does not involve issues of subjective knowledge. Therefore, the defendants objectively lacked the right to occupy the disputed land for at least 10 years (the latest acquisition being Defendant Lin Weizheng's registration of ownership on April 18, 2006). Consequently, the plaintiff's claim for unjust enrichment covering the five years prior to filing the lawsuit and extending until the date of the disputed land's return is legally justified.

2. The defendants' contention that unjust enrichment after June 2014 should be apportioned proportionally among the three defendants based on their respective benefits received, rather than each bearing the full amount of unjust enrichment, is without merit: If the defendants' argument were accepted, it would effectively render the provisions of Article 841-1 of the Civil Code concerning the distinction of surface rights a mere formality. Furthermore, Article 773 of the Civil Code stipulates: "Except as restricted by law, the ownership of land extends to the upper and lower spaces of the land to the extent necessary for the exercise of beneficial rights." Therefore, the disputed land is currently occupied by Defendant Lin Weizheng on the first floor, while the second and third floors are unlawfully occupied by Defendant Zheng Zhili and others. This prevents the plaintiff from using their own land and from establishing a separate easement for the second and third floor spaces. Consequently, the three defendants should each bear the responsibility to return the unjust enrichment corresponding to the area they unlawfully occupy on their respective floors.

3. Unjust enrichment equivalent to rent shall be calculated at an annual interest rate of 10% of the total declared value of the land and buildings under Article 97(1) of the Land Act. (1) The disputed land is classified as building land and inherently possesses market

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 29 of 146

economic value. Moreover, a short walk from the disputed land leads to Qiaodong Road, where a bus stop and convenience store are located, indicating nearby living amenities. This contradicts the defendants' claim that the area is a fire lane with no commercial activity. Therefore, a 10% interest rate remains appropriate for calculating the rent.

(2) The defendant further cited evidence 4, "Ministry of the Interior Real Estate Transaction Price Inquiry for Chongde Section, Lot No. 0000-0000," claiming that the July 2016 transaction price was approximately NT$100,000 per ping, and thus estimated the disputed land to be worth less than NT$100,000 per ping. However, upon examination, the land cited by the defendant for sale is zoned as "roadway land." The defendant intentionally concealed this fact, misleadingly suggesting the disputed land is worth only NT$100,000 per ping or even less, which is unacceptable.

(5) Declaration:

1. Defendant Lin Wei-cheng shall demolish the above-ground structure occupying an area of 10.18 square meters on the land located at Plot No. 0000, Section ○○, New Taipei City, and return the occupied land to the plaintiff.

2. Defendant Lin Weizheng shall pay the plaintiff NT$42,756, plus interest calculated at an annual rate of 5% from the day following service of the complaint copy until the date of full payment; and shall pay the plaintiff NT$713 monthly from the day following service of the complaint copy until the date of return of the land specified in the first declaration.

3. Defendant Zheng Zhilì shall demolish the above-ground structure occupying an area of 10.18 square meters on the land located at Plot No. 0000, Section ○○, New Taipei City, and return the occupied land to the plaintiff.

4. Defendant Zheng Zhili shall pay the plaintiff NT$42,756, plus interest calculated at an annual rate of five percent from the day following service of the complaint until the date of payment; and shall pay the plaintiff NT$713 monthly from the day following service of the complaint until the date of return of the land specified in Paragraph 1.

5. Defendant Zheng Liuzhu shall demolish the above-ground structure occupying an area of 10.18 square meters on the land located at Plot No. 0000, Section ○○, New Taipei City, and return the occupied land to the plaintiff.

6. Defendant Zheng Liu Meizhu shall pay the plaintiff NT$42,756, plus interest calculated at an annual rate of five percent from the day following service of the complaint copy until the date of full payment; and shall pay the plaintiff NT$713 monthly from the day following service of the complaint copy until the date of return of the land specified in Item 1 ( ).

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 30 of 146

7. The litigation costs shall be borne by the defendants.

8. Regarding the claims in items 1 through 6, the defendant is willing to provide security and requests permission for provisional enforcement.

2. The defendant argues as follows:

(1) Regarding the demolition of the house and return of the land, the plaintiff's claim against the defendant, whether based on contractual rights or rights in rem, is without merit:

1. The defendant's expression of intent in signing the "Demolition Consent Form" was vitiated due to coercion by the plaintiff:

(1) Upon discovering the boundary encroachment, the plaintiff actively negotiated with the defendant to purchase the encroached land. However, the plaintiff's initial offer of NT$8 million was clearly unaffordable for the defendant given his financial capacity and unreasonable considering the encroached area, preventing a purchase agreement. Subsequently, the plaintiff's representative stated that if the defendant and others refused to purchase the encroached land at that price, civil and criminal complaints would be filed according to law. The defendant and others, unfamiliar with the law, feared incurring substantial civil liability and facing imprisonment. Under these intimidating circumstances, they reluctantly signed the disputed consent form.

(2) Furthermore, the disputed demolition consent form explicitly states: "If demolition is not completed by December 31, 2014, Party B will demand compensation for unlawful occupation and file a criminal complaint for trespass." This clearly demonstrates that at the time of signing, the plaintiff again coerced the defendants into compliance by threatening civil and criminal legal liability. The defendants' signing of the disputed demolition consent form was indeed compelled by fear of unknown legal consequences, leaving them no choice but to agree to the demolition. Thus, their expression of intent in signing the demolition consent form was indeed vitiated by the plaintiff's coercion.

2. After signing the "Demolition Consent Form," both parties continued to negotiate a purchase price, indicating they were not bound by the consent form's terms:

(1) Article 153(1) of the Civil Code explicitly states that a contract is formed when the parties mutually express their agreement, whether explicitly or implicitly. Thus, the formation of a contract requires the convergence of expressions of intent. If both parties alter their expressions of intent after contracting and seek to establish a new contract, the original contract should be deemed to have lost its binding force due to a divergence of intent, thereby conforming to the legislative intent of this provision. Accordingly, if the

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 31 of 146

parties renegotiate the same matter after contract formation to establish a new agreement, the original contract shall be deemed to have lost its binding force.

(2) In this case, after signing the disputed demolition consent form, the parties renegotiated the same matter—purchasing the encroaching land—regarding acquisition methods and price. Moreover, the plaintiff's proposed solution (divisional sale) at that time (demolition of buildings) were fundamentally different, sufficiently demonstrating the plaintiff's intent to extinguish the original contract and establish a new one. Consequently, the disputed demolition consent form should be deemed to have lost its binding force.

3. The defendant did not act intentionally in occupying the disputed land with its structures:

(1) Article 796-1 of the Civil Code, which refers to "landowners intentionally encroaching on boundaries," pertains to situations where landowners construct buildings while fully aware of the boundary lines and deliberately extend the structures beyond those lines.

(2) The disputed building was completed on August 9, 1985. Therefore, when the defendants purchased the building, the encroachment already existed. It cannot be said that the defendants intentionally encroached on the boundaries. Furthermore, should the plaintiff assert that the defendants expanded the structure beyond the boundary after purchase, the burden of proof rests with the plaintiff. To date, no evidence has been presented to substantiate this claim. Therefore, the plaintiff's assertion that the defendants intentionally encroached lacks merit.

4. The defendants' claim that, pursuant to Article 796-1 of the Civil Code, they should be exempted from demolishing the encroaching structure after weighing public interest against the parties' interests is well-founded:

(1) As stated in Letter No. 10600701874 issued by the New Taipei City Government Public Works Bureau: "Therefore, regarding the aforementioned land parcel (i.e., Xizhi District, Chongde Section, Land Parcel No. 1297) and the associated building permit application concerns, it has been determined that the current building coverage ratio for residential zones has been reduced to 50%. Consequently, the aforementioned land parcel is no longer eligible for a building permit application."

(2) Accordingly, since the disputed encroaching portion of the land is no longer eligible for a building permit application, and given its remote location, with limited space, it is difficult to utilize it economically for other purposes, rendering its economic value very low. The portion requested by the plaintiff for demolition by the defendant and others is located within a narrow alleyway. The demolition work would inevitably be difficult to carry out and

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 32 of 146

may damage the existing structure and adjacent buildings. Furthermore, the demolition work would necessarily involve cutting along the walls of the encroaching portion, potentially causing structural and safety hazards to the building. Moreover, the costs required for this demolition work are substantial and clearly exceed the value of the occupied land. Therefore, the defendant's argument that, pursuant to Article 796-1 of the Civil Code, the removal of the encroaching structure should be waived after weighing public interest against the interests of the parties, is well-founded.

5. The plaintiff's demand that the defendant demolish the structure and return the land constitutes an abuse of rights under Article 148 of the Civil Code:

(1) The plaintiff contends that abuse of rights requires the sole purpose of harming others. However, Article 148 of the Civil Code stipulates "the primary purpose shall not be to harm others," differing from Section 226 of the German Civil Code, which requires "solely for the purpose of harming others." In interpretation, the application of Article 148 of the Civil Code is broader than that of German law. Furthermore, both judicial practice and academic doctrine in our country predominantly adopt the "balancing of interests theory" as the basis for determining whether a right has been abused.

(2) In this case, the plaintiff's demand that the defendant demolish the structure and return the land—whether based on contractual rights or property rights—causes significant harm to the defendant while yielding minimal benefit to the plaintiff. This disparity inherently constitutes an abuse of rights under Article 148 of the Civil Code.

(b) Regarding the claim for restitution of unjust enrichment equivalent to rent:

1. The defendant's argument that they occupied the disputed land in good faith prior to June 2014 and thus bear no liability for unjust enrichment is well-founded:

(1) Before its amendment in 2010, Article 943 of the Civil Code provided that "a possessor exercising rights over the possessed property is presumed to have lawful rights thereto." " Although this article was amended in 2010 to add an exception under Paragraph 2, Article 1 of the Implementation Act of the Property Rights Section of the Civil Code stipulates: "Property rights arising before the implementation of the Property Rights Section of the Civil Code shall not be governed by the provisions of the Property Rights Section of the Civil Code, except as otherwise provided in this Implementation Act; those arising before the amended provisions took effect shall also not be governed by the amended provisions, except as otherwise provided in this Implementation Act." The encroachment on the land in this case occurred prior to 2010 and should therefore be governed by the provisions of the Civil Code before the amendment.

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 33 of 146

(2) When the defendants purchased the house, the encroachment already existed. However, as there was no boundary survey map at the time, they were unaware of the occupation of another's land. Therefore, prior to their knowledge of the encroachment in June 2014, they were bona fide possessors. Accordingly, the rights exercised by the defendants on the disputed land with the intent of ownership are still presumed to be lawful under the aforementioned pre-amendment Article 943 of the Civil Code. Furthermore, pursuant to Article 952 of the same Code, the defendants may use and derive benefits from the possessed property within the scope of their presumed lawful ownership rights. Since the defendants were entitled to use and derive benefits from the possessed property, they bear no liability for restitution of unjust enrichment.

2. The defendants' argument that unjust enrichment after June 2014 should be apportioned among the three defendants proportionally based on the amount of benefit received, rather than each bearing the full amount of unjust enrichment, is well-founded:

(1) It is a common social understanding that unauthorized occupation of another's land yields benefits equivalent to rent, while the landowner suffers losses equivalent to rent. Moreover, the benefit equivalent to rent refers to the rent that could be obtained if the land were leased. In typical cases where land is leased for constructing buildings, the rent amount is generally calculated based on factors such as land area and lease duration. The number of tenants or the number of floors in the constructed building does not affect the rent calculation.

(2) Therefore, although the defendants are respectively the owners of the first, second, and third floors of the building, they shall only bear the liability for unjust enrichment equivalent to rent in proportion to the amount of benefit each obtained from the occupied portion of the plaintiff's land, rather than each bearing the entire unjust enrichment.

3. The standard for calculating unjust enrichment equivalent to rent shall be 3% annual interest on the declared total land value:

(1) The occupied land in this case has long served as a fire lane, is frequently used by neighbors for storing miscellaneous items, and is a narrow, irregularly shaped plot. It cannot be developed for construction and cannot be utilized for typical economic purposes. Furthermore, the land is situated in a residential area with minimal commercial activity, making it difficult to recognize any significant economic value. Based on the actual usage of the occupied land, the defendants consider it appropriate to calculate the unjust enrichment equivalent to rent using an annual interest rate of 3% of the land's declared total value.

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 34 of 146

(2) Therefore, the defendants are only required to return the unjust enrichment equivalent to rent for the period from June 1, 2014, to February 1, 2016 (1 year and 8 months), totaling NT\$3,943 (Calculation: NT\$8,400 × 9.37× 0.03× 1.67 = 3,943, rounded to the nearest whole dollar). and for the compensation regarding the continued occupation portion, only NT\$197 per month is required (calculation: NT\$8,400 × 9.37× 0.03÷ 12 = NT\$197, rounded to the nearest whole dollar).

(3) In summary, the defendants signed the disputed demolition consent form due to coercion by the plaintiff's agent. Furthermore, this consent form subsequently lost its binding effect when both parties renegotiated a land purchase agreement. Moreover, when the defendants purchased the disputed property, the encroachment had already existed. It cannot be said that the defendants intentionally crossed the property boundary. Moreover, the value of the plaintiff's occupied land is minimal, while the damage caused to the defendants by demolishing the house is substantial. Therefore, whether the plaintiff seeks the defendants' demolition of the house and return of the land based on contractual rights or rights in rem, such claims should not be permitted. Regarding the defendants' unjust enrichment from occupying the plaintiff's land, equivalent to rental fees: prior to June 2014, the defendants were bona fide possessors and thus legally exempt from restitution obligations. After June 2014, the defendants bear only proportional liability for restitution. Regarding the calculation basis for the amount to be returned, the defendants contended that an annual interest rate of 3% on the total declared land value would be appropriate.

(4) Declaration:

1. The plaintiff's suit and application for provisional execution are dismissed.

2. The plaintiff shall bear the litigation costs.

3. Should an adverse judgment be rendered, the plaintiff is willing to provide security and requests permission to waive provisional execution.

III. Disputed and Undisputed Matters:

(1) Undisputed Matters:

1. The buildings owned by Defendants Lin Weizheng, Zheng Zhili, and Zheng Liuzhu at Plot No. 0000, Section ○○, District ○○, New Taipei City (street addresses: No. 00, Lane 00, Alley 00, ○○ Road, District ○○, New Taipei City; 2nd Floor, No. 20; 3rd Floor, No. 20) occupy the adjacent land owned by the plaintiff, namely the aforementioned Plot No. 1297 in the same segment (hereinafter referred to as the Disputed Land), with an area of 10.18 square meters (based on the re-survey results issued by the Xizhi Land Administration Office of New Taipei City on June 8, 2016, as detailed in the re-survey reference map

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 35 of 146

attached to the court record). Time and reason for the defendants' acquisition of the aforementioned buildings:

(1) Defendant Lin Weizheng: Purchased from his former wife, non-party Zhuo Fenglan, on April 18, 2006.

(2) Defendant Zheng Zhili: Purchased from non-party Li Jianxing on August 30, 2004.

(3) Defendant Zheng Liumeizhu: Purchased from non-party Li Xingyi on September 3, 1987.

3. On May 7, 2014, after a re-survey conducted by the Xizhi Land Administration Office of New Taipei City, the plaintiff became aware that the aforementioned land owned by him was being occupied.

4. In June 2014, the plaintiff applied to the Xizhi District Mediation Committee of New Taipei City for mediation regarding the aforementioned occupied land. The Committee notified the defendants. Both parties mediated on July 1, 2014, and signed a "Demolition Agreement" on the same day, stipulating that the defendants agreed to complete the demolition of the occupied portion of the land by December 31, 2014.

5. Following mediation, the parties attempted to negotiate the purchase price for the disputed land but failed to reach an agreement.

6. On February 13, 2015, the plaintiff filed a complaint with the Taiwan Shilin District Prosecutors Office (hereinafter referred to as the Shilin District Prosecutors Office) alleging the defendant committed crimes including unlawful occupation and breach of trust. which resulted in a non-prosecution decision on June 8, 2015 (Case No. 104-D-7105). The plaintiff appealed this decision. After the Taiwan High Court Prosecutors Office remanded the case for further investigation, the Shilin District Prosecutors Office issued another non-prosecution decision on December 8, 2015 (Case No. 104-D-275).

(2) Disputed Issues:

1. Regarding Demolition and Land Restoration:

(1) Was the Defendant's expression of intent in signing the "Demolition Consent Form" vitiated by coercion from the Plaintiff?

(2) Did the parties' continued negotiations on purchase price after signing the "Demolition Consent Form" indicate an intent not to be bound by the consent form's expression of intent?

(3) Did the Defendant act intentionally in occupying the disputed land with his structures?

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 36 of 146

(4) Is the defendant's claim justified under Article 796-1 of the Civil Code, which exempts removal of overboundary structures after balancing public interest and party interests?

(5) Does the plaintiff's demand for demolition and land return constitute an abuse of rights under Article 148 of the Civil Code?

2. Regarding the return of unjust enrichment equivalent to rent:

(1) Is the defendant's argument that they occupied the disputed land in good faith prior to June 2014 and thus bear no liability for restitution of unjust enrichment well-founded?

(2) Is the defendant's argument that unjust enrichment after June 2014 should be shared proportionally among the three defendants based on the amount of benefit each received, rather than each bearing the full amount of unjust enrichment, well-founded?

(3) What standard should be used to calculate the unjust enrichment equivalent to rent?

IV. Reasons for the Court's Findings :

(1) The plaintiff's claim, based on the contractual relationship between the parties, that the defendants demolish the portion of their structures occupying the disputed land is justified:

1. It is found that in June 2014, the plaintiff filed a mediation request with the Xizhi District Mediation Committee, New Taipei City, alleging that the defendants were occupying the disputed land owned by the plaintiff. Subsequently, the parties reached a separate settlement on July 1, 2014, and signed a "Consent Agreement," which stipulated that the defendants would complete the demolition of the portion of the disputed land occupied by Party A (i.e., the plaintiff) by December 31, 2014. This fact is undisputed by both parties and is documented by a copy of the Agreement on file (Case No. 106 of 2016, Hu Jian Diao, hereinafter referred to as the Mediation File, p. 45). Since a settlement agreement has been established between the parties regarding the portion of the disputed land occupied by the Defendant's structures, the Plaintiff's request for the Defendant to perform under this settlement agreement and demolish the portion of the disputed land occupied by their structures is well-founded.

2. Although the defendant contends that the "Consent Form" constitutes a defective declaration of intent made under duress, allegedly coerced by the plaintiff's litigation representative who threatened to initiate civil and criminal proceedings if the defendant refused to purchase the property at the offered price,

(1) A declaration of intent made under duress refers to a situation where the declarant is subjected to unlawful threats or coercive actions by the counterparty or a third party,

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 37 of 146

causing fear and leading to the declaration of intent; As for demanding a specific declaration by threatening to file a complaint or report a crime, whether such coercion constitutes unlawful harm must be determined by weighing the legitimate connection between the benefit sought by the coercing party and the means employed, based on the objective and specific circumstances of each case. to determine whether the threat constitutes unlawful harm. In this case, after the plaintiff learned that the defendant's house occupied the disputed land, the plaintiff's litigation agent, Tsai Tsung-ho, negotiated with the defendant and others. During negotiations, the plaintiff demanded the defendant purchase the land at NT$500,000 per ping. However, as the defendant and others could not afford this price, the plaintiff then stated his intention to assert his rights through litigation. Both parties subsequently signed the aforementioned "Consent Form" on July 1, 2014. These facts were consistently stated by the defendants during police questioning and investigative interrogations in the criminal cases where they were accused of unlawful occupation (Taiwan Shilin District Prosecutors' Office, hereinafter referred to as Shilin District Prosecutors' Office, Case No. 779 of 2015, hereinafter referred to as the Criminal Case File, pp. 23-27, 88). This account is corroborated by statements made by the plaintiff's representative, Tsai Tsung-ho (Criminal Case File, pp. 28, 88), and is therefore credible. While the plaintiff's assertion that failure to purchase the land would result in civil and criminal litigation may, under the rules of experience, reasonably be deemed to exert considerable psychological pressure on the defendants, the fact remains that the defendants' occupation of the disputed land constitutes a factual basis. The plaintiff, as the rightful owner, is entitled to assert protection of their ownership rights. Although the terms proposed by the plaintiff for purchasing the disputed land appear stringent, both the defendants and the plaintiff's litigation representative, Cai Zonghe, stated during the aforementioned investigative proceedings that negotiations regarding the purchase price would continue afterward (see pp. 88 of the aforementioned case file). This Court finds that the plaintiff used litigation as a means to demand that the defendants purchase the disputed land at a fair price, while the defendants, unable to afford the plaintiff's high price, compromised by signing the "Consent Form" pledging to demolish the portion occupying the disputed land by December 31, 2014. The defendants' defense that they signed the "Consent Form" under the plaintiff's coercion cannot be accepted, as they have not reached the level of losing their freedom of expression.

(2) On the other hand, defects in expression arising from coercion, pursuant to Article 92(1) of the Civil Code, are only subject to rescission, not invalidity. The person expressing the intent must exercise the right of rescission within a one-year period of limitation after the coercion ceases, as further stipulated in Article 93 of the same Code. Even if the defendants were coerced by the plaintiff into signing the "Consent Form" on July 1, 2014,

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 38 of 146

agreeing to voluntarily demolish the portion of the structure occupying the disputed land, they failed to take any action to rescind the coerced declaration of intent until February 2016, when the plaintiff filed this lawsuit. This clearly exceeds the aforementioned period of limitation. Based on the protection of transactional security, the defendants' declarations in the "Consent Form" have become legally binding. Consequently, the defendants' subsequent claim that the signatures were coerced is untenable.

3. The defendants further argue that after signing the "Consent Form," the parties continued to negotiate the purchase price of the disputed land, contending that they were no longer bound by the "Consent Form." It is noted that the plaintiff originally claimed the defendants should purchase the entire disputed land at NT$500,000 per ping ( ) and could not purchase it in separate portions. Following the signing of the "Agreement" on July 1, 2014, both parties continued negotiations regarding whether the disputed land could be purchased in separate portions and the unit price of the land. This is corroborated by the statements made by the three defendants during the preliminary investigation (see page 88 of the aforementioned other case file). Plaintiff's legal representative Tsai Tsung-ho also made identical statements during interrogation. This demonstrates that after signing the "Agreement" to remove the occupied portion, the parties indeed continued negotiations regarding the purchase price of the disputed land. However, since the parties failed to reach an agreement on the purchase price of the disputed land, it cannot be said that a new contract replaced the original "Agreement." Furthermore, the "Agreement" signed by both parties clearly stipulated their respective rights and obligations. Regarding the handling of the defendants' house occupying the disputed land, their expressions of intent were consistent, thus establishing a settlement agreement whose validity is beyond doubt. Moreover, the "Consent Agreement" contained no termination or invalidation clause such as "if both parties continue negotiations regarding the purchase price," and the defendant failed to present evidence demonstrating any other facts that would cause the "Consent Agreement" to terminate or become invalid. Consequently, the mere fact that the parties engaged in discussions regarding another set of rights and obligations cannot be deemed to have extinguished the existing contractual relationship. The defendant's defense on this point is therefore inadmissible.

(2) The defendants' claim that they should be exempt from demolishing the house is well-founded:

1. Article 148 of the Civil Code explicitly states that the exercise of rights shall not have the primary purpose of harming others. Whether the exercise of a right has the primary purpose of harming others should be determined by weighing the benefits the right holder gains from exercising the right against the losses incurred by others and society as a result.

Exhibit 2 to Lee Declaration

Exhibit A to Petition - p. 39 of 146

Where the exercise of a right yields minimal benefit to the holder while causing substantial loss to others and society, it may be deemed primarily aimed at harming others. This interpretation is inherent to the fundamental principle of the socialization of rights, as established in the Supreme Court precedent No. 737 of 1982. The disputed land in this case is situated between the plot occupied by the defendants' buildings—New Taipei City, ○○ District, ○○ Section, Plot No. 0000—and another plot in the same section, Plot No. 1298. Both plots contain structures, rendering the disputed land a narrow space used for storing miscellaneous items between the two buildings. This is corroborated by on-site photographs on file (p. 69 of this court's record). Subsequently, this Court, acting ex officio, inquired with the New Taipei City Government Public Works Bureau regarding whether the disputed land could be developed for building construction in accordance with regulations. The response stated, in part: "...the land parcel in question holds a Use Permit No. 69 Xisih Zi No. 3213 (Building Permit No. 68 Xisih Jian Zi No. 2649) on file..." Upon reviewing the file for Use Permit No. 69 Xisih No. 3213 (Building Permit No. 68 Xisih Jian No. 2649), the attached application materials and area calculation table indicate that at the time of the building permit application, the land use zoning was Residential District, with a statutory building coverage ratio of 60% with a design building coverage ratio of 60%. Therefore, regarding the aforementioned land parcel's eligibility for building applications, it has been verified that the current building coverage ratio for residential zones has been reduced to 50%. Consequently, the aforementioned land parcel is no longer eligible for building applications. This is documented in the Bureau's letter dated January 18, 2017 (Ref. No. 1060070184). Although the land classification of the disputed plot is designated as building land, according to the aforementioned explanation from the New Taipei City Government Public Works Bureau, construction of buildings is not feasible. and considering the objective reality that the land serves as a narrow passageway between two buildings, it is reasonable to conclude that the disputed land has limited economic utility. On the other hand, it is indeed true that the defendants' structures encroach upon the disputed land, which is a fact. However, the encroaching portion constitutes a corner extension of the buildings, covering only 10.18 square meters. Regardless of whether demolishing this encroaching section would be operationally difficult or prohibitively costly, weighing the necessary repairs, reinforcements, and associated expenses the defendants would incur after demolition against the plaintiff's gain of land that is neither encroaching nor yet of very low utility value. This disparity renders the plaintiff's claim for demolition disproportionate. Thus, the plaintiff's demand to remove the encroaching portion of the defendants' structure risks constituting an abuse of rights under Article 148 of the Civil Code.

2. Furthermore, when a landowner constructs a building beyond the property boundary and the adjacent landowner requests its removal or alteration, the court may, after weighing

**Exhibit 2 to Lee Declaration**

**Exhibit A to Petition - p. 40 of 146**

public interest and the parties' interests, exempt the removal or alteration in whole or in part. However, this does not apply if the landowner intentionally encroached beyond the boundary. This is explicitly stipulated in Article 796-1(1) of the Civil Code: . Furthermore, the provisions of this article are mutatis mutandis applicable to other land and building users, as clearly stipulated in Article 800-1 of the same Code. The three defendants in this case acquired ownership of their respective houses from third parties in 1987 (Defendant Zheng Liu Meizhu), 2004 (Defendant Zheng Zhili), and 2006, as previously stated. The building at No. 00, Lane 0, Alley 000, Road 00, District ○○, New Taipei City was completed on August 9, 1974, as evidenced by the second-class transcript of its registration (Mediation Record, p. 11). Additionally, aerial photographs of the disputed land and its surroundings from 1985, 1987, 2009, 2014, and 1994, provided by the plaintiff during the investigation (Shilin District Prosecutors Office Case No. 275 of 2015, Vol. 77, pp. 77, 83-85; He Case File pp. 96, 97), the aerial photographs of the defendants' house dated October 12, 1985, and November 1, 1987, show no discernible additions. However, aerial photographs taken after 1983 (see p. 96 of the aforementioned Other Case File) clearly reveal that additions had been made to the house. It can therefore be inferred that these additions were constructed no later than between 1987 and 1983. Finally, considering that it is not uncommon for builders to conduct a second construction phase to expand outward after the building is completed, submitted the building for review and approval by the local government's construction management unit, and obtained a use permit before undertaking secondary construction to expand outward. This practice of increasing the usable indoor area and raising the property's sale price is not uncommon. For subsequent purchasers of a property with such additions, their primary concern is whether the area claimed by the seller is accurate. whether the additions encroached onto neighboring land was not a concern. Thus, it is reasonable that the defendants, as subsequent purchasers, acquired the property based on its existing condition. Even if they were aware of the secondary construction, their defense that they were unaware the additions encroached onto the disputed land remains admissible. remains admissible. Since the defendants neither intentionally caused the structure to exceed property boundaries nor acted with intent, and considering the aforementioned balancing of public interest and the interests of the parties involved in removing the encroaching portion, the defendants' request to be exempted from removing the encroaching portion under the first part of Article 796-1(1) of the Civil Code is also admissible.

(3) The plaintiff's claim for unjust enrichment equivalent to rent from the defendant is justified.

1. It is a common societal understanding that unauthorized occupation of another's land may yield benefits equivalent to rent. The owner of the occupied land is therefore justified

**Exhibit 2 to Lee Declaration**

**Exhibit A to Petition - p. 41 of 146**

in seeking restitution of such unjust enrichment under the doctrine of unjust enrichment. Supreme Court Civil Precedent No. 1695 of 1972 (Tai-Shang-Yi) may be referenced. Given the factual occupation of the disputed land by the defendant's house, the plaintiff's claim for unjust enrichment equivalent to rent under the legal relationship of unjust enrichment is well-founded.

2. Although the defendants claim they were unaware of the occupation when moving in, Article 182(1) of the Civil Code stipulates that liability for restitution or compensation is only exempted when the benefit received no longer exists. Their argument that they possessed the property in good faith under Article 943 of the Civil Code, even if true, does not negate the fact that they benefited from unauthorized possession. Moreover, since the state of possession continues, the benefit from possession persists, precluding any claim of exemption from liability for restitution or compensation.

(IV) Calculation of Unjust Enrichment Equivalent to Rent 1. The defendants acquired ownership of the existing houses through purchase between 1987 and 2006. At the time of purchase, the building extensions had been completed, and the fact of occupying the disputed land existed. Therefore, the plaintiff's claim that the defendants' period of occupation exceeded five years is established. The plaintiff's request for the defendants to pay unjust enrichment equivalent to rent for the five years prior to the lawsuit arising from unauthorized occupation is also justified. The defendants' defense that they only became aware of the occupation after the plaintiff applied for mediation and conducted a survey, even if true, does not exempt them from the obligation to return the land, as previously stated.

2. Regarding the amount of unjust enrichment equivalent to rent, it must be determined not only based on the declared land value but also by considering the location of the site, the level of commercial and industrial prosperity, the economic value of the land's use by the occupiers, and the benefits they derived. This amount should be compared with the rent of neighboring lands and need not necessarily reach the maximum annual interest rate of 10% of the declared land value. Supreme Court Civil Judgment No. 3331 of 1999 may serve as a reference. The location and current utilization of the disputed land in this case have been described above; Further consideration shows that the disputed land is surrounded by three- or four-story condominium buildings, residential properties within alleyways ( ), with a few storefronts on the first floor. Most buildings are old. At the alley entrance is Chongde Elementary School, and the nearest bus stops are on Qiaodong Road and Zhongxiao East Road. These facts were clearly verified during an on-site inspection by the judge of the Neihu Summary Court of this court, documented in an inspection record (Mediation Record p. 55). It can be recognized that the area surrounding the disputed land

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 42 of 146

is not yet a thriving commercial or industrial zone. Therefore, the plaintiff's claim for unjust enrichment equivalent to rent calculated at 10% annual interest based on the declared land value is deemed excessive. The calculation method proposed by the defendant et al., based on 3% annual interest of the declared land value, is more acceptable.

3. Furthermore, the amount of unjust enrichment equivalent to rent should be determined based on the benefit received by the other party, not on the extent of damage suffered by the claimant. This principle has been repeatedly clarified in the aforementioned precedents and judgments of the Supreme Court. Since the buildings owned by each defendant on Floors 1 to 3 all occupy the disputed land, and considering that the defendants' usable indoor space was thereby expanded, each defendant should be deemed to have received benefits calculated based on the occupied area. Therefore, the plaintiff's claim that each defendant should bear the full amount is justified. The defendants' argument that liability should be shared proportionally based on the benefits received is not accepted.

4. Calculation Method:

(1) Five years prior to filing: Declared land value of NT$8,400 per square meter × 10.18 square meters × annual interest rate of $0.03 \times 5 =$ NT$12,827 (rounded to the nearest dollar)

(2) Each month after filing: Declared land value: NT$8,400 per square meter × 10.18 square meters × Annual interest rate $0.03 \div 12 =$ NT$214 (rounded to the nearest dollar)

V. Where no specific payment deadline exists, if the debtor fails to perform upon the creditor's demand after being notified, the debtor shall bear liability for delay from the time of notification. The creditor's filing of a lawsuit with service of the complaint, or service of a payment order under summary proceedings, or other similar actions, shall have the same effect as a demand. For delayed debts involving payment of money, the creditor may claim default interest calculated at the statutory rate. For debts bearing interest where the rate is neither agreed upon nor prescribed by law, the annual interest rate shall be 5%. as expressly stipulated in Article 229(2), the first part of Article 233(1), and Article 203 of the Civil Code. In this case, the plaintiff's claim against the defendants for unjust enrichment equivalent to rent lacks a fixed term and involves payment of money. The plaintiff requested that the defendants commence proceedings on April 2, 2016, and April 1, 2016, respectively, the day after the service of the copies of the complaint. (Copies of the complaint were served on Defendant Lin Weizheng on April 1, 2016, and on Defendants Zheng Zhili and Zheng Liumeizhu on March 31, 2016; see pages 21 to 23 of the mediation

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 43 of 146

record). This claim for default interest calculated at the statutory rate of 5% is legally justified and should be granted.

VI. Furthermore, the amount ordered to be paid by the defendant in this case does not exceed NT$500,000. Pursuant to Article 389, Paragraph 1, Item 5 of the Civil Procedure Law, provisional execution shall be declared ex officio. As for the portion of the plaintiff's claim that was dismissed, the request for provisional execution thereof is no longer relevant and shall be dismissed. The defendant further states that if an unfavorable judgment is rendered, it is willing to provide security to request exemption from provisional enforcement. Therefore, a reasonable amount is determined, and exemption from provisional enforcement is declared.

VII. The evidence in this case is sufficiently clear. The Court has considered the remaining arguments and evidence presented by both parties and finds them insufficient to affect the outcome of this judgment. Therefore, they are not addressed individually but are noted here for the record. Based on the foregoing, the plaintiff's suit is partially justified and partially unjustified.

Pursuant to Articles 79, 85(1), 389(1)(5), and 392(2) of the Civil Procedure Law, the judgment is rendered as stated in the main text.

Republic of China, March 29, 2017

Civil Division I Judge Wu Kun-fang

The above original judgment is duly prepared in accordance with the original document. To appeal this judgment, an appeal petition must be filed with this Court within 20 days after service of this judgment. If an attorney is retained to file the appeal, the appellate court fee must be paid concurrently.

March 29, 2017

Clerk: Weng Shih-heng

Judicial Decisions

 Relevant Statutes: Land Act Article 97, Civil Procedure Act Article 79, Civil Procedure Act Article 85, Civil Procedure Act Article 389, Civil Procedure Act Article 392, Civil Code Article 92, Civil Code Article 93, Civil Code Article 148, Civil Code Article 153 , Civil Code Article 182, Civil Code Article 203, Civil Code Article 226, Article 229 of the Civil Code, Article 233 of the Civil Code, Article 773 of the Civil Code, Article 796 of the Civil Code, Article 796-1 of the Civil Code, Article 800-1 of the Civil Code, Article 841-1 of the Civil Code, Article 943 of

**Exhibit 2 to Lee Declaration**

Exhibit A to Petition - p. 44 of 146

the Civil Code, Article 944 of the Civil Code, Article 952 of the Civil Code, Article 1 of the Implementation Act of the Property Rights Section of the Civil Code

Exhibit 2 to Lee Declaration



下載日期：114 年 8 月 15 日

臺灣臺中地方法院 113 年度訴字第 45 號

【裁判字號】113,訴,45

【裁判日期】民國 114 年 5 月 28 日

【裁判案由】確認區分所有權人會議決議無效等

【裁判內文】

臺灣臺中地方法院民事判決

113 年度訴字第 45 號

原　　　告　天闊有限公司

法定代理人　朱祐宗

訴訟代理人　蔡琇媛律師

複代理人　　林柏漢律師

被　　　告　寶麗金大樓管理委員會

法定代理人　林瑞興

訴訟代理人　黃鉦哲律師

複代理人　　洪任鋒律師

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 46 of 146

上列當事人間請求確認區分所有權人會議決議無效等事件，本院於民國114年4月16日言詞辯論終結，判決如下：

主　　文

一、確認被告於民國一一二年十月二十二日召開之區分所有權人會議所為如附表第二案所示之決議無效。

二、被告應容忍及禁止妨礙原告及其所雇請之工程人員依社團法人台中市建築師公會於民國一一三年十月二十四日鑑定報告書(案號○○○-○○○○)第四、五頁所載如鑑定結果所示方式，對原告所有門牌號碼台中○○區○○路○段○○號地下一層樓之一房屋進行設置及維護自來水表、水管配備等相關工程。

三、原告其餘之訴駁回。

四、訴訟費用由被告負擔二分之一，餘由原告負擔。

事實及理由

壹、程序部分：

一、按不變更訴訟標的，而補充或更正事實上或法律上之陳述者，非為訴之變更或追加，民事訴訟法第256條定有明文。本件原告起訴聲明請求原為：「一、確認被告於民國112年10月22日召開之區分所有權人會議(下稱系爭區權會)所為如附表所示之決議(下稱系爭決議)無效。二、被告應容忍並禁止妨礙原告及其所雇請之工程人員在坐落台中市○○區○○段00地號土地及坐落其上之同段1071建號建物設置及維護自來水表、水管及配備工程。」等情，嗣原告於112年10月22日言詞辯論期日具狀更正聲明第2項請求為：「被告應容忍並禁止妨礙原告及其所雇請之工程人員依社團法人台中市建築師公會於113年10月24日鑑定報告書(案號000-0000，下稱系爭鑑定報告)第4-5頁所載如鑑定結果所示方式，對原告所

有門牌號碼台中○○區○○路0段00號地下1層樓之1房屋(下稱系爭房屋)進行設置及維護自來水表、水管及配備工程。」，其餘不變等情，有該日民事準備五狀可憑(參見本院卷第1宗第333頁)。本院審酌原告上開更正請求，其訴訟標的之法律關係及請求原因事實均未變更，僅係依系爭鑑定報告之結論為更正或補充陳述而已，核屬更正事實上之陳述，依

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 47 of 146

首揭法條規定，並非訴之變更或追加，應予准許，合先敘明。

二、又「當事人喪失訴訟能力或法定代理人死亡或其代理權消滅者，訴訟程序在有法定代理人或取得訴訟能力之本人承受其訴訟以前當然停止。」、「第 168 條至第 172 條及前條所定之承受訴訟人，於得為承受時，應即為承受之聲明。他造當事人，亦得聲明承受訴訟。」，民事訴訟法第 170 條及第 175 條分別設有規定。原告起訴時原列被告法定代理人即於社區管理委員會主任委員羅國祥，嗣被告於 113 年 10 月 27 日因主任委員職期屆滿而重新推選林瑞興接任，被告乃於 113 年 12 月 23 日具狀聲明承受訴訟，並提出被告社區管理委員會 113 年 10 月 27 日會議紀錄及台中市政府都市發展局 113 年 11 月 27 日函為證，有該日民事聲明承受訴訟狀在卷可憑(參見本院卷第 1 宗第 385、405 頁)。本院審酌被告所為前揭承受訴訟聲明，核與法律規定相符，應予准許。

三、另確認之訴非原告有即受確認判決之法律上利益者，不得提起，民事訴訟法第 247 條第 1 項前段著有明文。所謂即受確認判決之法律上利益，係指法律關係之存否不明確，原告主觀上認其在法律上之地位有不安之狀態存在，且此種不安之狀態，能以確認判決將之除去者而言，若縱經法院判決確認，亦不能除去其不安之狀態者，即難認有即受確認判決之法律上利益(參見最高法院 90 年度台上字第 961 號民事裁判意旨)。原告主張被告社區於 112 年 10 月 22 日召開系爭區權會所為系爭決議有違反法令及章程，暨違反誠信原則、權利濫用等無效之事由，乃以起訴聲明第 1 項訴請確認如附表所示之系爭決議無效等情，已為被告所否認，則系爭決議是否有效，攸關原告自 112 年 1 月 1 日起每月應繳管理費數額為何？及原告得否在系爭房屋地下 1 樓安裝獨立水錶及管線使用等，致原告在被告社區之區分所有權人私法上地位處於不安之狀態，而此不安狀態，得因取得法院勝訴確定判決而予除去，故依前揭民事訴訟法第 247 條第 1 項前段規定及最高法院 90 年度台上字第 961 號民事裁判意旨，應認原告具有受確認判決之法律上利益存在，是原告起訴聲明第 1 項提起消極確認訴訟，即屬合法，應予准許。

貳、實體部分：

一、原告方面：

　(一)原告起訴主張：

　　1、寶麗金大樓(下稱系爭大樓)坐落台中市○○區○○段 00 地號土地，原告為其上同段

3

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 48 of 146

1071 建號建物即系爭房屋之區分所有權人。詎被告於 112 年 10 月 22 日召開系爭區權會作成如附表所示第 1 案關於管理費之計算決議(以下若單獨敘述時稱 A 決議)、及第 2 案關於否決地下 1 樓設置獨立水表決議(以下單獨敘述時稱 B 決議)，均係以損害原告為主要目的，依民法第 71 條前段及第 148 條等規定為無效，且已妨害原告就系爭房屋所有權之正當行使，原告自得請求被告除去妨害，茲分述如下：

(1)請求確認 A 決議無效部分：

①系爭房屋主要用途為商場等商業使用，屬於店面，且於系爭大樓 1 樓設有獨立門戶供來客出入，使用上及構造上實與其他 1 樓店面相當。而原告就系爭房屋規劃亦係作為商業用途，僅會由社區 1 樓之獨立門戶出入，消費者不會使用社區內部電梯及樓梯，亦無法直接進入社區，與住家生活作息各自獨立。是系爭房屋與非店面住戶已有獨立劃分之認定，系爭房屋既與一般住戶須搭乘大樓內電梯或使用共有空間之樓梯進出不同，所受管理維護程度亦有差異，則對於系爭房屋之管理措施自應與其他店面相同。準此，系爭房屋本身既作為經營商業用途而屬店面，並非作為住家使用，則系爭房屋對於公共設施使用情形及管理維護程度與社區其他 1 樓店面相同，自不應與其他社區店面相異對待。參佐系爭房屋管理費用自 86 年以來即係以商家店面之標準收費，此為被告所是認。

②依原證 6 即系爭大樓住戶規約第 20 條第 2 款約定：「區分所有權人資格有異動時，取得資格者應以書面提出登記資料。」，已足使被告掌握原告人員之人別身分，且地下 1 樓電梯既能透過設定將按鍵上鎖，以達管制電梯使用目的，則系爭房屋與系爭大樓其餘 1 樓店面相較，無論是社區安全及公共設施環境品質之管理維護程度均相同，被告復未提出原告使用系爭房屋有何增加管理工作內容而需另支出額外費用之情形，尚難認有何以住家標準調漲系爭房屋管理費之充分理由。詎系爭決議變更自 86 年以來認定系爭房屋為店面及維持收費標準，單獨針對原告所有系爭房屋之管理費(原為每坪 30 元)調漲至與一般住戶相同之收取標準(即每坪 70 元)，與其他供營業使用店面有不同之管理措施，且系爭房屋管理費調漲幅度達 2 倍有餘，亦遠高於其他全體區分所有權人，顯有重大之差異。然被告未提出客觀上合理之區別理由，並說明將原告與其他店面管理費為差別收費之合理必要性及舉證，遽以 A 決議將系爭房屋管理費為不同對待，彰顯 A 決議係專為不利原告所為之差別待遇，係以損害原告為主要目的，已失衡平，有濫用多數表決、違反公平、衡平及誠實信用原則之情形，對原告構成權利濫用或有悖公序良俗，而違反法律強制或禁止規定等無效之情事。遑論被告自原告

取得系爭房屋所有權後，迄今仍拒絕讓原告進入及使用收益，益徵系爭決議顯係利用多數決優勢之恣意，以損害原告為目的之權利行使，無正當理由而顯失公平，屬於權利濫用而無效。是系爭決議違反民法第 56 條第 2 項、第 148 條、第 71 條前段、第 72 條規定為無效。

(2)請求確認 B 決議無效，及請求被告應容忍並不得妨礙原告及其所雇請之工程人員依系爭鑑定報告記載鑑定結果所示方式，對原告所有系爭房屋進行設置及維護自來水表、水管及配備工程部分：

①依公寓大廈管理條例(下稱公寓條例)第 6 條第 1 項第 4 款規定，於維護、修繕專有部分、約定專用部分或設置管線，必須使用共用部分時，雖應經管理負責人或管理委員會之同意後為之，但管理委員會無正當理由時，亦不得擅加拒絕。而同條例第 4 條第 1 項、第 5 條亦規定，區分所有權人得自由使用、收益、處分其專有部分，除有妨害建物正常使用或違反區分所有權人共同利益之情形或其他法律明文限制外，如任由區權會或大樓規約，就區分所有權人專有部分之使用設有特別限制，顯然影響區分所有權人之財產權益。且如區分所有權人就其專有部分之特定使用方式，實質上並未對其餘區分所有權人造成重大影響，基於民法財產權之保障，其使用方式自屬適法。是區分所有權人權利之正當行使，受到區權會決議或規約之過當箝制，而其餘區分所有權人可獲得之利益亦非重大，自得以該決議或規約之限制已失衡平，有違誠信原則，認為該決議或規約限制為無效。

②原告為系爭大樓之區分所有權人，系爭房屋為原告之專有部分，本有自由使用、收益之權，惟系爭房屋現狀並無供水設備，因系爭房屋主要用途為商場、儲藏室，即有用水需求，而原告使用系爭房屋(商場)之通常使用方法必須設置用水所需相關管線等設備，參酌用水為民生最基本事項，倘若欠缺獨立水表，自來水公司難以統計用水及計算水費，亦無法正常供應用水，進而造成用水戶嚴重不便，故原告主張系爭房屋有設置獨立水表及配備工程之必要。

③又原告出設置自來水管線及獨立水表之方案如系爭鑑定報告記載鑑定結果所示方式，在設置過程雖需使用系爭大樓共用部分，惟原告已考量進水及排水規劃，施作面積並非龐大，施工期間亦屬短暫、影響範圍甚小，施作後對系爭大樓現況均無影響，並無安全疑慮，亦未造成任何損害，原告主張之管線及水表設置地點及方式應為損害最少之處所及方法。然被告召集系爭區權會卻以 B 決議予以否決，完全排除原告用水之民生需求，使系爭房屋持續

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 50 of 146

處於斷水狀態，已剝奪系爭房屋所有權之完整性，被告復未能提出其他證據證明原告在系爭房屋設置自來水管線及獨立水表對於其他區分所有權人有何重大損害，或違反區分所有權人之共同利益，B決議顯無正當理由，要屬濫用多數表決、違反公平、衡平及誠實信用原則，對原告應構成權利濫用或有悖公序良俗情事，依民法第56條第2項、第71條前段、第72條、第148條等規定，自屬無效。

2、原告在系爭房屋既有外接供水設備之必要，系爭區權會作成B決議已妨害系爭房屋所有權之正當行使，原告自得請求被告除去妨害，爰依民法第767條第1項中段、後段規定請求被告容忍並不得妨礙原告設置及維護自來水表、管線及配備工程。

3、並聲明：(1)確認被告於112年10月22日召開系爭區權會作成如附表所示之系爭決議無效。(2)被告應容忍並禁止妨礙原告及其所僱請之工程人員依系爭鑑定報告第4-5頁所載如鑑定結果所示方式，對原告所有系爭房屋進行設置及維護自來水表、水管及配備工程。

(二)對被告抗辯之陳述：

1、原告就台灣自來水股份有限公司第四區管理處台中服務所(下稱自來水公司)113年2月16日台水四中所工字第1132101162號函(下稱113年2月16日函)，表示意見如次：

(1)上開函說明二記載：「經查本案地址未申請用水，倘日後需申請用水，可依規定申請：(一)獨立表：設置於1樓建築線旁，獨立設置水表及管線。……(二)分表：分表表位自備設置於屋頂大樓分表集中處，使用大樓自設供水設備及公共空間。……」等語。是原告為供水目的而於系爭區權會提出系爭房屋申設水表等2個方案之設置位置及方法，均經自來水公司確定其可行性，足認原告申設水表及連通水管係依系爭大樓之經濟目的所定用法，合於公寓條例第9條第2項規定「依其設置目的及通常使用方法為之」之規範，不會對被告造成任何妨害與損害。

(2)原告對於系爭房屋具有獨立所有權，本得自由使用、收益及處分，若僅因被告拒絕同意，原告即無法裝設水表及其管線，無法使用系爭房屋，不僅對於原告造成重大損害，對社會經濟亦顯然不利，依民法第148條權利濫用禁止、誠信原則，及第820條第1項、第3項規定共有人不得故意或過失為不利他共有人之管理決定，否則應連帶負損害賠償責任之立法意旨，被告應無拒絕同意原告裝置水表及其管線之理。從而，原告為獲得日常生活不可或缺之自來水，此部分主張自屬權利之正當行使。

6

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 51 of 146

(3)又被告爭執原告另行配置水表及進排水管路有危及系爭大樓全體住戶之虞云云，係以現實尚不存在之假設性事實為抗辯，原告否認之，而依民事訴訟法第 277 條舉證責任分配規定，此部分事實亦應由被告負舉證責任。

2、台中市建築師公會系爭鑑定報告之鑑定結果稱：於 1 樓設置獨立水表由騎樓埋設管線施工方式，打除表層後再復原對整體結構安全影響降至最低，以其建議之施工方式無影響結構安全；屋頂設自來水分表於欄杆鑽洞 1 樓版鑽洞，適當鑽洞不影響結構安全，以其所載施工方式未達破壞結構程度等語(參見系爭鑑定報告書第 4-6 頁)。從而，原告為供水目的，不論以獨立表或分表方式設置，皆係於適宜之位置及處所而為通常之使用，應可認定原告申設水表及連通管線係依系爭大樓之經濟目的所定用法，不會對被告造成任何妨害與損害，故被告不得以系爭 B 決議拒絕原告裝設水表之請求。

3、系爭 B 決議議案討論及表決者，旨在原告為滿足系爭房屋民生用水需求之目的，並為向自來水公司申請用水及供作計量及計費使用，而就水表表位設置位置為決議，至於裝設方式究為自來水公司所指之獨立錶或分錶，又或詳細工法為何，尚非所問。尤其原告對於系爭大樓共用部分亦有使用權，縱令施工方法與系爭大樓共用部分相涉，原告既　為系爭大樓之共有人，當然得就共用部分為使用收益，原告請求為系爭房屋設置水表及連通管線，乃所有權能及共有權能之正當行使，況系爭大樓其他用戶均得設置水表及連通水管，自無單獨排除原告之理。再系爭房屋價值不菲，因被告拒絕同意致原告無法裝設水表、水管，而無法完整使用系爭房屋，不僅對於原告造成重大損害，對社會經濟亦顯然不利，依民法第 148 條權利濫用禁止、誠信原則，及第 820 條第 1 項、第 3 項規定等意旨，被告自不得拒絕同意原告裝置水表、水管，但被告藉由系爭區權會多數決方式，針對性且剝奪原告本於所有權能而設置自來水管線及獨立水表之合法權益，明顯妨害原告所有權權利之行使，自屬權利濫用，並有違反誠信原則，及背於公序良俗。被告抗辯稱「分錶」部分及「墊高樓板」施作方式未在系爭 B 決議討論範疇，無從推認該決議不當，系爭 B 決議無權利濫用、未違反誠信原則及公序良俗云云，其未對系爭房屋「專有部分」作出限制云云，顯係事後卸責之詞，難以採信。

4、被告以系爭 B 決議妨害原告對於系爭房屋所有權等圓滿行使之行為，妨害狀態持續，實已有介入意思，並具有除去妨害狀態之支配力，即應負除去妨害之責任，此從系爭大樓區權會前於 111、112 年度先後作成決議妨礙原告對於系爭房屋行使權利，且就系爭房屋調漲管理費之決議內容一致，原告亦分別提起訴訟在案，可見被告既能召開區權會不斷作成相同

7
Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 52 of 146

內容之決議，原告對於系爭房屋所有權及共有部分使用權等權能，日後遭繼續妨害之可能性極大，而有事先防範之必要，故原告依民法第 767 條第 1 項中、後段規定為請求權基礎，即屬有據，被告抗辯稱原告此部分主張與民法第 767 條第 1 項中、後段規定不符云云，容有誤解。

5、原告所有系爭房屋屬於店面，係作為商業用途，並非住家，有系爭大樓使用執照存根可佐，而系爭大樓對於系爭房屋管理費之收取標準，自 86 年以來迄至系爭決議作成前均係依「店面」標準計收，此從 98、99、108 年規約第 10 條關於管理費繳納部分，均未規定系爭房屋比照住家收費，而被告以系爭 A 決議將系爭房屋「比照」住家收費，足見被告在針對系爭房屋作成調漲管理費之決議前，皆依「店面」為管理費計費標準。再對照原證 5 即地下 1 樓管理費明細表，系爭房屋於 99 年至 106 年每坪管理費為 27.5 元之收費狀況，要與 99 年規約第 10 條「店面每坪 27.5 元/月，空屋無半價」之規定相符，且 99、108 年規約第 10 條及 111 年區權會決議第 2 案均記載「空屋無半價」等詞明確，是被告歷次關於管理費調整之區權會決議亦未見所謂空屋半價之情形。準此，被告於 113 年 12 月 22 日民事答辯四狀抗辯稱關於系爭房屋管理費均係以住家管理費空屋半價收取云云，其計算方式僅為自行拼湊之詞，與前開規約關於管理費收取標準不合，原告均否認之。至於被證 3 即管理費收費資料，其手寫部分與電腦打字登載部分不符，亦欠缺 98 年至 106 年之收費資料，原告否認被證 3 之形式暨實質真正，且其中 89、90、107 年收費資料電腦登打部分之記載，益見系爭房屋與其他 1 樓店面之管理費用均為每坪 30 元。

6、系爭 A 決議使系爭房屋負擔之管理費較其他店面倍增，其議案卻未提及從 108 年規約訂定管理費收取標準到系爭決議之調漲間，系爭房屋究竟何種活動增加何項管理費用？或系爭房屋使用何種共用部分而有更高獲益？況系爭房屋在起造當時即預定作為商場供營業使用，被告在訂定管理費收取標準時亦考量此情，故按店面收費標準訂定系爭房屋之管理費，但系爭 A 決議並未說明何以無法按各戶別原訂之性質調整管理費，及為何僅針對原告大幅加收管理費之理由，顯然欠缺調漲系爭房屋管理費合法及正當之依據，背離公平原則，且以損害特定人為目的，即與誠信原則有違，故系爭決議核屬權利濫用。

7、系爭房屋為店面，管理維護與其他 1 樓店面一致，並得與一般住家相區隔，系爭房屋人員進出或收發信件均無需經過被告社區管理室，而被告在另案訴訟就上情亦不爭執。被告雖抗辯稱系爭房屋位處系爭大樓內部，需透過社區守衛室管理人員代為換收信件，及 1 樓騎

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 53 of 146

樓店面不會使用公設云云，原告否認，且原告從未使用被證5照片所示之信箱，尤其因被告故意阻礙原告對於系爭房屋為使用收益及就該鐵捲門為修繕，被告以此據為調漲管理費之理由，更凸顯調漲系爭房屋管理費為權利濫用。再系爭房屋能經由原告之室內空間規劃設計及自主管制，隔絕消費者使用社區內部電梯及樓梯，使消費者無法直接進入社區，達到與住家生活作息各自獨立之效果，被告亦自承其可將電梯設定為系爭房屋樓層不能開啟，且系爭房屋之電梯目前仍未開啟，被告既能達成管制電梯使用之安全目的，實際上並無因系爭房屋而需額外增加管理工作內容。況系爭大樓1樓店面之水表均設置在社區11樓頂樓，並有配屬地下室之停車位，足見1樓店面使用電梯之頻率遠高於原告所有之系爭房屋，系爭大樓從有調漲管理費之需求，受益程度較低之系爭房屋，與受益程度較高之1樓店面相較，調整幅度顯不相當而有失均衡，故系爭A決議顯係專為不利原告所為之差別待遇，不符合公平原則。

8、兩造就裝設水表及水路管線部分已於114年3月11日達成和解，有協議書及同意書可憑，但原告認為即使和解，並不影響本件訴訟之進行，且依協議書記載，被告已承諾將系爭房屋之管理費部分改以每月50元/坪計收，並送區權會決議，可見被告已自承系爭A決議對原告有欠公允。

二、被告方面：

(一)就系爭A決議部分，茲說明如次：

1、原告為系爭大樓之區分所有權人，依公寓條例第10條第2項規定應負擔支付共有部分管理費之義務。又社區之價值及使用效益如何，與該社區整體外觀、結構、管理、維護等息息相關，如整棟社區大樓維護及管理良好，自有助於社區範圍內使用效益或交易價格提昇，故原告為系爭大樓區分所有權人，雖使用公共設施如電梯頻率較低，亦不得認為無庸分攤或當然減免分攤社區管理費。況原告所有系爭房屋有2支電梯分別於A棟及B棟，原告亦得正常使用(參見被證1即日電電梯估價單明確記載「A、B棟B1檢測正常」可知)。而原告主張「電梯上鎖管制」部分，先前因系爭房屋無人使用，被告為管理方便方暫時上鎖管制，目前已可正常使用，原告仍可自由使用電梯而與非店面之住家並無不同。又系爭房屋不論是電梯或一般樓梯均與住家及地下停車場相連通，即系爭房屋即為系爭大樓住家之一樓層，系爭房屋水表未來將裝設於11樓，原告日後勢必使用電梯前往11樓，倘原告未來有停車位可以使用，亦可使用電梯前往B2、B3停車場。尤其原告未來將裝修系爭房屋，勢必將大幅利

用電梯，可知就系爭大樓內之通行往來，原告與其他住戶無異，基於「集體住戶間共同生活緊密相連難以獨立切割」之性質，尚難認為系爭房屋管理費應有不同收費標準。反而系爭大樓騎樓處店面則完全獨立於大樓住家之外，其結構、位置與系爭房屋不同，騎樓處店面之員工或顧客無法使用系爭大樓內部電梯及樓梯，原告援引店面作為管理費計算標準，應屬誤會。另原告主張被告承認系爭房屋管理費自 86 年以來即係以店面標準收費云云，惟其提出原證 5 函文並未見被告對於收費標準有何描述，僅要求原告繳納前手滯納之管理費而已，原告前述主張並未舉證證明而不可採。

2、又系爭房屋與住家之大樓屬同一建物，被告對原告並非調漲超過同社區一般住戶之收費標準，自不能單憑系爭決議對原告目前之權益有所減損，即認被告係藉由多數決方式形成對少數區分所有權人即原告為不利之分擔決議，而有專以損害他人為主要目的，屬於權利濫用，或違反平等原則之情事，故系爭 A 決議不違反公寓條例之強制規定，應屬有效。

(二)就系爭 B 決議部分，茲說明如下：

1、原告起訴主張若要裝設自來水管線及獨立水表，則需要「經過車道旁裝」、「接管鑿洞至地下一樓」等方式，其施作範圍顯然不僅涉及原告得自由使用、收益之「專有部分」而已，尚包括系爭大樓全體住戶權益之共用部分(如車道、共用牆面等)，則依本院 104 年度訴字第 102 號民事裁判意旨，原告自應徵得全體共有人之同意始得對於該共有物之特定部分為占有及使用收益，而被告經由系爭區權會決議方式否決原告之提案，即係保障全體住戶權益之合理且適法之作法，原告主張系爭 B 決議有權利濫用、違背公序良俗等情事，顯然未明辨「專有部分」之範圍，其主張自不可採。

2、又系爭大樓興建時建設公司即將系爭房屋位置預定作為倉儲、置物之用，故未施作任何進水、排水設施，若貿然依原告要求裝設獨立水表及相關配備工程，對系爭大樓之結構是否發生影響，及其他使用上是否發生問題，均將難以預測，即若依原告要求另行配置水表及進排水管路如有不慎，將有危及系爭大樓全體住戶之虞(例如可能衍生後續漏水問題等，因系爭大樓 B2 以下均為停車場，若有漏水問題亦嚴重影響住戶權益)，原告應事先與相關區分所有權人溝通及提交區權會評估、議決為適當，尚難認被告之權利行使利益有超越原告喪失利益之情事。至於原告主張「施作面積非龐大」、「施工期間短暫」、「影響範圍甚小」云云，卻並未提出任何證據佐證，被告無法僅憑其片面說法置全體大樓住戶之安危於不顧。退步

言,縱認原告主張設置管線以及設置獨立水表為可採,然被告從未禁絕原告相關水路管線及獨立水表之設置,因系爭大樓住戶均將水表設置在11樓處,原告仍可與住戶協商在11樓處設置獨立水表,並經由系爭大樓既有水路管線延伸使用,被告捨此不為,卻執意要求重新設置獨立水表及配備新水路管線工程,是否為侵害最小手段,即有疑義?益見系爭B決議係為追求系爭大樓全體住戶之權利,而限縮原告部分權利之行使(原告尚有前述之其他手段),此與最高法院71年台上字第737號判決先例意旨:「自己所得利益極少而他人及國家社會所受之損失甚大者」並不相符,自無從認定被告有權利濫用之情形。準此,原告主張系爭B決議無正當理由濫用多數表決、違反公平、衡平及誠實信用原則,構成權利濫用或有違悖公序良俗,而違反民法第56條第2項、第71條前段、第72條規定、第148條而為無效,併依民法第767條第1項中段、後段主張被告應容忍原告裝設獨立水表及管線云云,應無理由。

(三)原告請求「確認B決議部分無效」及「被告應容忍原告裝設自來水管線、水錶等工程」,其主張無非係以系爭B決議有「權利濫用」、「違背民法第765條、公寓條例第4條第1項、第9條第3項,牴觸物權法所有權能內容及憲法保障財產權之核心原則及價值體系」等情形,依民法第71條、第72條及第148條規定為無效,然查:

1、原告當初從法院強制執行拍賣取得系爭房屋所有權以前,早已知悉系爭房屋「並無水電」,而該樓層本即作為「倉儲」之用,於系爭大樓規劃設計時並無裝設水路管線之需求,被告故意於拍定取得系爭房屋所有權後提出「裝設自來水管線、水錶等工程」之不合理要求,破壞系爭大樓原先規劃設計,原告始為濫用權利之一方。況依原告之主張

是否對於系爭大樓整體結構發生嚴重影響,尚不得而知,且原告未經具體評估即逕行提出要求裝設自來水管線、水表等,被告在毫無任何風險評估資訊之情況,自難認同原告之主張,系爭B決議在上開背景下作成,如何能苛責系爭區權會作成系爭決議為「權利濫用」?

2、自來水公司113年2月16日回函內容,僅針對本院所詢:「……該B1樓層設置水錶及管線,而無法與大樓其他住戶共同在11樓處設置水錶及使用共同管線?」之問題做出回覆,對於系爭房屋能否裝設自來水管線、水表?是否適合裝設自來水管線、水表?裝設自來水管線、水錶後是否會對大樓產生不良影響?等疑義,均未為任何說明,僅略稱「可依規定申請」,亦即無法排除申請後遭拒絕之可能性,故是否得依自來水公司上開函文認定安裝自

來水管線、水錶具有可行性，尚有疑義。

3、民法第 765 條及公寓條例第 4 條第 1 項後揆於「所有權」、「專有部分權利」之自由使用、收益、處分及排除他人之干涉，然依前述，系爭 B 決議涉及者不僅是原告私有之「所有權」、「專有部分權利」，亦涉及系爭大樓之共有部分，則系爭 B 決議是否違反民法第 765 條、公寓條例第 4 條第 1 項等規定，即有疑問？又原告並未具體指明系爭 B 決議「如何」違反公寓條例、區域計畫法、都市計畫法及建築法令，遽認系爭 B 決議違反公寓條例第 9 條第 3 項規定，顯無理由。至於原告主張被告拒絕同意即違反民法第 820 條第 1、3 項規定云云，然系爭大樓區分所有權人本不可能在毫無任何風險評估資訊之情況即認同原告之主張，在此背景認知下，區分所有權人投票否定即不能構成「故意或過失為不利他共有人之管理決定」至明。

(四)系爭 B 決議略以：「……地下 1 樓欲申請獨立水表，因事涉大樓結構安全及公共區域之使用及公共用水分之公平性，管委會呈請區分所有權人決議。說明：天闊有限公司代理人表示，對申請獨立水表提出方案，一為門口經車道旁裝設水表接管線緊洞至地下 1 樓，二為頂樓水塔裝設水表接管線至地下 1 樓……」等語，即系爭 B 決議討論之 2 種方案均以「獨立水表」方案為前提，至於原告聲請鑑定者則係「1 樓獨立水表」及「屋頂分表」等 2 種方案，被告認為「屋頂分表」方案與系爭 B 決議所稱「頂樓水塔裝設水表接管線至地下 1 樓之獨立水表」方案不同，故「屋頂分表」方案並未在系爭 B 決議討論範圍。

(五)台中市建築師公會系爭鑑定報告雖稱：「……倘若配管不損及樑樓板等鋼筋，建議採取墊高樓板方式，先打除磁磚粉刷層鋼筋混凝土保護層約 5 公分，上方依次配置給水等管路、點焊鐵絲網、鋪 5 公分混凝土修復粉刷層，完成騎樓人行道表面比原地板面高出 3 公分，抵石子修成 1/10 斜坡銜接，可降低騎樓順平影響如(附件十)。……」等語(參見系爭鑑定報告第 3 頁)，惟「墊高樓板」之施作方案並非系爭 B 決議討論之內容，此係鑑定單位在衡量現況後另行提出之建議，該方案尚未經被告區分所有權人會議討論，無從推認系爭 B 決議有何不當之處。又系爭鑑定報告稱：「……原告提出方案(附件三)：管線經過騎樓人行道打除樓板混凝土磁磚呈溝狀，不計磁磚粉刷層約需挖深 7 公分，深度已達樓板上層鋼筋，該處沿著小梁 b1 邊 S7 版長 3.5 公尺，上方有樓板長負主筋需要彎折鋼筋 3 公分，除此管路需穿過樑 WB,G13 端部，碰上大梁上方主筋(附件八壹樓結構圖)，彎折困難需切斷鋼筋，埋完水管上面再鋪一層鋼筋，不論彎折或切斷鋼筋均會影響該部分結構，如果下降埋管將需穿

樑，影響下方台電受電室，故此方式有影響結構而無補救或改善方法另外於騎樓柱邊埋管鑽洞配管或店舖前地下外牆鑽洞配管均影響部分結構及鄰房權益亦不可行……」等語，可知原告提出「1 樓獨立水表」方案涉及打除樓板混凝土磁磚、彎折或切斷鋼筋等問題，故有「影響結構安全」之可能，此與原告主張：「施作後對於系爭大廈現況均無影響，並無安全疑慮」、「原告主張之管線及水表設置位置及方式為損害最少之處所及方法」之說法不符。況是否構成權利濫用之判斷，係經由比較「權利人所受利益」及「造成他人所受損失」孰輕孰重為斷，系爭決議雖限制原告不能裝設 1 樓獨立水表、水路管線，使原告受有無法用水之不利益，然其保障者係避免系爭大樓結構安全受有損害，兩相比較之下，被告社區全體近 200 餘戶住戶之居住、人身安全，顯然較原告之用水權益更加重要，堪信系爭 B 決議應無濫用權利、違反誠信原則可言。再系爭鑑定報告「結論與建議」稱：「……施工期間造成通行不便及大樓管理困難，屬於所有住戶共同持有部分有公共樓梯(安全梯)、升降機、消防設備、發電機、台電受電室、屋水處理池等及其他公共設施，平時均有賴專業管理與共同維護。共有部分公共設施變更應受公寓條例規範，區分所有權人會議同意。……」(獨立水表方案)、「……(二)屋頂設自來水分錶須於欄杆鑽洞 1 樓版鑽洞，適當鑽洞不影響結構安全，惟施工期間搭設鷹架多少造成住戶生活不便，大樓出入人員管理困擾，外牆配設管線影響建築物外觀，所有住戶共同持有部分另有公共樓梯(安全梯)、升降機、消防設備、發電機、台電受電室、汙水處理池等公共設備、平時均需專業管理與共同維護，故同樣應經受公寓條例規範，區分所有權人會議同意。」(分表方案)等語(參見系爭鑑定報告第 5、6 頁)，可見系爭鑑定報告提出上開 2 種施作方式固不影響系爭大樓結構體安全，然無論是採取「墊高樓板施作獨立水表」或「分表方式施作」，仍會對於被告社區住戶權益產生極大影響，系爭決議作成時亦將此住戶生活不便、日後管理成本等因素納入考量，自不能僅因原告權益受限即推認有權利濫用、違反誠信原則之情形。

(六)原告雖主張依民法第 767 條第 1 項中段、後段作為請求被告容忍其設置、維護自來水表、水管及配備工程之請求權基礎，然原告主張「受侵害之所有權」為何不明，其引用公寓條例第 4 條第 1 項及第 5 條規定作為請求之法理依據，倘原告係指系爭房屋為其「專有部分」，因系爭 B 決議並未對原告如何管理、使用系爭房屋「專有部分」做出任何限制，其內部管線之裝設、配置即非系爭 B 決議禁止之對象，故原告主張系爭房屋所有權受侵害云云，即屬無據。又依公寓條例第 9 條規定可知，就公寓大廈共有共用部分及其基地之使用、收益，可透過共有人間約定為之，且該約定應不得違反公寓條例、區域計畫法、都市計畫法及

13

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 58 of 146

建築法令，是系爭 B 決議係經由區權會決議方式形成對於共用部分管理、使用之限制，要與公寓條例第 9 條第 1、2 項規定相符，且系爭 B 決議並無任何違反公寓條例、區域計畫法、都市計畫法及建築法令等情形，亦未違背公寓條例第 9 條第 3 項規定，堪認系爭 B 決議應係「合法」限制原告對於「共有部分」之使用權利。至於原告雖援引公寓條例第 4 條第 1 項及第 5 條等規定，然上開法條規範對象均係指公寓大廈「專有部分」，「是否得於共有部分設置管線」並非公寓條例第 4 條第 1 項及第 5 條規定範圍。再公寓大廈「共有部分」之使用往往涉及全體區分所有權人之權益，在「共有部分」之管理、使用上需要調和單一住戶與全體區分所有權人間之矛盾，無法僅憑單一住戶需求，即容任其自由使用、收益、處分「共有部分」及排除他人干涉，此從公寓條例第 6 條第 1 項第 4 款規定「管線之設置」需要經由管理負責人或管理委員會同意後為之，被告在接獲原告之請求後交由區權會決定如何處置，因原告之提案已涉及全體住戶重大權益問題，則由區權會討論後投票表決，最為公平公正，是原告以民法第 767 條第 1 項中段、後段作為請求權基礎，其受侵害所有權範圍尚未特定，而被告既依合法、合理之區分所有權人決議而管理、使用系爭大樓共有部分，非屬於原告之無權妨害，且依原告更正後聲明，原告並非請求被告除去既有妨害，亦非請求禁止被告妨害其所有權，而係請求被告「容忍」其設置及維護自來水表、水管及配備工程，其請求是否包含在民法第 767 條第 1 項中、後段規定之射程範圍，顯有疑義。

(七)系爭房屋管理費均係以住家管理費之「半價」收取，此有被證 3 即青海寶麗金管理費收費資料表可稽，茲補充說明如下：

1、89-90 年部分，係以每坪每月 27.5 元為收費標準，與同期其他商家以每坪每月 15 元為收費標準不同，而被證 3 收費資料表以電腦繕打，實際收費應以其上「管理員手寫金額」為準(當時社區管理員年事已高，不懂如何使用電腦，其記錄管理費收費方式係沿用先前留存有錯漏管理費收費資料表表格，並在各欄位處以原子筆記載正確金額)。至於一般住家收費為係以每坪每月 55 元為收費標準，騎樓店家收費為係以每坪每月 15 元為收費標準。

2、97 年部分，店面管理費收費單價記載為 15 元/坪，一般住　家管理費收費單價記載為 55 元/坪，而特殊戶型包含系爭房屋管理費仍係以每坪每月 55 元為收費標準，至於其他未有住戶入住房屋仍以 27.5 元/坪計收。

3、98 年 10 月 25 日以後，店面每月 15 元/坪、住家每月 55 元/坪，空屋半價(參見被證

14

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 59 of 146

6即98年規約第4頁、98年10月25日區權會會議紀錄第2頁)。

4、100年1月1日以後,店面每月27.5元/坪、住家每月55元/坪,空屋無半價(參見被證6即99年10月31日區權會會議紀錄第7頁,99年規約第9頁,區權會決議於100年1月開始調整)。

5、107年1月1日以後,店面每月27.5元/坪、住家每月60元/坪,空屋無半價(參見被證6即106年10月29日區權會會議紀錄第21頁,該收費方式於107年1月1日調漲)。

6、111年10月以後,店面每月40元/坪,空屋無半價,住家每月70元/坪,空屋無半價,系爭房屋比照住家收費。

(八)系爭大樓規約雖未限制1樓騎樓店面使用公設,然因結構關係,1樓騎樓店面並不會使用被告社區之公設,且騎樓店面並非被告社區「內部」住戶,如要出入被告社區「內部」,亦多詢問社區管理人員而不會貿然進入,此與系爭房屋人員可以自由出入模式有別。又因1樓騎樓店面都有對外門面,收發信件均係由郵差直接交付予騎樓店面人員,然系爭房屋位於被告社區「內部」,收發信件並無對外收收管道,必需透過社區守衛室管理人員代為接收,或投遞於內部信箱,此與1樓騎樓店面之收發文件情形不同。

(九)兩造已於114年3月11日簽訂協議書,被告同意原告先行接管使用新華建設事業有限公司(下稱新華公司)原向自來水公司申請使用之水表及水路管線,並由原告自行負擔接管使用水表及水路管線之施工費用。原告亦於同日書具同意書,同意日後若發生污水管線損壞,或存在其他有修繕必要之情況,需進入或使用系爭房屋時,被告人員或指定之人經原告或日後承租方許可後,始得進入系爭房屋空間進行修繕。

(十)並聲明:原告之訴駁回。

三、兩造不爭執事項:

(一)原告為系爭大樓之區分所有權人,於111年9月27日因參與法院強制執行拍賣程序得標取得系爭房屋所有權,系爭房屋經法院點交時並無設置水表及自來水管線,處於無自來水可使用狀態。

(二)被告於112年10月22日召集區權會作成如附表所示之系爭決議。

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 60 of 146

(三)被告曾於111年10月23日召集區權會就系爭房屋之管理費計算方式比照住家,每月每坪以70元計算,原告不服提起確認該項決議無效之訴(另有其他聲明請求與本件無關,不贅),經本院民事庭以111年度訴字第3318號民事判決駁回原告此部分請求,原告就變更管理費決議部分不服提起第二審上訴,再經臺中高分院於114年3月19日以113年度上字第420號民事判決駁回上訴,尚未確定。

(四)本院函詢自來水公司關於原告主張申設獨立水表及水路管線之可行性,經該公司以113年2月16日函文答覆稱:「經查本案地址未申請用水,倘日後需申請用水,可依規定申請:(一)獨立表:設置於1樓建築線旁,獨立設置水表及管線。……(二)分表:分表表位自備設置於屋頂大樓分表集中處,使用大樓自設供水設備及公共空間。……」等語。

(五)兩造於114年3月11日簽訂協議書,被告同意原告先行接管使用新華公司原向自來水公司申請使用之水表及水路管線,並由原告自行負擔接管使用水表及水路管線之施工費用。原告亦於同日書具同意書,同意日後若發生污水管線損壞,或存在其他有修繕必要之情況,需進入或使用系爭房屋時,被告人員或指定之人經原告或日後承租方許可後,始得進入系爭房屋空間進行修繕。

四、兩造爭執事項:

(一)原告訴請確認被告於112年10月22日召開系爭區權會作成如附表所示之系爭決議無效,是否有理由?

(二)原告訴請被告應容忍並禁止妨礙原告及其所雇請之工程人員依系爭鑑定報告第4-5頁所載如鑑定結果所示方式,對系爭房屋進行設置及維護自來水表、水管及配備工程,是否有據?

五、法院之判斷:

(一)原告訴請確認被告於112年10月22日召開系爭區權會作成如附表所示第1案之系爭A決議部分無效,為無理由:

1、查總會決議之內容違反法令或章程者,無效,民法第56條第2項著有明文。而特定公寓大廈之全體區分所有權人,與民法社團均屬人的結合,有其相似性,在民主精神與法人自治基礎下,對於公寓大廈區分所有權人會議所為決議是否無效之爭執,自得類推適用民法

16

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 61 of 146

第 56 條第 2 項規定，視其決議內容是否有違反法令或章程(規約)而定。又行使權利，履行義務，應依誠實及信用方法，民法第 148 條第 2 項亦定有明文。公寓大廈共用部分、約定共用部分之修繕、管理、維護費用，原則上由公共基金支付或由區分所有權人按其共有之應有部分比例分擔之，惟區分所有權人會議或規約另有規定者，從其規定。公寓條例第 10 條第 2 項規定甚明。則共用部分之管理維護費用，以按區分所有權人共有之應有部分比例分擔為原則，惟區分所有權人會議或規約得依專有部分及共用部分坐落之位置關係、使用目的及利用狀況等情事，就公寓大廈共用部分之修繕管理及維護費用之負擔，為有別於共有之應有部分比例分擔規定。且其訂定分擔之標準或嗣後為變更時，基於公寓大廈為多數生活方式不同之住戶群聚經營共同生活環境之團體，住戶間就共用部分之使用頻率及其相互影響具有複雜多樣且不易量化之特性，難以具體核算區分所有權人就共用部分之各別使用利益，倘其分擔標準之設定或變更已具備客觀上合理性，且其區別程度亦不失相當性者，即難認為無效(參見最高法院 109 年度台上字第 1025 號民事裁判意旨)。

　　2、另「法律行為，違反強制或禁止之規定者，無效。」、「法律行為，有背於公共秩序或善良風俗者，無效。」、「權利之行使，不得違反公共利益，或以損害他人為主要目的(第 1 項)。行使權利，履行義務，應依誠實及信用方法(第 2 項)。」，民法第 71 條前段、第 72 條及第 148 條分別設有規定。而民法第 72 條所謂法律行為有背於公共秩序或善良風俗者無效，乃指法律行為本身違反國家社會一般利益及道德觀念而言。而法律行為是否違反公序良俗，則應就法律行為之內容，附隨情況，以及當事人之動機、目的及其他相關因素綜合判斷之(參見最高法院 83 年度台上字第 1530 號民事裁判意旨)。另民法第 148 條係規定行使權利，不得以損害他人為主要目的，若當事人行使權利，雖足使他人喪失利益，而茍非以損害他人為主要目的，即不在該條所定範圍之內(參見最高法院 45 年台上字第 105 號民事判決先例意旨)。且在私法領域內，當事人依其意思所形成之權利義務關係，基於契約自由原則，權利人雖得自由決定如何行使其基於契約所取得之權利，惟權利人就其已可行使之權利，在相當期間內一再不為行使，並因其行為造成特殊情況，足以引起義務人之正當信任，以為倘其履行權利人所告知之義務，權利人即不欲行使其權利，如是衡諸權利之性質，法律行為之種類，當事人間之關係，社會經濟情況及其他一切因素，認為權利人在義務人履行其所告知之義務後忽又出而行使權利，足以令義務人陷入窘境，有違事件之公平及個案之正義時，本於誠信原則發展而出之法律倫理(權利失效)原則，應認此際權利人所行使之權利有違誠信原則，而不能發生應有之效果(參見最高法院 100 年度台上字第 1728 號民事裁判意旨)。

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 62 of 146

3、原告主張於 111 年 9 月 27 日因法院強制執行拍賣登記為系爭房屋所有權人，而為系爭大樓區分所有權人，系爭 A 決議將系爭房屋之管理費「比照住家收費」乙節，已據其提出系爭土地、房屋之土地、建物登記第 2 類謄本、系爭區權會會議紀錄可證(參見本院卷第 1 宗第 35～41 頁)，核屬相符，亦為被告不爭執，是原告此部分主張自堪信為真實。至原告主張系爭房屋為店面，系爭房屋原與其他店面管理費之收取標準相同等情，雖為被告所否認，並以上情抗辯。惟依系爭大樓規約之最後修訂日期分別為 99 年 10 月 31 日、108 年 10 月 31 日，均無系爭房屋管理費比照住家收取之相關內容，迄至作成系爭 A 決議時始增列「系爭房屋比照住家收費」之記載，有系爭規約及系爭 A 決議可稽(參見本院卷第 1 宗第 39、63 頁)，可見於系爭 A 決議作成前，系爭房屋均按店面標準收取管理費。至於被告抗辯稱系爭房屋管理費原即按住家標準收取，甚至有「空屋半價」之情

事，並提出 89 年至 90 年間系爭大樓管理費收取資料為證(參見本院卷第 1 宗第 409 頁)，然上開資料原為電腦繕打製作，關於系爭房屋部分有以手寫修改之情形，被告固稱應以手寫修改為準，卻未提出積極證據證明，且被告迄未提出於作成系爭 A 決議前有何修改上開規約規定之區權會決議存在，尚難遽認系爭房屋管理費原始即按住家標準收取，被告此部分抗辯委無可採。

4、原告另主張系爭房屋於建商規劃設計時即為店面，對外有獨立出入口，可與系爭大樓住家區域完全隔離，且使用系爭大樓公共設施及需社區守衛室管理人員服務者均較一般住家少各情，已據其提出系爭大樓正面照片、複丈成果圖手繪標示為證，固堪認系爭房屋有直接連通至系爭大樓騎樓之出入口存在，然系爭房屋位置既坐落在系爭大樓內部地下 1 樓，並設有門扇可直接通至系爭大樓內部電梯及樓梯，亦有現場照片及系爭大樓地下 1 樓平面圖可參，而系爭大樓電梯於系爭房屋部分，僅因系爭房屋目前無人使用而暫未開啟，但仍可隨時開啟，且該電梯經檢測均正常，亦有吉承日電股份有限公司估價單 1 紙足憑(參見本院卷第 1 宗第 121 頁)，故系爭房屋之住戶即原告或相關使用人員(含日後可能之承租人)即可經由系爭房屋之門扇及樓梯間進入系爭大樓內部之電梯及樓梯，並使用電梯或樓梯通往系爭大樓之住家、頂樓、公共區域及地下停車場等，此與系爭大樓 1 樓之騎樓店面住戶須先經由戶外騎樓，再通過系爭大樓管理室始可進入大樓內部使用公共設施之情形不同，可見系爭房屋住戶使用系爭大樓公共設施之便利性及受益程度，核與一般住家住戶相近。又系爭大樓設有供系爭房屋住戶使用之專用信箱，亦為原告不爭執，則系爭房屋住戶既可與一般住家同樣享有

使用公共設施、保全、管理室、清潔人員等安全維護、信件包裹代收等服務，原告是否使用被告社區上開安全維護及信件代收等服務，要屬原告自行選擇接受服務與否之權利行使，在欠缺積極證據證明被告拒絕對原告提供上開服務之前提，自不得以原告主張未曾使用上揭信箱或不會干擾一般住家之生活作息為由，遽認被告有何故意妨礙其使用、收益系爭房屋之情事。是依系爭房屋與一般住家坐落位置之關係及利用公共設施便利性、受益程度等情事，系爭A決議以多數意見變更系爭房屋管理費收取標準與一般住家相同，應認已具備客觀上合理性，且其程度亦不失相當性，自難認為系爭A決議為無效。

5、原告又主張系爭房屋在系爭大樓設有獨立出入口，將來會透過室內規劃設計，管制、禁止消費者進入系爭大樓內部電梯或樓梯，且使用被告社區管理室等公共設施之可能性較一般住家為低等語。然系爭房屋通往系爭大樓內部之電梯及樓梯等門扇並未封閉，而原告是否使用系爭大樓電梯、樓梯、信箱或其他公共設施，係屬是否行使權利之選擇，尚難據為應減少負擔管理費之理由，已如前述。再系爭房屋性質既為商場，日後若有營業行為，其出入人員應較一般住家為複雜，且其坐落位置、通道均與住家區域關連性較為密切，復有門扇可直接通往住家及其他公共區域，則被告因系爭房屋之鄰防或相關安全管理問題亦需支出相對費用，並非如原告主張不致增加被告對於系爭大樓管理及維護上之負擔，亦毋庸支出相關費用。準此，系爭A決議雖就系爭房屋管理費收取標準每坪每月調漲40元，然其調整後金額與一般住家部分相同，並未超過系爭大樓多數住家住戶管理費之收取標準，且具備客觀上合理性，自不得以所謂「調幅比例」或「調整倍數」為何，遽認系爭A決議係以損害原告為目的，自無違反誠信原則或權利濫用之情事。再系爭A決議既係以系爭區權會決議修正系爭大樓一般住家住戶管理費收取標準，而區權會決議以區分所有權人多數決方式為之，亦為公寓條例第31條等規定所允許，且上揭調整住家部分管理費之決議與社會公共秩序或善良風俗全然無涉，何來違反法律強制禁止規定、公序良俗等情事？尤其原告迄未舉證證明被告有何舉動或作為讓其誤信不會有調整管理費，或有長期不行使權利，而誤認不會再有行使權利等情形，則被告何來違反誠信原則、權利濫用等情事？是原告主張系爭A決議違反民法第72條、第148條規定，應類推適用民法第56條第2項規定而無效，尚屬無據。

(二)==原告訴請確認被告於112年10月22日召開系爭區權會作成如附表所示第2案之系爭B決議部分無效，為有理由==：

1、查民法第736條規定：「稱和解者，謂當事人約定，互相讓步，以終止爭執或防止爭執

發生之契約。」，民法第 737 條亦規定：「和解有使當事人所拋棄之權利消滅及使當事人取得和解契約所訂明權利之效力。」。而和解，如當事人係以他種之法律關係或以單純無因性之債務約束等，替代原有之法律關係而成立者，為屬於創設性之和解；若僅以原來明確之法律關係為基礎而成立和解時，則屬認定性之和解。倘係前者，債務人如不履行和解契約，債權人應依和解所創設之新法律關係請求履行，不得再依原有之法律關係請求給付。如為後者，既係以原來明確之法律關係為基礎而成立之和解，僅有認定之效力，債權人自非不得依原來之法律關係訴請債務人給付，祇法院不得為與和解結果相反之認定而已(參見最高法院 98 年度台上字第 315 號民事裁判意旨)。再民事訴訟法第 279 條第 1 項規定：「當事人主張之事實，經他造於準備書狀內或言詞辯論時或在受命法官、受託法官前自認者，無庸舉證。」，而當事人或其訴訟代理人於訴訟上所為之自認，於辯論主義所行之範圍內有拘束當事人及法院之效力，法院應認其自認之事實為真，以之為裁判之基礎，在未經當事人合法撤銷其自認前，法院不得為與自認之事實相反之認定(參見最高法院 101 年度台上字第 1029 號民事裁判意旨)。

2、兩造間就被告於 112 年 10 月 22 日召開系爭區權會作成如附表所示第 2 案之系爭 B 決議部分，因被告已於 114 年 3 月 11 日與原告簽訂協議書，約定被告同意原告先行接管使用新華公司原向自來水公司申請使用之水表及水路管線，並由原告自行負擔接管使用水表及水路管線之施工費用。原告亦於同日書具同意書，同意日後若發生污水管線損壞，或存在其他有修繕必要之情況，需進入或使用系爭房屋時，被告人員或指定之人經原告或日後承租方許可後，始得進入系爭房屋空間進行修繕等情，已為兩造一致不爭執，並有該協議書及同意書各在卷可稽(參見本院卷第 2 宗第 17、19、33 頁)，是被告既已同意讓原告接管使用建商新華公司原向自來水公司申請使用之水表及水路管線，並由原告負擔接管使用水表及水路管線之施工費用等情事，可見被告已認同原告確有在系爭大樓裝設水表(不論是獨立水表或頂樓分表)及在系爭房屋設置水路管線之需求，並與原告成立和解契約，應係就原告此部分主張之事實(即系爭 B 決議部分)發生自認之效力，而此項自認即有拘束兩造當事人及法院之效力，法院應認被告自認之事實為真正，並據為裁判之基礎，在未經被告合法撤銷其自認前，法院不得為與自認之事實相反之認定。準此，系爭區權會作成系爭 B 決議前，在討論過程欠缺充分相關資訊之情形，無視自來水乃民生基本需求，及系爭房屋是否確有使用自來水之需求，尤其系爭大樓及系爭房屋均於 83 年 6 月間即已建造完成，縱令建造當時確無水表及水路管線等設施之規劃，但是否事隔 30 年後仍欠缺此項民生需求(用水)之必要性，即有疑

20

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 65 of 146

問？況依系爭房屋登記謄本記載，主要用途為「商業用」(參見本院卷第 1 宗第 37 頁)，而依目前之社會環境及日常生活需要，作為營業空間之系爭房屋是否「絕不需要」用水？被告疏未考量時空環境已有變遷，亦未探究原告申請在系爭房屋設置水表及水路管線是否確對系爭大樓 結構安全造成負面影響，明知相關資訊確有不足之情況，猶逕行以多數決方式表決通過系爭 B 決議，否定原告之提案請求，在客觀上自屬專以損害原告為主要目的，依前揭民法第 148 條第 1 項規定，即為權利濫用，應認為系爭 B 決議為無效。

(三)原告訴請被告應容忍並禁止妨礙原告及其所僱請之工程人員依系爭鑑定報告第 4-5 頁所載如鑑定結果所示方式，對系爭房屋進行設置及維護自來水表、水管及配備工程，為有理由：

1、又民法第 767 條第 1 項規定：「所有人對於無權占有或侵奪其所有物者，得請求返還之。對於妨害其所有權者，得請求除去之。有妨害其所有權之虞者，得請求防止之。」， 而此所謂妨害者，係指以占有以外方法，客觀上不法侵害所有權或阻礙所有人之圓滿行使其所有權之行為或事實而言。而所謂「不法」，僅須所有人對於行為人之妨害，於法令上並無容忍之義務為已足，並非以行為人之妨害具有刑事責任或有民事上無效、得撤銷事由為必要(參見最高法院 88 年度台上字第 2420 號民事裁判意旨)。另所謂有妨害所有權之虞，應就具體事實，依社會上一般觀念決定之。倘就現在既存之危險狀況加以判斷，所有人之所有權在客觀上被妨害之可能性極大，而有事先防範之必要者，即足當之(參見最高法院 109 年度台上字第 2932 號民事裁判意旨)。被告抗辯稱民法第 767 條第 1 項中段、後段規定之法效範圍不及於「容忍」義務云云，要無可採。

2、原告主張在系爭房屋設置水表及水路管線，其施作方式有二：即(1)在 1 樓設置獨立水表及埋設水路管線，(2)分表方式，即與系爭大樓其他住戶共同在 11 樓處設置分表及使用共同管線施作，被告原表示反對上開 2 方案，但兩造既於 114 年 3 月 11 日就裝設水表及水路管線部分達成協議，被告同意原告先行接管使用建商新華公司原向自來水公司申請使用之水表及水路管路，並由原告自行負擔施工費用， 已如前述，而本院曾就原告主張之上開 2 種施作方式囑託台中市建築師公會鑑定是否破壞系爭大樓結構安全，鑑定結論認為：「(1)獨立水表建議由騎樓埋設管線施工方式，打除表層後再復原對整體結構安全影響降至最低，得以解決工程施工問題，騎樓供公共通行鋪設新面材有改變建築物外觀，施工期間造成通行不便及大樓管理困難，屬於所有住戶共同持有部分有公共樓梯(安全梯)、升降機、消防設

備、發電機、台電受電室、屋水處理池等及其他公共設施，平時均有賴專業管理與共同維護。共有部分公共設施變更應受公寓條例規範，區分所有權人會議同意。(2)屋頂設自來水分錶須於欄杆鑽洞1樓版鑽洞，適當鑽洞不影響結構安全，惟施工期間搭設鷹架多少造成住戶生活不便，大樓出入人員管理困擾，外牆配設管線影響建築物外觀，所有住戶共同持有部分另有公共樓梯(安全梯)、升降機、消防設備、發電機、台電受電室、汙水處理池等公共設備、平時均需專業管理與共同維護，故同樣應經受公寓條例規範，區分所有權人會議同意。」等語(參見系爭鑑定報告第 5、6 頁)，可見系爭鑑定報告提出上開 2 種施作方式並不影響系爭大樓結構體安全，無論是採取「墊高樓板施作獨立水表」或「分表方式施作」，在施工期間可能 會對於被告社區住戶生活產生影響，但因施工期間並非長久，對住戶生活不便之處尚屬有限，且此屬技術問題，並非無法克服或經由其他方式解決(或由原告對可能受影響之住戶提出回饋或補償等)，故在兩造間之利益權衡，應認解決原告之用水民生需求重於施工期間對部分住戶造成之生活不便等影響，則原告請求被告應容忍並禁止妨礙原告及其所僱請之工程人員依系爭鑑定報告第 4-5 頁所載如鑑定結果所示方式，對系爭房屋進行設置及維護自來水表、水管及配備工程，即有理由，應予准許。

六、綜上所述，被告於 112 年 10 月 22 日召開系爭區權會作成如附表所示之系爭決議部分，其中系爭 A 決議調整系爭房屋管理費並無違反法律強制禁止規定、公序良俗，亦無違反誠信原則及權利濫用等情形，系爭 A 決議自屬有效，原告此部分主張為無理由，應予駁回。又系爭 B 決議即系爭房屋設置水表及水路管線，此部分應屬權利濫用而無效，但因兩造已達成和解，被告同意原告先行接管使用舊有水表及水路管線，益見系爭 B 決議之討論表決過程確有瑕疵之情事，則依系爭鑑定報告記載，系爭房屋設置水表及水路管線並不影響系爭大樓結構安全，則原告訴請被告應容忍並禁止妨礙原告及其所僱請之工程人員依系爭鑑定報告第 4-5 頁所載如鑑定結果所示方式，對系爭房屋進行設置及維護自來水表、水管及配備工程，亦有理由，併准許之。

七、再本件事證已臻明確，兩造其餘攻擊防禦方法及所提證據資料，核與本判決所得心證及結果均不生影響，毋庸逐一論述，併此敘明。

參、結論：本件原告之訴為一部有理由、一部無理由，依民事訴訟法第 79 條判決如主文。

中　華　民　國　114　年　5　月　28　日

民事第一庭　　法　官　林金灶

以上正本係照原本作成。

如對本判決上訴，須於判決送達後 20 日內向本院提出上訴狀。如

委任律師提起上訴者，應一併繳納上訴審裁判費。

中　華　民　國　114　年　5　月　28　日

書記官　張哲豪

附表：(金額：新台幣元)

| 議案 | 決議內容 |
|---|---|
| 第 1 案案由：<br>管理費自 112 年 01 月 01 日起調漲；調漲幅度於會議中討論與決議。 | 店面調整為每坪 40 元/月；住家每坪 70 元/月；地下 1 樓比照住家收費(每坪 70 元/月)。 |
| 第 2 案案由：<br>地下 1 樓欲申請獨立水表，因事涉大樓結構安全及公共區域之使用及公共用水分攤之公平性，管委會呈請區分所有權人決議。 | 區分所有權人表決同意 9 票；反對 123 票，地下 1 樓申請獨立水表案否決。 |

歷審裁判

臺灣臺中地方法院 113 年度訴字第 45 號裁定

臺灣臺中地方法院 113 年度訴字第 45 號判決

相關法條

23

Exhibit 3 to Lee Declaration

Exhibit A to Petition - p. 68 of 146

公寓大廈管理條例第 4 條、公寓大廈管理條例第 5 條、公寓大廈管理條例第 6 條、公寓大廈管理條例第 9 條、公寓大廈管理條例第 10 條、公寓大廈管理條例第 31 條、民事訴訟法第 79 條、民事訴訟法第 170 條、民事訴訟法第 175 條、民事訴訟法第 247 條、民事訴訟法第 256 條、民事訴訟法第 277 條、民事訴訟法第 279 條、民法第 56 條、民法第 71 條、民法第 72 條、民法第 148 條、民法第 736 條、民法第 737 條、民法第 765 條、民法第 767 條、民法第 820 條

24
Exhibit 3 to Lee Declaration

Taichung District Court, Taiwan

【Case Number】 113, Su, 45

【Date of Judgment】 May 28, 2015

【Subject Matter】 Declaration of Invalidity of Condominium Owners' Meeting Resolution, etc.

【Judgment Text】

Civil Judgment of the Taichung District Court, Taiwan

Case No. 45 of 113

Plaintiff          Plaintiff: Tiankuo Co., Ltd.

Legal Representative: Zhu Youzong

Legal Representative Attorney Tsai Hsiu-Yuan Co-Representative          Attorney Lin Bo-han

Defendant          Defendant: PolyGram Building Management Committee

Legal Representative: Lin Ruixing

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 70 of 146

Legal Representative Attorney Huang Zhengzhe Deputy Representative        Attorney Hong Renfeng

 Regarding the above-mentioned parties' request to invalidate the resolution of the owners' meeting, this Court concluded oral arguments on April 16, 2025, and hereby issues the following judgment:

 Main   Text

 1. The resolution adopted at the owners' meeting convened by the defendant on October 22, 2023, as detailed in Appendix 2, is hereby declared invalid.

 2. The defendant shall tolerate and refrain from obstructing the plaintiff and its hired engineering personnel from installing and maintaining water meters, water pipes, and related equipment in the plaintiff's property located at [Address], as described in the appraisal report dated October 24, 2014 (Case No. 000-○○○○ ) issued by the Taichung City Architects Association, in accordance with the methods specified in pages 4 and 5 of said report. 5 of the Appraisal Report dated October 24, 2014 (Case No. 000-xml-ph-0000@deepl.internal), to install and maintain water meters, water pipes, and related equipment in the property owned by the plaintiff, located at the first basement floor of No. ○○, ○○ Road, ○○ District, Taichung City.

 3. The plaintiff's remaining claims are dismissed.

 IV. The defendant shall bear one-half of the litigation costs, with the remainder borne by the plaintiff. Facts and Reasons

 I. Procedural Matters:

 1. The Civil Procedure Act explicitly states that supplementing or correcting factual or legal statements without altering the subject matter of the suit does not constitute an amendment or addition to the claim (Article 256). The plaintiff's original statement of claim was: "1. To confirm the invalidity of the resolution (hereinafter referred to as the Disputed Resolution) adopted at the meeting of owners of separately owned property (hereinafter referred to as the Disputed Owners' Meeting) convened by the defendant on October 22, 2023, as shown in the attached table. 2. The defendant shall tolerate and prohibit any

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 71 of 146

obstruction of the plaintiff and its hired engineering personnel in installing and maintaining water meters, water pipes, and related equipment on the land located at Plot 00, Section ○○, District ○○, Taichung City, and the building located thereon with Building No. 1071 in the same section." Subsequently, on October 22, 2023, during the oral argument session, the plaintiff filed a pleading to amend the second claim as follows: "The defendant shall tolerate and prohibit any obstruction of the plaintiff and its hired engineering personnel in installing and maintaining water meters, water pipes, and related equipment in accordance with the findings stated on pages 4-5 of the appraisal report issued by the Taichung City Architects Association on October 24, 2024 (Case No. 000-0000, hereinafter referred to as the "Disputed Appraisal Report") on October 24, 2024, to install and maintain water meters, water pipes, and related equipment at the plaintiff's

the property located at No. 00, Section 0, ○○ Road, ○○ District, Taichung City (hereinafter referred to as the Disputed Property), with a street address of ○○ District, ○ Road, Section 0, No. 00, Taichung City. The remainder remains unchanged, as evidenced by the civil preparation pleading of that date (see Volume 1, Page 333 of this Court's record). This Court, having considered the plaintiff's aforementioned amendment request, finds that neither the legal relationship nor the factual basis of the subject matter of the litigation has changed. The amendment merely corrects or supplements the statement based on the conclusions of the disputed appraisal report. It constitutes an amendment to factual statements. Pursuant to

First, it should be clarified that the provision of the law does not constitute an amendment or addition to the suit and should be permitted.

II. Furthermore, "Where a party loses capacity to sue, or where a legal representative dies or their authority ceases, the proceedings shall be automatically suspended until a legal representative or the party regaining capacity to sue assumes the litigation." "The persons entitled to assume the litigation under Articles 168 to 172 and the preceding article shall, upon becoming eligible to assume, immediately declare their assumption. The opposing party may also declare assumption of the litigation." Provisions are established in Articles 170 and 175 of the Civil Procedure Law, respectively. When the plaintiff filed the lawsuit, the original defendant was the legal representative, Luo Guoxiang, Chairman of the Community Management Committee. Subsequently, on October 27, 2014, due to the expiration of the Chairman's term, the defendant re-elected Lin Ruixing to assume the position.

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 72 of 146

. The defendant then filed a statement of assumption of litigation on December 23, 2014, and submitted the minutes of the defendant Community Management Committee meeting on October 27, 2014

and the letter from the Taichung City Government Urban Development Bureau dated November 27, 2014, as evidence. The civil statement of assumption of litigation dated that day is on file for reference (see pages 385 and 405 of Volume 1 of this Court's case file). This Court, having considered the aforementioned statement of assumption of litigation made by the defendant, finds it to be in compliance with legal provisions and shall grant permission.

III. Furthermore, a declaratory action may not be brought unless the plaintiff has a legal interest in obtaining a declaratory judgment, as expressly provided in the first part of Article 247(1) of the Civil Procedure Law. The term "legal interest in obtaining a declaratory judgment" refers to situations where the existence of a legal relationship is uncertain, the plaintiff subjectively perceives an unsettled state regarding their legal position, and such uncertainty can be resolved by a declaratory judgment. If the uncertainty cannot be resolved even with a court's declaratory judgment, it is difficult to recognize the existence of a legal interest in obtaining such a judgment. (See the rationale of the Supreme Court's Civil Judgment No. 961 of 90). The plaintiff alleges that the disputed resolution adopted by the defendant community at the disputed district rights meeting held on October 22, 2023, violates laws, regulations, and bylaws, as well as principles of good faith and constitutes an abuse of rights, rendering it invalid. This forms the basis of the first claim in the statement of claim, seeking confirmation that the disputed resolution, as shown in the attached table, is invalid. The defendant has denied this. Therefore, whether the disputed resolution is valid, directly impacts the amount of monthly management fees the plaintiff must pay starting January 1, 2023, and whether the plaintiff may install an independent water meter and pipeline on the first basement floor of the disputed property. This uncertainty regarding the plaintiff's private law status as a co-owner within the defendant community creates a state of legal uncertainty, This state of uncertainty may be resolved by obtaining a final and binding court judgment in favor of the plaintiff. Therefore, pursuant to the first part of Article 247(1) of the aforementioned Civil Procedure Law and the intent of the Supreme Court's Civil Judgment No. 961 of 90, it should be recognized that the plaintiff has a legal interest in obtaining a declaratory judgment. Thus, the plaintiff's claim for a negative declaratory judgment in Item 1 of the statement of claim is lawful and should be permitted.

II. Substantive Issues: A. Regarding the Plaintiff:

(1) Plaintiff's Claims:

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 73 of 146

1. The PolyGram Building (hereinafter referred to as the "Disputed Building") is situated on land parcel 00, segment ○○, district ○○, Taichung City. The plaintiff is the owner of land parcel ○○, segment ○○, district ○○, Taichung City, which is adjacent to the Disputed Building.

Building No. 1071 in the same section, which is the disputed property. However, on October 22, 2023, the Defendant convened a meeting of the owners' association for the disputed building and adopted Resolution No. 1 regarding the calculation of management fees (hereinafter referred to as Resolution A when mentioned separately) and Resolution No. 2 regarding the rejection of installing independent water meters on the first basement floor (hereinafter referred to as Resolution B when mentioned separately), both of which were primarily intended to harm the Plaintiff. and are invalid under the first part of Article 71 and Article 148 of the Civil Code. Moreover, they have impeded the plaintiff's legitimate exercise of ownership rights over the disputed property. The plaintiff is therefore entitled to request the defendant to remove the impediment, as detailed below:

(1)        Request for Declaration of Partial Invalidity of Resolution A:

① The disputed property is primarily used for commercial purposes such as a shopping mall, functioning as a storefront. It features an independent entrance on the first floor of the disputed building for customer access, and its usage and structure are equivalent to other first-floor storefronts. The plaintiff has also planned the disputed premises for commercial use, with access solely through the independent entrance on the first floor of the community. Consumers will not use the community's internal elevators or staircases and cannot directly enter the community, ensuring that its operational rhythm is completely separate from residential living. Thus, the disputed premises are already recognized as being distinctly separated from non-storefront residential units. Since the disputed premises differ from typical residential units requiring access via the building's elevators or shared staircases, the level of management and maintenance they receive is also different. Consequently, the management measures for the disputed premises should be identical to those for other storefronts. Accordingly, since the disputed property itself is used for commercial operations as a storefront and not as a residence, its usage of public facilities and level of management and maintenance are identical to other first-floor storefronts in the community. It should not be treated differently from other community storefronts. Reference is made to the fact that management fees for the disputed property

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 74 of 146

have been charged at the commercial storefront standard since 1997, a point acknowledged by the defendant.

② According to Exhibit 6, Article 20(2) of the Building Residents' Rules stipulates: "When there is a change in the qualification of a unit owner, the person acquiring the qualification shall submit registration information in writing." This provision sufficiently enables the defendant to ascertain the identity of the plaintiff's personnel. Furthermore, since the elevator on the first basement floor can be locked via button settings to control its usage, the disputed premises share identical levels of management and maintenance regarding community safety and the quality of public facilities and environment compared to other first-floor commercial units in the building. The defendant has not presented any evidence that the plaintiff's use of the disputed premises necessitates additional management tasks requiring extra expenses. Therefore, there is insufficient justification to raise the management fee for the disputed premises to residential standards. Yet the disputed resolution, which has since 1997 classified the disputed property as a commercial unit and maintained its fee standard, singled out the plaintiff's disputed property for a management fee increase (from NT$30 per ping to NT$70 per ping) to match the standard charged to general residential units. This constitutes a distinct management measure from other commercial premises. Moreover, the increase in the disputed property's management fee exceeds twofold, far surpassing that of all other co-owners, demonstrating a significant disparity. However, the defendant failed to present objectively reasonable grounds for differentiation, nor did it substantiate the necessity or provide evidence for charging the plaintiff differently from other commercial units. The abrupt implementation of Resolution A imposing differential treatment on the disputed property's management fees demonstrates that Resolution A constitutes discriminatory treatment specifically designed to disadvantage the plaintiff. Its primary purpose is to harm the plaintiff, thereby breaching the principle of equity. This constitutes an abuse of majority voting, violates the principles of fairness, equity, and good faith ( ), and amounts to an abuse of rights or contravenes public order and good morals. It further breaches mandatory or prohibitive legal provisions, rendering the resolution invalid. Moreover, the defendant has failed to provide any objective justification for the differential treatment, nor has it demonstrated the reasonable necessity for charging the plaintiff differently from other storefronts.

 acquired ownership of the disputed property, the defendant has persistently denied the plaintiff access and use of the property. This further demonstrates that the disputed resolution constitutes an arbitrary exercise of rights, exploiting the majority vote advantage to harm the plaintiff. It is unjustifiable and manifestly unfair, amounting to an abuse of

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 75 of 146

rights and is therefore invalid. Therefore, the disputed resolution violates the provisions of Article 56, Paragraph 2, Article 148, the first part of Article 71, and Article 72 of the Civil Code and is invalid.

(2)    Request for confirmation of the invalidity of Resolution B, and request that the defendant tolerate and not obstruct the plaintiff and its hired engineering personnel in installing and maintaining water meters, water pipes, and related equipment in the disputed house owned by the plaintiff, in accordance with the findings stated in the disputed appraisal report:

① Pursuant to Article 6, Paragraph 1, Item 4 of the Apartment Building Management Act (hereinafter referred to as the "Apartment Act"), when maintaining, repairing exclusive portions, designated exclusive portions, or installing pipelines necessitates the use of common portions, such actions must be undertaken with the consent of the management responsible person or the management committee. However, the management committee may not arbitrarily refuse consent without justifiable grounds. Furthermore, Article 4(1) and Article 5 of the same Ordinance stipulate that Owners of divided property may freely use, derive benefits from, and dispose of their exclusive portions, except where such use hinders the normal use of the building, violates the common interests of owners, or is expressly restricted by other laws. If the management committee or building regulations impose special restrictions on the use of owners' exclusive portions, this clearly affects the property rights of owners. Moreover, if a specific manner of use by a co-owner of their exclusive portion does not substantially impact other co-owners, such use is lawful under the protection of property rights in the Civil Code. Thus, when the proper exercise of a co-owner's rights is unduly restricted by a decision of the co-owners' association or by the building regulations, and the benefits gained by the other co-owners are not substantial, the restrictions imposed by such decisions or regulations are deemed disproportionate and contrary to the principle of good faith. Consequently, such restrictions are considered invalid.

② The plaintiff is a co-owner of the disputed building, and the disputed premises constitute the plaintiff's exclusive portion, conferring inherent rights to free use and enjoyment. However, the disputed premises currently lack water supply facilities. Given that the primary functions of the disputed premises are as a commercial space and storage room, there exists a need for water usage. The plaintiff's customary use of the disputed premises (retail space) necessitates the installation of relevant piping and equipment for water supply. Considering water as a fundamental necessity of life, the absence of an independent water meter would hinder the water utility company's ability to accurately measure water usage, calculate fees, and maintain normal water supply, thereby causing

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 76 of 146

significant inconvenience to users. The plaintiff therefore asserts the necessity of installing an independent water meter and associated engineering works for the disputed premises.

③ Furthermore, the plaintiff's proposed plan for installing water pipes and an independent water meter, as detailed in the disputed appraisal report, requires using common areas of the disputed building during installation. However, the plaintiff has carefully planned water intake and drainage, ensuring the construction area is not extensive. The construction period would be brief, the impact area minimal, and the work would leave no lasting effects on the building's current condition. There are no safety concerns, nor would any damage be caused. The locations and methods proposed by the plaintiff for installing the pipes and meter represent the least disruptive approach. However, the defendant convened the disputed area rights committee and rejected the proposal via Resolution B, completely disregarding the plaintiff's essential household water needs. This has resulted in the disputed property continuing to

deprived the plaintiff of the integrity of ownership rights to the disputed property. The defendant further failed to provide any evidence demonstrating that the plaintiff's installation of water pipes and an independent water meter in the disputed property would cause significant harm to other co-owners or violate the common interests of the co-owners. Resolution B is manifestly without just cause, constituting an abuse of majority voting and violating the principles of fairness, equity, and good faith. It amounts to an abuse of rights or a contravention of public order and good morals against the plaintiff. Pursuant to Article 56(2), the first part of Article 71, Article 72, and Article 148 of the Civil Code, it is inherently invalid.

2. The plaintiff's necessity for existing external water supply facilities in the disputed property means that Resolution B adopted by the disputed owners' association impedes the proper exercise of ownership rights over the disputed property. The plaintiff is entitled to request the defendant to remove such impediment. Therefore, pursuant to the middle and latter parts of Article 767(1) of the Civil Code, the plaintiff requests the defendant to tolerate and refrain from obstructing the plaintiff's installation and maintenance of water meters, pipelines, and associated equipment.

3. And hereby declare: (1) The resolution adopted at the disputed district rights meeting convened by the defendant on October 22, 2023, as shown in the attached schedule, is invalid. (2) The Defendant shall tolerate and prohibit any interference with the Plaintiff and its hired engineering personnel in performing the installation and maintenance of water meters, water pipes, and related equipment for the disputed house owned by the Plaintiff,

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 77 of 146

as specified in the manner indicated by the findings on pages 4-5 of the disputed appraisal report.

 (b) Statement of the Defendant's Defense:


 1. Regarding the letter dated February 16, 2014 (Taiwan Water Fourth District Management Office Letter No. 1132101162, hereinafter referred to as the "February 16, 2014 Letter") from the Taiwan Water Corporation Fourth District Management Office Ta

 (1) Regarding the letter dated February 16, 2014, No. 1132101162 (hereinafter referred to as the "February 16, 2014 Letter") from the Taiwan Water Corporation, District 4 Management Office, Taichung Service Center (hereinafter referred to as the "Water Corporation"), the Plaintiff expresses the following opinions:


 (1)       Paragraph 2 of the aforementioned letter states: "Upon investigation, no water supply application exists for the address in question. Should a water supply application be required in the future, it may be submitted in accordance with regulations: (1) Independent Meter: Installed beside the building line on the first floor, featuring an independently installed water meter and pipeline. ... (b) Sub-meter: The sub-meter location shall be self-provided at the building's centralized sub-meter area on the roof, utilizing the building's self-installed water supply equipment and common areas. ..." etc. The plaintiff proposed two installation locations and methods for the disputed house's water meter application at the disputed area rights meeting for water supply purposes. Both were confirmed feasible by the Waterworks Company, sufficient to establish that the plaintiff's installation of water meters and connecting pipes complies with the building's economic purpose as defined by its intended use and conforms to the Apartment Building Ordinance Article 9, Paragraph 2 requirement of "installation in accordance with its intended purpose and customary usage methods," causing no obstruction or damage to the defendant.

 (2)       The plaintiff holds independent ownership of the disputed property and is entitled to freely use, derive benefits from, and dispose of it. If the plaintiff were unable to install a water meter and its associated pipes solely due to the defendant's refusal to consent, thereby preventing the use of the disputed property, this would not only cause significant harm to the plaintiff but would also be manifestly detrimental to the social economy. Pursuant to the prohibition against abuse of rights under Article 148 of the Civil Code, the principle of good faith, and the legislative intent of Article 820(1) and (3) stipulating that co-owners shall not intentionally or negligently make management decisions detrimental to other co-owners, otherwise they shall be jointly and severally liable for damages, the

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 78 of 146

defendant has no valid grounds to refuse consent for the plaintiff to install the water meter and its pipelines. Therefore, the plaintiff's claim to obtain tap water essential for daily life constitutes a legitimate exercise of rights.


 (3)      Moreover, the defendant's contention that the plaintiff's separate installation of a water meter and inlet/outlet pipes poses a risk to all residents of the disputed building constitutes a defense based on hypothetical facts that do not currently exist. The plaintiff denies this, and pursuant to the burden of proof allocation under Article 277 of the Civil Procedure Law, the defendant bears the burden of proving these facts.

 2. The Taichung City Architects Association's disputed appraisal report concluded: - Installing an independent water meter on the first floor with pipes buried in the arcade, involving surface demolition and restoration, minimizes impact on overall structural safety; the recommended construction method poses no structural safety risk; Installing a water meter on the roof by drilling holes in the railing and first-floor slab, provided the holes are drilled appropriately, does not affect structural safety. The construction methods described in the report do not reach the level of structural damage (see pages 4-6 of the disputed appraisal report). Therefore, whether installing an independent meter or a sub-meter for water supply purposes, the plaintiff's actions constitute normal usage at appropriate locations and premises. It should be recognized that the plaintiff's application to install water meters and connecting pipelines aligns with the economic purpose of the disputed building and does not cause any hindrance or damage to the defendant. Consequently, the defendant may not refuse the plaintiff's request to install water meters based on the disputed Resolution B.

 3. The discussion and vote on the disputed Resolution B proposal aimed to determine the location for installing the water meter to meet the plaintiff's domestic water needs for the disputed property, to apply for water service from the water utility company, and to enable metering and billing. The specific installation method—whether an independent meter or sub-meter as indicated by the water utility company, or the detailed construction techniques—was not the subject of the resolution. Notably, the plaintiff also holds usage rights over the common areas of the disputed building. Even if the installation method involves such common areas, as a co-owner of the building, the plaintiff naturally possesses the right to use and benefit from these common areas. The plaintiff's request to install a water meter and connecting pipes for the disputed property constitutes a legitimate exercise of ownership and co-ownership rights. Moreover, since all other users in the disputed building are permitted to install water meters and connecting pipes, there is no justification for singling out the plaintiff for exclusion. Moreover, the disputed property

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 79 of 146

holds significant value. The defendant's refusal to consent has prevented the plaintiff from installing water meters and pipes, thereby obstructing the full utilization of the disputed property. This not only inflicts substantial harm upon the plaintiff but also clearly disadvantages the social economy. Pursuant to the prohibition against abuse of rights under Article 148 of the Civil Code, the principle of good faith, and the provisions of Article 820, Paragraphs 1 and 3, the defendant may not refuse consent for the plaintiff to install water meters and pipes. However, by leveraging the majority decision of the disputed area rights committee, the defendant has targeted and deprived the plaintiff of the lawful rights and interests to install water pipelines and independent water meters based on ownership. This clearly impedes the exercise of the plaintiff's ownership rights, constituting an abuse of rights, violating the principle of good faith, and contravening public order and morals. The defendant argues that the "sub-meter" aspect and the "elevated floor slab" construction method were not within the scope of discussion in the disputed Resolution B, making it impossible to infer the resolution was improper. The defendant claims Resolution B does not constitute an abuse of rights, nor does it violate the principle of good faith or public order and morals. The claim that the disputed resolution did not impose restrictions on the "exclusive areas" of the disputed property is clearly an attempt to shift responsibility after the fact and is not credible.

 4. The defendant's actions in obstructing the plaintiff's full exercise of ownership rights over the disputed property through Resolution B constitute an ongoing interference. This demonstrates both an intent to intervene and the capacity to eliminate the obstruction, thereby imposing a duty to remove the impediment. This is evident from the fact that the building's owners' association previously passed resolutions in 2022 and 2023 that obstructed the plaintiff's exercise of rights over the disputed property, and the content of the resolutions to increase management fees for the disputed property was consistent. The plaintiff has also filed separate lawsuits regarding these matters. It is clear that the defendant is capable of convening the owners' association to continuously pass identical

Resolution on the Content, The plaintiff faces a high likelihood of continued infringement upon their rights to ownership of the disputed property and usage rights to the common areas in the future, necessitating preemptive measures. Therefore, the plaintiff's basis for the claim under the middle and latter parts of Article 767, Paragraph 1 of the Civil Code is well-founded. The defendant's defense that this portion of the plaintiff's claim is inconsistent with the provisions of the middle and latter parts of Article 767, Paragraph 1 of the Civil Code is based on a misunderstanding.

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 80 of 146

5. The disputed property owned by the plaintiff is a storefront used for commercial purposes, not residential use, as evidenced by the building's use permit stub. The building's management fee standards for the disputed property have been calculated based on "storefront" rates since 1997 until the disputed resolution was adopted. This is evident from Articles 10 of the 2009, 2010, and 2019 regulations concerning management fee payments, which never stipulated charging the disputed unit at residential rates. The defendant's resolution A to charge the disputed unit "at residential rates" demonstrates that prior to making the resolution to increase management fees for the disputed unit, the defendant consistently applied the "commercial space" standard for calculating management fees. Furthermore, comparing Exhibit 5 (the management fee breakdown for the basement level), the disputed property was charged NT$27.5 per ping from 2010 to 2017. This aligns with Article 10 of the 2010 regulations: "NT$27.5 per ping/month for storefronts, No half-price for vacant units," and both Article 10 of the 2010 and 2019 regulations and Resolution No. 2 of the 2022 Property Owners' Association meeting explicitly state "No half-price for vacant units." Consequently, no instances of so-called "half-price for vacant units" appear in the defendant's successive Property Owners' Association resolutions regarding management fee adjustments. Accordingly, the defendant's fourth civil defense statement dated December 22, 2024, which claims that management fees for the disputed property were calculated based on the "half price for vacant units" residential management fee standard, is merely a self-invented calculation method inconsistent with the aforementioned regulations on management fee collection standards. The plaintiff denies these claims. Regarding Exhibit 3 (management fee records), discrepancies exist between its handwritten and computer-typed sections, and it lacks fee data from 2009 to 2017. The plaintiff disputes both the form and substance of Exhibit 3's authenticity. Furthermore, computer-printed entries for 1999 and 2018 reveal that management fees for the disputed property and other first-floor storefronts were uniformly NT$30 per ping. 1990, and 2018, further demonstrates that the management fee for the disputed property and other first-floor storefronts is uniformly NT$30 per ping.

6. The disputed Resolution A doubled the management fees borne by the disputed property compared to other storefronts. Yet, the resolution fails to specify what activities or shared facilities used by the disputed property generated increased management costs between the establishment of the management fee standards in the 2019 regulations and the increase mandated by the disputed resolution. Or did the disputed property derive greater benefits from using specific common areas? Moreover, the disputed property was originally designed for commercial use as a shopping mall, and the defendant considered this circumstance when establishing the management fee standards, hence setting the disputed property's fee according to the shopfront rate. However, the disputed Resolution

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 81 of 146

A fails to explain why management fees cannot be adjusted according to the originally designated nature of each unit type, nor does it justify why only the plaintiff's management fees were substantially increased. This clearly lacks a lawful and legitimate basis for raising the disputed property's management fees, deviates from the principle of fairness, and aims to harm a specific individual, thereby violating the principle of good faith. Therefore, the disputed resolution constitutes an abuse of rights.

7. The disputed premises are commercial units. Their management and maintenance align with other first-floor commercial units and can be separated from residential units. Personnel entering or exiting the disputed premises or receiving/sending mail do not need to pass through the defendant's community management office. The defendant did not dispute these facts in separate litigation. Although the defendant argued that the disputed premises are located inside the disputed building and require mail to be received by community security personnel, and that first-floor

The plaintiff denies these claims and has never used the mailbox shown in Exhibit 5. Particularly, the defendant intentionally obstructed the plaintiff's use and enjoyment of the disputed premises and the repair of the rolling gate. The defendant's use of this as a basis to increase the management fee further highlights that raising the management fee for the disputed premises constitutes an abuse of rights. Moreover, the disputed premises can be designed and managed independently by the plaintiff to prevent consumers from using the community's internal elevators and staircases, thereby preventing direct access to the community and achieving complete separation from residential living routines. The defendant has also admitted that the elevator can be programmed to prevent access to the disputed premises' floor, and the elevator for the disputed premises remains inaccessible to this day. Since the defendant can achieve the safety objective of controlling elevator access, the disputed property does not actually necessitate additional management tasks. Moreover, the water meters for the first-floor commercial units in the disputed building are all located on the 11th-floor rooftop of the community, and these units are assigned basement parking spaces. clearly indicating that the first-floor commercial units utilize the elevator far more frequently than the disputed residence owned by the plaintiff. Even if the disputed building requires an increase in management fees, the adjustment amount for the disputed residence, which benefits to a lesser extent, is disproportionately higher compared to the first-floor commercial units that benefit more significantly. This adjustment is clearly unbalanced and unfair. Therefore, the disputed Resolution A constitutes discriminatory treatment specifically disadvantageous to the plaintiff and violates the principle of fairness.

**Exhibit 4 to Lee Declaration**

8. The parties reached a settlement on March 11, 2025, regarding the installation of water meters and water pipelines, evidenced by an agreement and consent form. However, the plaintiff contends that the settlement does not affect the progress of this litigation. Moreover, as stated in the agreement, the defendant has committed to recalculating the management fee for the disputed property at NT$50 per ping per month and submitting it to the district rights committee for resolution. This demonstrates that the defendant has acknowledged the unfairness of Resolution A towards the plaintiff.

II. Defendant's Position:

(1) Regarding the disputed Resolution A, the following explanation is provided:

1. The plaintiff, as a co-owner of the disputed building, is obligated to pay management fees for the common areas pursuant to Article 10, Paragraph 2 of the Apartment Ownership Act. Moreover, the value and utility of a community are intrinsically linked to its overall appearance, structure, management, and maintenance. Well-maintained and managed community buildings naturally enhance the utility within the community and increase transaction prices. Therefore, although the plaintiff, as a unit owner in the disputed building, may use common facilities such as elevators less frequently, this does not justify exempting or automatically reducing their share of community management fees. Moreover, the plaintiff's disputed property has access to two elevators located in Buildings A and B, which the plaintiff can use normally (as evidenced by Exhibit 1, the elevator appraisal report dated the same day, which clearly states "Buildings A and B, B1 inspection normal"). Regarding the plaintiff's claim about "locked elevator access," the defendant temporarily locked the elevators for management convenience when the disputed property was unoccupied. They are now fully operational, allowing the plaintiff unrestricted access identical to non-commercial residential units. Furthermore, the disputed property connects to residential units and the underground parking garage via both elevator and staircase, confirming its status as a residential floor within the building. The water meter for the disputed property will be installed on the 11th floor, necessitating elevator use for future access. Should the plaintiff obtain a parking space, elevator access to the B2 and B3 parking levels would also be available. Particularly, the plaintiff's future renovation of the disputed property will significantly benefit

The plaintiff will inevitably make significant use of the elevator when renovating the disputed property. It is evident that the plaintiff's access within the disputed building is no

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 83 of 146

different from that of other residents. Given the nature of "close interdependence among collective residents that cannot be independently separated," it is difficult to conclude that the disputed property should be subject to a different management fee standard. Conversely, the storefronts in the building's arcade are entirely separate from the residential units. Their structure and location differ from the disputed property. Employees or customers of these arcade storefronts cannot use the building's internal elevators or staircases. The plaintiff's reference to the storefronts as the basis for calculating management fees appears to be a misunderstanding. Furthermore, the plaintiff claims that the defendant acknowledged the disputed property's management fees had been charged at the commercial unit rate since 1997. However, the letter submitted as Exhibit 5 by the plaintiff contains no description of the fee standard by the defendant; it merely demands payment of the previous owner's delinquent management fees. The plaintiff's aforementioned claim lacks supporting evidence and cannot be accepted.

2. Furthermore, since the disputed property and the residential units belong to the same building, the defendant did not impose a fee increase exceeding the standard charged to general residential units within the same community. Therefore, it cannot be concluded solely based on the disputed resolution's potential reduction of the plaintiff's current rights that the defendant formed a resolution detrimental to the minority co-owner (the plaintiff) through majority decision, with the primary purpose of harming others, constituting an abuse of rights or violating the principle of equality. Thus, the disputed Resolution A does not violate the mandatory provisions of the Apartment Act and should be deemed valid.

(2) Regarding the disputed Resolution B, the following explanation is provided:

1. The plaintiff's claim that installing water pipes and an independent water meter would require "installation alongside the driveway" and "drilling through walls to connect pipes to the basement level." The scope of such work clearly extends beyond the plaintiff's "exclusive portion" for free use and enjoyment, encompassing common areas shared by all residents of the building (such as the driveway and shared walls). According to the ruling in this court's Civil Case No. 102 of 2015, the plaintiff must obtain the consent of all co-owners before occupying, using, or deriving benefits from specific portions of the common property. The defendant's rejection of the plaintiff's proposal through the resolution of the disputed area rights committee constitutes a reasonable and lawful measure to safeguard the interests of all residents. The plaintiff's claim that the disputed Resolution B constitutes an abuse of rights or violates public order and morals clearly fails to distinguish

the scope of "exclusive areas," and their claims are therefore inadmissible.

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 84 of 146

 2. Furthermore, during the construction of the disputed building, the developer designated the location of the disputed unit for storage and warehousing purposes, hence no water supply or drainage facilities were installed. If the installation of an independent water meter and related equipment, as demanded by the plaintiff, were to proceed without caution, it would be difficult to predict whether this would affect the building's structure or cause other operational issues. Should the installation of a separate water meter and water supply/drainage pipes proceed as requested by the plaintiff without due care, it could endanger all residents of the building (e.g., potentially leading to subsequent water leakage problems; since levels B2 and below of the building are parking areas, any leakage would severely impact residents' rights). The plaintiff should first communicate with the relevant co-owners and submit the matter to the co-owners' committee for assessment and resolution. It is difficult to conclude that the defendant's exercise of rights outweighs the plaintiff's loss of benefits. As for the plaintiff's assertions that "the construction area is not extensive," "the construction period is brief," and "the impact is minimal" ( ), no evidence has been presented to substantiate these claims. The defendant cannot disregard the safety of all building residents based solely on the plaintiff's unilateral statements.


 Even if the plaintiff's claims regarding pipeline installation and independent water meter placement are deemed valid, the defendant never prohibited the plaintiff from installing relevant water pipelines or independent water meters. Since all residents of the disputed building have their water meters located on the 11th floor, the plaintiff could still negotiate with residents to install independent water meters on the 11th floor and utilize the building's existing water pipelines. The defendant, choosing not to pursue this option, instead insists on requiring the installation of new independent water meters and new water pipelines. Whether this constitutes the least intrusive means is questionable. This further demonstrates that Resolution B was enacted to pursue the rights of all residents in the disputed building, thereby restricting the exercise of some of the plaintiff's rights (the plaintiff still has the aforementioned alternative means). This aligns with the precedent set by the Supreme Court in Judgment No. 737 of 1982, which states: "where the benefit gained by the party is minimal while the loss incurred by others and society is substantial." Therefore, it cannot be concluded that the defendant abused its rights. Accordingly, the plaintiff's claim that Resolution B constitutes an abuse of rights or violates public order and good morals by unjustifiably abusing majority voting, breaching principles of fairness, equity, and good faith, and that it violates Article 56(2), the first part of Article 71, Article 72, and Article 148 of the Civil Code, rendering it invalid. Furthermore, the plaintiff's claim

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 85 of 146

under the middle and latter parts of Article 767(1) of the Civil Code that the defendant should tolerate the plaintiff's installation of an independent water meter and pipeline, etc., is unfounded.

(3) The plaintiff's claims for "declaration of invalidity of Resolution B" and "defendant's obligation to tolerate the plaintiff's installation of water pipes, water meters, and related works" are based solely on assertions that the disputed Resolution B constitutes "abuse of rights," violates Article 765 of the Civil Code, Article 4(1) and Article 9(3) of the Apartment Regulations, and conflicts with the content of ownership rights under the Property Rights Act and the core principles and value system of property rights protected by the Constitution. The plaintiff seeks to invalidate Resolution B pursuant to Articles 71, 72, and 148 of the Civil Code. However, upon examination:

1. Prior to acquiring ownership of the disputed property through court-ordered auction, the plaintiff was already aware that the property "lacked water and electricity," and that the floor was originally intended for "storage" purposes, with no requirement for water pipeline installation during the building's planning and design. The defendant intentionally made unreasonable demands for "installation of water pipes, water meters, etc." after acquiring ownership through auction, thereby disrupting the building's original design. Thus, the plaintiff is the party abusing its rights. Moreover, according to the plaintiff's claim,

whether this would seriously impact the overall structure of the disputed building remains unknown. Moreover, the plaintiff proceeded to demand the installation of water pipes, water meters, etc., without conducting a concrete assessment. Without any risk assessment information, the defendant could not possibly agree with the plaintiff's claims. Given the aforementioned background, how can the disputed Resolution B be criticized as an "abuse of rights" by the disputed District Rights Committee?

?"

2. The Water Company's February 16, 2024, response addressed only this Court's inquiry: "...whether water meters and pipes can be installed on the B1 floor instead of sharing a common meter and pipes with other residents on the 11th floor?" It provided no clarification on whether the disputed property is suitable for installing water pipes and meters, Is it suitable for installing water pipes and meters? Would installing water pipes and meters adversely affect the building? It merely stated, "Applications may be submitted in accordance with ," implying the possibility of rejection. Therefore, whether installation can be determined based on the Water Company's aforementioned letter

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 86 of 146

water pipes and meters is feasible remains questionable.

3. Article 765 of the Civil Code and Article 4(1) of the Apartment Regulations govern the free use, enjoyment, disposal, and exclusion of interference regarding "ownership" and "rights to exclusive portions." However, as previously stated, the disputed Resolution B concerns not only the plaintiff's privately owned "ownership" and "exclusive portion rights," but also the common portions of the disputed building. Therefore, it is questionable whether the disputed Resolution B violates the provisions of Article 765 of the Civil Code

and Article 4(1) of the Apartment Regulations? Moreover, the plaintiff has not specifically indicated "how" the disputed Resolution B violates the Apartment Regulations, the Regional Planning Act, the Urban Planning Act, and building codes. Therefore, the direct assertion that the disputed Resolution B violates Article 9(3) of the Apartment Regulations is clearly without merit. Regarding the plaintiff's claim that the defendant's refusal to consent violates Article 820, Paragraphs 1 and 3 of the Civil Code

However, it is evident that the owners of the disputed building could not possibly endorse the plaintiff's claims without any risk assessment information. Against this backdrop, the owners' vote of rejection cannot constitute "deliberately or negligently making a management decision detrimental to other co-owners."

(4) The disputed Resolution B states: "...Regarding the application for an independent water meter on the first basement floor, as this involves the structural safety of the building, the use of common areas, and the fairness of public water usage, the Management Committee submits this for resolution by the owners." Explanation: The representative of Tiankuo Co., Ltd. proposed two solutions for installing an independent water meter: one involves installing a water meter and connecting pipes from the entrance along the driveway to the basement level, and the other involves installing a water meter on the rooftop water tank and connecting pipes to the basement level..." These statements indicate that both solutions discussed in the disputed Resolution B are premised on the "independent water meter" solution. Whereas the plaintiff's request for appraisal concerns two options: "1st-floor independent water meter" and "roof sub-metering." The defendant contends that the "roof sub-metering" option differs from the "independent water meter installed on the rooftop water tank with piping extending to the first basement level" described in the disputed Resolution B. Therefore, the "roof sub-metering" option was not within the scope of discussion for the disputed Resolution B.

(5) Although the disputed appraisal report by the Taichung City Architects Association states: "...if piping does not damage reinforcing bars in beams or floor slabs, it is

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 87 of 146

recommended to elevate the floor slab. First, remove approximately 5 cm of the protective layer of reinforced concrete beneath the tile plastering layer. then sequentially install water supply pipes, spot-weld wire mesh, and lay 5 cm of concrete to restore the plaster layer. This would elevate the arcade sidewalk surface by 3 cm above the original floor level, finished with terrazzo to form a 1/10 slope for seamless connection, thereby mitigating the impact of the arcade's leveling (see Attachment 10)...." (See page 3 of the disputed appraisal report). However, the "raising the floor slab" implementation plan was not discussed in the disputed Resolution B. This was an additional recommendation proposed by the appraisal unit after assessing the current situation. This plan has not been discussed by the defendant's co-owners' meeting, and it cannot be inferred that the disputed Resolution B was improper. Furthermore, the disputed appraisal report states: "······ The plaintiff's proposed solution (Attachment 3): The pipeline passes through the concrete tiles of the arcade sidewalk, which are removed to form a trench. Excluding the tile plaster layer, the excavation depth is approximately 7 cm, reaching the upper steel reinforcement ( ) of the floor slab. This section runs along the edge of small beam bl, spanning 3.5 meters. The longitudinal negative reinforcement above requires bending the steel bar by 3 cm. Additionally, the pipeline must pass through the end of beam WB,G13, encountering the main reinforcement above the main beam (see Annex VIII, First Floor Structural Drawing). Bending is difficult, necessitating cutting the reinforcement. After embedding the water pipe, another layer of reinforcement must be laid above. Whether bending or cutting the reinforcement will affect the structure in this area. If the pipe is lowered for embedding, it will need to pass through

 the beam, impacting the Taiwan Power Company's electrical room below. Therefore, this method affects the structure without any remedial or improvement measures. Additionally, embedding pipes by drilling holes near arcade columns or drilling holes in the underground exterior walls in front of shops to install pipes both affect the structure and the rights of neighboring properties and are also unfeasible..." These statements indicate that the plaintiff's "1st floor independent water meter" proposal involves issues such as breaking concrete floor tiles and bending or cutting reinforcing bars, thus potentially "compromising structural safety." This contradicts the plaintiff's claim that "the work will have no impact on the current condition of the disputed building and poses no safety concerns." and "the location and method of installing pipes and water meters proposed by the plaintiff represent the least damaging approach." Moreover, determining whether an abuse of rights has occurred involves weighing the relative importance of "the benefit gained by the rights holder" against "the loss inflicted upon others." While the disputed resolution restricts the plaintiff from installing a first-floor independent water meter and water pipelines on the

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 88 of 146

first floor, causing the plaintiff the disadvantage of being unable to use water. However, it safeguards against damage to the structural safety of the disputed building. Comparing the two, the residential and personal safety of the defendant community's nearly 200 households is clearly more important than the plaintiff's right to use water. It is reasonable to believe that the disputed Resolution B does not constitute an abuse of rights or violate the principle of good faith. Furthermore, the "Conclusions and Recommendations" section of the disputed appraisal report states: "…Construction will cause inconvenience to passage and difficulties in building management. The common areas jointly owned by all residents include public staircases (safety stairs), elevators, firefighting equipment, generators, the Taiwan Power Company's power receiving room, roof water treatment tanks, and other public facilities, which normally rely on professional management and joint maintenance. Modifications to these common facilities must comply with the Apartment Regulations and require approval from the owners' meeting." (Independent Water Meter Proposal)

 "…(2) Installing water meters on the roof requires drilling holes in the railing and floor slab. Proper drilling does not compromise structural safety. However, scaffolding erected during construction may cause some inconvenience to residents and complicate access management. External piping installations affect the building's appearance. Other common areas include public staircases (emergency staircases), elevators, firefighting equipment, generators, Taiwan Power Company receiving rooms, sewage treatment tanks, and other public facilities. These require professional management and joint maintenance at all times. Therefore, they must also comply with the Apartment Regulations and be approved by the meeting of co-owners." (Split Meter Installation Plan) (see pp. 5-6 of the disputed appraisal report). This indicates that while the disputed appraisal report proposes the two aforementioned installation methods as not affecting the structural safety of the disputed building, whether adopting "raising the floor slab to install independent water meters" or "individual meter installation," both approaches would significantly impact the rights of the defendant community residents. When the disputed resolution was adopted, factors such as inconvenience to residents' daily lives and future management costs were also taken into consideration. Therefore, it cannot be inferred that there was an abuse of rights or a violation of the principle of good faith merely because the plaintiff's rights were restricted.

 (6) Although the plaintiff asserts that Article 767, Paragraph 1, middle and latter parts of the Civil Code form the basis for requesting the defendant to tolerate the installation and maintenance of water meters, pipes, and associated equipment, the plaintiff fails to clarify which "property rights" are allegedly infringed. The plaintiff cites Article 4, Paragraph 1 and Article 5 of the Apartment Regulations as the legal basis for the request. If the plaintiff

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 89 of 146

refers to the disputed property as its "exclusive portion," since Resolution B at issue imposes no restrictions on how the plaintiff manages or uses the "exclusive portion" of the disputed property, the installation and configuration of internal pipelines are not prohibited by Resolution B at issue. Therefore, the plaintiff's claim that ownership rights to the disputed property are infringed is unfounded. Furthermore, Article 9 of the Apartment Building Act stipulates that the use and enjoyment of the common and shared areas of an apartment building and its land may be governed by agreements among the co-owners. Such agreements shall not violate the Apartment Building Act, the Regional Planning Act, the Urban Planning Act, and

Building regulations stipulate that the disputed Resolution B, formed through a district rights committee resolution, imposes restrictions on the management and use of common areas. It must comply with the provisions of Article 9, Paragraphs 1 and 2 of the Apartment Act. Furthermore, the disputed Resolution B does not violate the Apartment Act, the Regional Planning Act, the Urban Planning Act, or building regulations. It also does not contravene Article 9, Paragraph 3 of the Apartment Act. Therefore, it can be concluded that the disputed Resolution B

"lawful" restriction on the plaintiff's right to use the "common areas." Although the plaintiff invoked Article 4(1) and Article 5 of the Apartment Building Act, these provisions regulate only the "exclusive areas" of apartment buildings. The question of "whether pipelines may be installed in common areas" falls outside the scope of Article 4(1) and Article 5 of the Apartment Building Act. Furthermore, the use of "common areas" in apartment buildings often involves the interests of all co-owners. The management and use of "common areas" require balancing the interests of individual residents against those of all co-owners. It is not permissible for a single resident to freely use, derive benefits from, dispose of, or exclude others from interfering with "common areas" solely based on their individual needs. This is evident from Article 6(1)(4) of the Apartment Building Act, which stipulates that "installation of pipelines" requires approval from the management representative or management committee. After receiving the plaintiff's request, the defendant referred the matter to the owners' association for decision. Since the plaintiff's proposal involved significant interests of all residents, the owners' association discussed and voted on it, This constitutes the fairest and most equitable approach. The plaintiff bases their claim on the middle and latter parts of Article 767, Paragraph 1 of the Civil Code, yet the scope of the infringed ownership rights remains unspecified. The defendant managed and used the common areas of the disputed building in accordance with a lawful and reasonable resolution by the co-owners. This does not constitute an unauthorized interference with

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 90 of 146

the plaintiff's rights. Furthermore, according to the plaintiff's amended statement, the plaintiff neither seeks the removal of existing encroachments nor seeks to prohibit the defendant from infringing upon his ownership rights. Instead, the plaintiff requests that the defendant "tolerate" the installation and maintenance of water meters, water pipes, and associated equipment. Whether this request falls within the scope of Article 767, Paragraph 1, first and second sentences of the Civil Code is clearly questionable.

(7) Management fees for the disputed premises were consistently charged at "half price" relative to residential management fees, as evidenced by Exhibit 3 (Qinghai Poly Gold Management Fee Schedule). Supplementary clarification follows:

1. For the period 1989-1990, the standard charge was NT$27.5 per ping per month, differing from the NT$15 per ping per month charged to other businesses during the same period. The fee schedule in Exhibit 3 was computer-generated, The actual charges should be based on the "manually written amounts" by the administrator (the community administrator at the time was elderly and unfamiliar with computer use; the method of recording management fee payments continued to use previously retained forms with errors or omissions, with the correct amounts written in ballpoint pen in each field). For standard residential units, the fee is NT$55 per ping per month. For shops under the arcade, the fee is NT$15 per ping per month.

2. For the portion of 2008, the management fee rate for storefronts was recorded as NT$15/ping, while the rate for general residences was recorded as NT$55/ping. However, the management fee for special unit types, including the disputed property, remained at NT$55/ping per month. Other unoccupied units continued to be charged at NT$27.5/ping.

3. After October 25, 2009, commercial units are charged NT$15 per ping per month, residential units NT$55 per ping per month, and vacant units receive a 50% discount (see Exhibit

6, i.e., page 4 of the 2009 regulations, and page 2 of the October 25, 2009, district rights committee meeting minutes).

4. Effective January 1, 2011, commercial premises shall be charged NT$27.5 per ping per month, and residential premises NT$55 per ping per month. Vacant properties shall not receive a 50% discount (see

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 91 of 146

Document 6: Minutes of the October 31, 2010 District Rights Committee Meeting, Page 7; 2010 Regulations, Page 9. The District Rights Committee resolved to implement the adjustment starting January 2011.

January 2011).

5. Effective January 1, 2018, commercial units shall be charged NT$27.5 per ping per month, and residential units shall be charged NT$60 per ping per month. Vacant units shall not receive a 50% discount (see

Exhibit 6: Minutes of the District Rights Committee meeting dated October 29, 2017, page 21. This fee structure was increased effective January 1, 2018.

6. After October 2022, commercial units are charged NT$40/ping monthly with no half-price discount for vacant units, while residential units are charged NT$70/ping monthly with no half-price discount for vacant units. The disputed property is charged at the residential rate.

(8) Although the building regulations do not restrict the use of common facilities by first-floor arcade shops, due to structural constraints, such shops do not utilize the defendant community's common facilities. Furthermore, arcade shops are not considered "internal" residents of the defendant community. Access to the defendant community's "interior"

, they typically inquire with community management personnel rather than entering without permission. This differs from the free access enjoyed by personnel of the disputed property. Furthermore, as the first-floor arcade shops have external storefronts, mail is delivered directly to shop personnel by postal carriers. However, the disputed property is located within the defendant's community "interior," lacking external mail reception channels. Mail must be received through the community security office personnel or deposited in internal mailboxes, differing from the document handling practices of the first-floor arcade shops.

(9) The parties executed an agreement on March 11, 2025, wherein the Defendant consented to the Plaintiff's prior takeover and use of the water meter and water pipeline originally applied for by Xinhua Construction Enterprise Co., Ltd. (hereinafter "Xinhua Company") from the Waterworks Company. The Plaintiff shall bear the construction costs for taking over and using the water meter and pipeline. On the same day, the plaintiff also submitted a written consent form agreeing that in the event of damage to the sewage pipeline or other circumstances requiring repairs necessitating entry into or use of the

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 92 of 146

disputed premises, the defendant's personnel or designated individuals may only enter the disputed premises for repairs after obtaining permission from the plaintiff or any future lessee.

(10) It is further declared: The plaintiff's claim is dismissed. III. Matters Not Disputed by Both Parties:

(1) The plaintiff is the owner of a unit in the disputed building. On September 27, 2022, the plaintiff acquired ownership of the disputed property through a successful bid in a court-ordered forced execution auction. At the time of court-ordered handover, the disputed property lacked a water meter and water supply lines, rendering it without access to tap water.

(2) On October 22, 2023, the defendant convened the District Rights Committee and adopted the disputed resolution as shown in the attached table.

(3) On October 23, 2022, the defendant convened the District Rights Committee to adopt a resolution calculating management fees for the disputed property at NT$70 per ping per month, applying the same rate as for residential units. The plaintiff, dissatisfied, filed a lawsuit seeking confirmation of the invalidity of this resolution (other claims unrelated to this case are omitted). The Civil Division of this Court dismissed this portion of the plaintiff's claim in Civil Judgment No. 3318 of 2022. The plaintiff appealed this decision regarding the management fee resolution to the second instance. The Taichung High Court subsequently dismissed the appeal in Civil Judgment No. 420 of 2025 on March 19, 2025, which has not yet become final.

The judgment is not yet final.

(4) This Court inquired with the Water Supply Company regarding the feasibility of the plaintiff's claim to install an independent water meter and pipeline. The company responded in a letter dated February 16, 2024, stating: "Upon investigation, no water supply application exists for this address. Should a water supply application be required in the future, it may be submitted in accordance with regulations: (1) Independent Meter: Installed beside the building line on the first floor, featuring an independently installed water meter and pipeline. ... (2) Sub-meter: The sub-meter location shall be self-provided and installed at the building's centralized sub-meter area on the roof, utilizing the building's self-installed water supply equipment and public space."

**Exhibit 4 to Lee Declaration**

(5) On March 11, 2015, the parties executed an agreement whereby the Defendant consented to the Plaintiff's prior takeover and use of the water meter and pipeline originally applied for by Xinhua Company from the Waterworks Company. The Plaintiff shall bear all construction costs associated with taking over and using the water meter and pipeline. On the same day, the plaintiff also submitted a written consent form agreeing that in the event of future sewage pipeline damage or other circumstances necessitating repairs requiring access to or use of the disputed premises, the defendant's personnel or designated individuals may only enter the disputed premises for repairs upon obtaining permission from the plaintiff or any future lessee.

IV. Matters in Dispute Between the Parties:


(1) Is the plaintiff's claim that the disputed resolution adopted at the disputed area rights meeting convened by the defendant on October 22, 2023, as shown in the attached table, is invalid, well-founded?

(b) Is the plaintiff's claim that the defendant should tolerate and prohibit any obstruction of the plaintiff and its hired engineers in installing and maintaining water meters, pipes, and equipment in the disputed property as specified in the disputed appraisal report (pages 4-5) based on the appraisal findings well-founded?

V. Court's Ruling:


(1) The plaintiff's claim seeking confirmation that the disputed Resolution A (Case 1) adopted by the defendant at the disputed area rights meeting held on October 22, 2023, as shown in the attached table, is invalid, is without merit:

1. Pursuant to Article 56(2) of the Civil Code, resolutions of the general meeting that violate laws, regulations, or the articles of association are null and void. The collective of all unit owners in a specific condominium complex, like associations under the Civil Code, constitutes a human association with similar characteristics. Under the principles of democracy and corporate autonomy, disputes over the validity of resolutions made by condominium unit owners' meetings may analogously apply the Civil Code


Article 56, Paragraph 2 stipulates that this shall be determined based on whether the resolution violates laws, regulations, or the articles of association (regulations). Furthermore, the exercise of rights and fulfillment of obligations shall be conducted in good

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 94 of 146

faith and with integrity, as explicitly provided in Article 148, Paragraph 2 of the Civil Code. Expenses for the repair, management, and maintenance of the common areas and designated common areas of an apartment building shall, in principle, be paid from the common fund or shared by the owners of separate units in proportion to their respective shares of ownership. However, if the owners' meeting or the regulations stipulate otherwise, such provisions shall prevail. This is clearly stipulated in Article 10, Paragraph 2 of the Apartment Building Act. Thus, the principle for sharing management and maintenance costs of common areas is proportional to the co-owners' respective shares. However, the co-owners' meeting or regulations may establish different burden-sharing rules for repair, management, and maintenance costs of common areas, based on factors such as the location relationship between exclusive and common areas, their intended use, and actual utilization. Furthermore, when establishing or subsequently modifying such allocation standards, given that apartment buildings are communities where residents with diverse lifestyles collectively manage a shared living environment, the frequency of use of common areas among residents and their mutual impact exhibit complex, diverse, and difficult-to-quantify characteristics. It is challenging to precisely calculate the individual benefits derived from the use of common areas by each co-owner. Therefore, if the established or amended allocation standards possess objective rationality and the degree of differentiation remains proportionate, they cannot be deemed invalid. (See the rationale of the Supreme Court's Civil Judgment No. 1025 of 2020).

 2. Additionally, "A legal act that violates mandatory or prohibitive provisions is void." "A legal act that violates public order or good morals is void." "The exercise of rights shall not violate the public interest or have the primary purpose of harming others (Paragraph 1). Rights shall be exercised and obligations shall be performed in good faith and with integrity (Paragraph 2)." These principles are respectively established in the first part of Article 71, Article 72, and Article 148 of the Civil Code. The invalidity of legal acts contrary to public order or good morals under Article 72 refers to acts that violate the general interests and moral concepts of the state and society. Whether a legal act violates public order and good morals must be determined by comprehensively considering the content of the act, its accompanying circumstances, the parties' motives and purposes, and other relevant factors (See the rationale of the Supreme Court's Civil Judgment No. 1530 of 1994). Furthermore, Article 148 of the Civil Code stipulates that the exercise of rights ( ) shall not have the primary purpose of harming others. If a party exercises a right that causes another to lose an interest, but such exercise does not have the primary purpose of harming others, it falls outside the scope of this provision (See the precedent established in the Supreme Court's Civil Judgment No. 105 of 1956). Furthermore, within the realm of private law, the rights and obligations formed by the parties according to their intentions are governed by

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 95 of 146

the principle of contractual freedom. While the right holder may freely decide how to exercise the rights acquired under the contract, However, if the right holder repeatedly fails to exercise an already exercisable right within a reasonable period, and their conduct creates special circumstances sufficient to induce the obligor's legitimate expectation that the right holder will not exercise the right if the obligor performs the duty notified by the right holder, then considering the nature of the right, the type of legal act, the relationship between the parties, socioeconomic conditions, and all other relevant factors, it is deemed that the creditor's subsequent exercise of the right after the debtor has performed the obligation as informed would place the debtor in undue hardship, violating the fairness of the situation and the justice of the particular case. In such circumstances, the principle of legal ethics (estoppel) developed from the principle of good faith should hold that the creditor's exercise of the right violates good faith and cannot produce the intended effect. (See the rationale of the Supreme Court's Civil Judgment No. 1728 of 100).

3. The plaintiff claims that on September 27, 2022, he became the registered owner of the disputed property through court-ordered forced execution auction and thus a co-owner of the disputed building. The disputed Resolution A stipulating that management fees for the disputed property shall be "charged at residential rates" is substantiated by the submitted Category 2 transcripts of land and building registrations for the disputed land and property, as well as the minutes of the disputed co-owners' association meeting. (See Case File Vol. 1, pp. 35 ~ 41). This is consistent with the facts and uncontested by the defendant, rendering the plaintiff's claim credible. Regarding the plaintiff's assertion that the disputed property is a storefront and that its management fees were originally charged at the same rate as other storefronts, the defendant denies this and raises the above circumstances as a defense. However, the last revision dates of the building regulations for the disputed building were October 31, 2010, and October 31, 2019, respectively, and neither contained any provisions regarding charging management fees for the disputed premises at the same rate as residential units. It was only when the disputed Resolution A was adopted that the provision "management fees for the disputed premises shall be charged at the same rate as residential units" was added. This is evidenced by the disputed building regulations and the disputed Resolution A (See Volume 1, Pages 39 and 63 of this Court's case file).

Page), it can be seen that prior to the disputed Resolution A, management fees for the disputed properties were uniformly charged at the commercial premises rate. As for the defendant's defense that management fees for the disputed properties were originally charged at the residential rate, and that there was even a "half price for vacant units" arrangement

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 96 of 146

and presented management fee collection records for the disputed building from 1999 to 2000 as evidence (see p. 409 of Volume 1 of this court's case file). However, the aforementioned data was originally computer-generated, with handwritten modifications present regarding the disputed property. While the defendant claims the handwritten modifications should prevail, it failed to provide positive evidence to support this assertion. Moreover, the defendant has yet to present any resolution from the District Rights Committee modifying the aforementioned regulations prior to the creation of the disputed Resolution A. Therefore, it is difficult to conclude that the management fees for the disputed property were originally charged at the residential rate. The defendant's defense on this point is therefore not accepted.

 4. The plaintiff further contends that the disputed property was designed as a commercial unit from the developer's planning stage, featuring an independent external entrance that allows complete separation from the residential areas of the disputed building. Additionally, the property utilizes fewer of the building's common facilities and requires less service from the community security office personnel than typical residences. This is evidenced by photographs of the building's front facade and hand-drawn annotations on the re-measurement results diagram submitted by the plaintiff. Thus, it is reasonable to conclude that the disputed property possesses an entrance directly connecting to the building's arcade. However, the disputed property is situated on the building's B1 th floor, featuring a door directly accessible to the building's internal elevators and staircases, as evidenced by on-site photographs and the B1 floor plan. The elevator serving the disputed premises within the building is currently inactive solely because the premises are unoccupied, but it remains operable at any time. The elevator has been tested and found to be in normal working order, as evidenced by the appraisal report from Jichengri Electric Co., Ltd. (see Volume 1, Page 121 of this Court's case file). Therefore, occupants of the disputed premises—including the plaintiff or relevant users (such as future tenants)—may access the building's elevators and staircases through the disputed unit's door and stairwell. They may then use these elevators or stairs to reach residential units, the rooftop, common areas, and the underground parking garage within the building. This differs from the situation of the shopfront tenants on the first floor of the disputed building, who must first pass through the outdoor arcade and then through the building management office to access the interior and use the common facilities. It is evident that the convenience and extent of benefit enjoyed by the occupants of the disputed premises in using the common facilities of the disputed building are comparable to those of ordinary residential tenants. Moreover, the disputed building provides dedicated mailboxes for the residents of the disputed property, a fact not disputed by the plaintiff. Therefore, the residents of the disputed property can enjoy the same

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 97 of 146

use of public facilities, security services, management office, cleaning staff, and mail/package collection services. Whether the plaintiff utilizes the defendant community's aforementioned security and mail collection services constitutes the plaintiff's exercise of the right to choose whether to accept such services. Absent active evidence proving the defendant refused to provide the plaintiff with the aforementioned services, the plaintiff's claim that they never used the aforementioned mailbox or would not interfere with the daily routines of ordinary households cannot be used as grounds to directly conclude that the defendant intentionally obstructed the plaintiff's use or enjoyment of the disputed property. Considering the location of the disputed property relative to ordinary residences and the convenience and degree of benefit derived from using public facilities, the resolution by the disputed A to amend the management fee collection standard for the disputed property to align with that of ordinary residences, adopted by majority vote, should be deemed objectively reasonable and proportionate in scope. It is therefore difficult to conclude that the disputed A resolution is invalid.

5. The plaintiff further contends that the disputed property possesses an independent entrance within the disputed building, and that future interior design plans will restrict or prohibit consumers from accessing the building's internal elevators or staircases. The plaintiff also asserts that the likelihood of using the defendant's community management office and other public facilities is lower than for ordinary residences. However, the doors leading from the disputed property to the building's internal elevators and staircases remain unsealed. Whether the plaintiff uses the building's elevators, staircases, mailboxes, or other public facilities constitutes an exercise of choice regarding rights, and thus cannot serve as grounds for reducing management fee obligations, as previously stated. Furthermore, given the nature of the disputed property as a commercial space, any future business operations would likely involve a more complex flow of people than typical residential units. Its location and access routes are also more closely connected to the residential area. Furthermore, with doors providing direct access to residential units and other common areas, the defendant must incur corresponding expenses for fire safety or related security management of the disputed property. This does not, as the plaintiff contends, avoid increasing the defendant's burden for managing and maintaining the disputed building, nor does it exempt the defendant from related expenditures. Accordingly, although Resolution A increased the management fee for the disputed property by NT$40 per ping per month, the adjusted amount aligns with that for general residential units and does not exceed the management fee standards charged to the majority of residential households in the disputed building. This adjustment possesses objective rationality. Therefore, one cannot arbitrarily conclude that the disputed

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 98 of 146

Resolution A was intended to harm the plaintiff based solely on the so-called "adjustment ratio" or "adjustment multiple." Consequently, there is no violation of the principle of good faith or abuse of rights. Moreover, since Resolution A amended the management fee standards for general residential units in the building through a resolution of the District Rights Committee, and such committee resolutions are permitted under Article 31 of the Apartment Ownership Act and related provisions, and since the aforementioned adjustment to residential management fees has no bearing whatsoever on social public order or public morals, how could it possibly violate mandatory legal prohibitions or public order and good morals? Moreover, the plaintiff has failed to provide evidence demonstrating that the defendant engaged in any conduct or actions that led the plaintiff to mistakenly believe management fees would not be adjusted, or that the defendant had long failed to exercise its rights, causing the plaintiff to mistakenly assume rights would no longer be exercised. Therefore, how could the defendant be said to have violated the principle of good faith or abused its rights? The plaintiff's claim that the disputed Resolution A violates Civil Code Articles 72 and 148 and should be deemed invalid by analogy under Civil Code Article 56(2) remains unsubstantiated.

 (2) The plaintiff's claim seeking confirmation that the disputed Resolution B adopted at the disputed district rights meeting convened by the defendant on October 22, 2023, as shown in the attached table under Case 2, is invalid, is well-founded:

 1. Article 736 of the Civil Code provides: "A settlement refers to an agreement between parties to mutually compromise in order to terminate or prevent a dispute."


 ." Article 737 of the Civil Code further provides: "A settlement has the effect of extinguishing the rights waived by the parties and of conferring upon the parties the rights specified in the settlement agreement." . A settlement is constitutive if it replaces the original legal relationship with another legal relationship or a simple, non-obligatory debt. A settlement is declaratory if it is based solely on the original, clearly defined legal relationship. In the former case, if the debtor fails to perform the settlement agreement, the creditor must seek performance based on the new legal relationship created by the settlement and may no longer demand performance under the original legal relationship. In the latter case, since the settlement is based on the original, clearly defined legal relationship and has only declaratory effect, the creditor is not precluded from suing the debtor for performance under the original legal relationship; the court merely cannot make a determination contrary to the outcome of the settlement. (See the rationale of the Supreme Court's Civil Judgment No. 315 of 98). Furthermore, Article 279(1) of the Civil Procedure Law stipulates: "Where a party's asserted facts are admitted by the opposing

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 99 of 146

party in a pleading, during oral argument, or before a commissioned or entrusted judge, no evidence need be presented." . An admission made by a party or their litigation representative during the proceedings binds both the parties and the court within the scope of the adversarial principle. The court shall treat the admitted facts as true and base its judgment upon them. Unless the admission is validly withdrawn by the party, the court may not make findings contrary to the admitted facts. (See the rationale of the Supreme Court's Civil Judgment No. 1029 of 2012).

2. Regarding the disputed Resolution B under Case 2, as shown in the attached table, which was adopted at the disputed district rights meeting convened by the defendant on October 22, 2023, since the defendant entered into an agreement with the plaintiff on March 11, 2025, agreeing that the Defendant consents to the Plaintiff taking over and using the water meter and water pipeline originally applied for by Xinhua Company from the Water Supply Company, with the Plaintiff bearing the construction costs for taking over and using the water meter and water pipeline. The plaintiff also submitted a written consent on the same day, agreeing that in the event of sewage pipeline damage or other circumstances necessitating repairs requiring access to or use of the disputed premises, the defendant's personnel or designated individuals may only enter the disputed premises for repairs after obtaining permission from the plaintiff or any future lessee. This has been acknowledged as undisputed by both parties and is evidenced by the agreement and consent letter on file (See Court File Volume 2, Pages 17, 19, 33). Thus, the defendant has agreed to allow the plaintiff to take over and use the water meter and water supply lines originally applied for by the developer, Xinhua Company, from the Waterworks Company, with the plaintiff bearing the construction costs for taking over and using the water meter and water supply lines. it is evident that the defendant has acknowledged the plaintiff's genuine need to install water meters (whether independent meters or rooftop sub-meters) in the disputed building and to install water pipelines in the disputed premises. The defendant entered into a settlement agreement with the plaintiff. Therefore, the defendant's admission should be deemed to have the effect of an admission of fact regarding the plaintiff's claim in this part (i.e., the disputed Resolution B portion). This admission has the effect of binding both parties and the court. The court shall deem the facts admitted by the defendant to be true and base its judgment upon them. Unless the defendant lawfully revokes such admission, the court may not make findings contrary to the admitted facts. Accordingly, prior to the disputed B resolution being adopted by the District Rights Committee, the discussion process lacked sufficient relevant information. It disregarded the fact that tap water is a basic necessity of life and failed to consider whether the disputed property actually required tap water. Notably, both the disputed building and the disputed property were completed in June 1994. even if no water meters or water pipelines were planned at the

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 100 of 146

time of construction, it is questionable whether the necessity for this basic civilian need (water usage) still lacks after 30 years.

F urthermore, according to the property registration transcript, the primary use of the disputed property is "commercial" (see Volume 1, Page 37 of this Court's record). Given the current social environment and daily living needs, is it truly "absolutely unnecessary" for the disputed property, functioning as a business space, to have water? The defendant failed to consider the changes in the temporal and spatial environment and did not investigate whether the plaintiff's application to install a water meter and water pipes in the disputed building would indeed negatively impact the structural safety of the disputed building. Despite knowing that relevant information was indeed insufficient, the defendant proceeded to pass the disputed Resolution B by majority vote, rejecting the plaintiff's proposal. Objectively, this action was primarily aimed at harming the plaintiff. Pursuant to the aforementioned Article 148(1) of the Civil Code, this constitutes an abuse of rights, and the disputed Resolution B should be deemed invalid.

 (3) The plaintiff's claim that the defendant should tolerate and refrain from obstructing the plaintiff and its hired engineers from installing and maintaining water meters, pipes, and equipment in the disputed property as specified in the appraisal report (pages 4-5) is well-founded:

 1. Article 767(1) of the Civil Code provides: "The owner may demand the return of property from a person who possesses it without right or who has usurped it. The owner may demand the removal of any obstruction to his ownership. Where there is a threat of obstruction to his ownership, the owner may demand prevention thereof." The term "interference" here refers to acts or facts that objectively unlawfully infringe upon ownership or obstruct the owner's full exercise of ownership rights through means other than possession. The "unlawfulness" of such interference requires only that the owner has no legal obligation to tolerate the interferer's actions; it is not necessary for the interferer's actions to constitute criminal liability or to involve grounds for civil invalidity or revocation (See the rationale of the Supreme Court's Civil Judgment No. 2420 of 1999). Furthermore, the "risk of interference with ownership" should be determined based on specific facts and general societal perceptions. If, upon assessing the existing dangerous circumstances, the possibility of the owner's ownership being objectively interfered with is extremely high and requires prior prevention, this suffices (See the rationale of the Supreme Court's Civil Judgment No. 2932 of 109). The defendant's defense that the scope of legal effect under the middle and latter parts of Article 767, Paragraph 1 of the Civil Code does not extend to the duty of "tolerance" is untenable.

**Exhibit 4 to Lee Declaration**

Exhibit A to Petition - p. 101 of 146

2. The plaintiff proposes installing water meters and water pipelines in the disputed property through two methods: (1) installing an independent water meter on the first floor and burying water pipelines, (2) A sub-metering approach, where a sub-meter is installed on the 11th floor and shared pipelines are used with other residents in the building. The defendant initially opposed both options. However, the parties reached an agreement on March 11, 2015, regarding the installation of the water meter and water pipelines. the defendant agreed to allow the plaintiff to take over and use the water meter and pipeline originally applied for by the developer, Xinhua Company, from the water utility company ( ), with the plaintiff bearing the construction costs, as previously stated. This court commissioned the Taichung City Architects Association to assess whether the two construction methods proposed by the plaintiff would compromise the structural safety of the disputed building. The assessment concluded: "(1) The recommended construction method for installing the independent water meter involves burying the pipeline under the arcade. Removing the surface layer and subsequent restoration will minimize the impact on overall structural safety, resolving the construction issue. However, laying new surface materials on the arcade for public passage will alter the building's appearance. During construction, it will cause inconvenience to pedestrians and difficulties in building management. As the arcade is a common area jointly owned by all residents, it includes public staircases (safety stairs), elevators, and firefighting facilities.

, generator, Taiwan Power Company (TPC) receiving room, roof water treatment tank, and other public facilities. These rely on professional management and collective maintenance. Alterations to common facilities must comply with the Apartment Ownership Act and require approval from the owners' meeting. (2) Installing water meters on the roof requires drilling holes in the railing and floor slab. Proper drilling does not compromise structural safety. However, scaffolding erected during construction may cause some inconvenience to residents and complicate access management. External piping installations affect the building's appearance. Other common areas include public staircases (emergency stairs), elevators, firefighting equipment, generators, Taiwan Power Company (TPC) electrical rooms, sewage treatment tanks, and other public facilities. These require professional management and collective maintenance, and thus should also be subject to the Apartment Regulations and require approval by the owners' meeting.

(See pages 5 and 6 of the disputed appraisal report). This indicates that the disputed appraisal report proposes the aforementioned two construction methods do not affect the structural safety of the disputed building. Whether adopting the "raising the floor slab to install independent water meters" or the "sub-metering method," Construction may

**Exhibit 4 to Lee Declaration**

**Exhibit A to Petition - p. 102 of 146**

temporarily impact residents' daily lives during the work period. However, as the construction duration is not prolonged, the inconvenience to residents remains limited. Moreover, this constitutes a technical issue that is not insurmountable or incapable of alternative solutions (such as the plaintiff offering compensation or benefits to potentially affected residents). Therefore, in balancing the interests of both parties, the resolution of the plaintiff's essential water supply needs outweighs the inconvenience caused to some residents during construction. The plaintiff's request that the defendant tolerate and prohibit any obstruction to the plaintiff and its hired personnel in installing and maintaining water meters, pipes, and equipment in the disputed property as specified in the expert report on pages 4-5 is therefore justified and should be granted.

VI. In summary, The portion of the disputed resolution adopted at the disputed area rights meeting convened by the defendant on October 22, 2023, as shown in the attached table, specifically Resolution A regarding the adjustment of the disputed property's management fees, does not violate mandatory legal prohibitions, public order and morals, nor does it contravene the principle of good faith or constitute an abuse of rights. Resolution A is therefore valid. The plaintiff's claim in this regard is without merit and should be dismissed. Furthermore, the disputed Resolution B concerning the installation of water meters and water pipelines in the disputed property constitutes an abuse of rights and is invalid. However, since the parties have reached a settlement and the Defendant agrees to allow the Plaintiff to take over and use the existing water meters and pipelines first, this further demonstrates that the discussion and voting process for the disputed Resolution B indeed contained defects. According to the disputed expert report, the installation of water meters and water pipelines in the disputed house does not affect the structural safety of the disputed building. Therefore, the plaintiff's request that the defendant tolerate and refrain from obstructing the plaintiff and its hired engineering personnel from installing and maintaining water meters, water pipes, and related equipment in the disputed house in accordance with the methods and findings stated on pages 4-5 of the disputed appraisal report is also well-founded and is hereby granted.

VII. The evidence in this case has been sufficiently clarified. The remaining arguments and evidence presented by both parties have no bearing on the court's findings and conclusions reached in this judgment. Therefore, it is unnecessary to address them individually, and this is hereby stated.

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 103 of 146

III. Conclusion: The plaintiff's claim is partially justified and partially unjustified. Pursuant to Article 79 of the Civil Procedure Law, judgment is rendered as stated in the main text.

China  China  Republic      Republic      114    Year    5      May    28    Civil Division I

Civil Division I        Judge Lin Jinzhao This original copy is made in accordance with the original.

To appeal this judgment, an appeal petition must be filed with this Court within 20 days after service of this judgment. If an attorney is retained to file the appeal, the appeal trial adjudication fee shall be paid concurrently.

China  China  Republic      Republic      114    Year    5      May    28    2014

Clerk Chang Che-hao

Appendix: (Amount: New Taiwan Dollars)

Resolution    Resolution Content

Item 1:

Management fees shall be increased effective January 1, 2023; the specific increase rate shall be discussed and resolved during the meeting.      Retail spaces adjusted to NT$40 per ping per month; residential units at NT$70 per ping per month.

; Basement Level 1 will be charged at the residential rate (NT$70 per ping/month).

Case 2:

Application for an independent water meter for the basement level 1. As this involves building structural safety, use of common areas, and fairness in allocating common area water usage, the Management Committee submitted the matter to the owners for

Exhibit 4 to Lee Declaration

Exhibit A to Petition - p. 104 of 146

resolution.       The owners voted: 9 votes in favor; 123 votes against. The application for an independent water meter for the basement floor was rejected.

Judicial Rulings

Taiwan Taichung District Court Ruling No. 45 of 113 Taiwan Taichung District Court Judgment No. 45 of 113

Relevant Statutes

Article 4 of the Apartment Building Management Act, Article 5 of the Apartment Building Management Act, Article 6 of the Apartment Building Management Act, Article 9 of the Apartment Building Management Act, Article 10 of the Apartment Building Management Act, Article 31 of the Apartment Building Management Act, Article 79 of the Civil Procedure Act, Article 170 of the Civil Procedure Act, Article 175 of the Civil Procedure Act, Article 247 of the Civil Procedure Act, Article 256 of the Civil Procedure Act, Article 277 of the Civil Procedure Act, Article 279 of the Civil Procedure Act, Article 56 of the Civil Code, Article 71 of the Civil Code, Article 72 of the Civil Code, Article 148 of the Civil Code, Article 736 of the Civil Code, Article 737 of the Civil Code, Article 765 of the Civil Code, Article 767 of the Civil Code, Article 820 of the Civil Code

**Exhibit 4 to Lee Declaration**

# 臺灣高等法院臺南分院民事判決

113年度上易字第308號

上　訴　人　洪筠靚即洪儀婷
　　　　　　□□□□□□□□□□□□□□□□□
　　　　　　□□□□□□□□□□□□□□□

訴訟代理人　陳冠仁律師
　　　　　　孟士珉律師
被上訴人　　謝孟珊
訴訟代理人　蔡文健律師
　　　　　　王又真律師
　　　　　　黃信豪律師
上列當事人間請求債務人異議之訴事件，上訴人對於中華民國11
3年8月21日臺灣臺南地方法院第一審判決（112年度訴字第952
號）提起上訴，本院於114年7月16日言詞辯論終結，判決如下：

## 主　　文

原判決廢棄。

被上訴人於第一審之訴駁回。

第一、二審訴訟費用均由被上訴人負擔。

## 事實及理由

一、本件被上訴人主張：兩造前因請求給付買賣價金等事件，經
　　本院以111年度上易字第41號判決伊應給付上訴人新臺幣
　　（下同）105萬6,680元（下稱系爭債權）確定，上訴人遂執
　　該確定判決（下稱系爭執行名義）聲請原法院民事執行處
　　（下稱執行法院）以112年度司執字第33143號事件（下稱系
　　爭執行事件）對伊強制執行。惟伊與上訴人及其前配偶陳永
　　靜（下合稱三方）曾於民國（下同）100年5月10日簽訂如原
　　證6所示協議書（下稱第一份協議書），約定由伊以總金額2
　　20萬元接手訴外人美陸生物科技有限公司（下稱美陸公司）
　　之經營，且承受該公司之債權及債務，上訴人並應將如附表
　　所示房地（各別簡稱詳附表，下合稱系爭房地）移轉登記予
　　美陸公司所有，嗣因上訴人及陳永靜不斷干擾伊經營美陸公

Exhibit 5 to Lee Declaration

01　　　司，三方又於101年2月6日另行簽訂如原證7所示協議書（下
02　　　稱第二份協議書），約定上訴人應將陳永靜借名登記在上訴
03　　　人名下如附表編號2至4所示房地（下稱系爭3戶房地）移轉
04　　　登記為陳永靜所有，如有違約，應賠償伊懲罰性違約金500
05　　　萬元（下稱系爭違約金）。詎上訴人竟於附表所示時間，將
06　　　系爭3戶房地出售予第三人，自應賠償伊500萬元違約金。伊
07　　　以該違約金與系爭債權抵銷後，上訴人對伊已無系爭債權存
08　　　在，系爭執行事件之強制執行程序即應撤銷，上訴人不得再
09　　　執系爭執行名義對伊為強制執行。爰提起債務人異議之訴，
10　　　聲明：㈠系爭執行事件之強制執行程序應予撤銷。㈡上訴人
11　　　不得執系爭執行名義對伊為強制執行。
12　二、上訴人則以下列情詞置辯，並求為判決駁回被上訴人本件請
13　　　求：三方簽立第二份協議書之目的，係為讓陳永靜取得系爭
14　　　3戶房地，以換取其完全退出美陸公司之經營，被上訴人嗣
15　　　已完全取得美陸公司之經營權，且系爭3戶房地係約定由陳
16　　　永靜取得，而陳永靜復於101年3月21日與伊簽立如被證5所
17　　　示協議書（下稱第三份協議書），表明拋棄其就系爭3戶房
18　　　地之一切權利，並約定由伊取得所有權，陳永靜其後於101
19　　　年4月13日死亡，其繼承人均拋棄繼承，已可能無履行第三
20　　　份協議，伊始將系爭3戶房地出售，並無違約，被上訴人亦
21　　　未受有任何損害，被上訴人主張以系爭違約金抵銷系爭債
22　　　權，有違誠信原則。又系爭違約金屬懲罰性違約金性質，縱
23　　　認伊有違約，因伊依第一、二份協議書所承擔之義務顯高於
24　　　被上訴人所獲得之利益，且被上訴人完全未受有損害，系爭
25　　　違約金應予酌減等語。【原審判決：系爭執行事件之強制執
26　　　行程序應予撤銷；上訴人不得執系爭執行名義對被上訴人為
27　　　強制執行。上訴人不服提起上訴，聲明：原判決廢棄，被上
28　　　訴人於第一審之訴駁回。被上訴人則求為判決駁回上訴】。
29　三、本件經整理兩造不爭執事項，及依民事訴訟法第463條準用
30　　　同法第270條之1第1項第3款規定整理並協議簡化兩造爭點，
31　　　分別列舉如下（見本院卷第520至524頁）：

Exhibit 5 to Lee Declaration

(一)兩造不爭執事項：

1. 兩造前因請求給付買賣價金等事件，經本院以111年度上易字第41號判決被上訴人應給付上訴人105萬6,680元確定。上訴人執系爭執行名義向執行法院對被上訴人之財產聲請強制執行（見補字卷第17至35、37頁）。被上訴人於系爭執行程序中，對上訴人提起本件債務人異議之訴，嗣被上訴人依原法院112年度聲字第135號裁定供擔保後，獲准聲請停止執行系爭執行事件（見聲字卷第49至51頁）。

2. 陳永靜為上訴人之前配偶，二人於000年0月00日協議離婚（見限閱卷），陳永靜於101年4月13日死亡（見本院卷第57頁）。

3. 美陸公司為陳永靜於85年1月14日設立登記，登記之法定代理人曾變更為上訴人，於100年5月16日變更為被上訴人迄今（見原審卷第337至338頁）。

4. 三方於100年5月10日，簽訂如原證6即第一份協議書，約定上訴人應將系爭房地（均含坐落基地）過戶予美陸公司（見原審卷第53至54頁）。

5. 三方簽立第一份協議書時，系爭房地係登記為上訴人所有（見本院卷第242至243頁）。

6. 第一份協議書第2條前段約定：「乙方（即被上訴人）須接受甲方（即上訴人）自100年5月10日起轉讓美陸公司之債權與債務，約220萬元以內（含未付貨款與已開出支票）」等語。被上訴人已給付上訴人220萬元完畢（見本院卷第245頁）。

7. 第一份協議書第4條約定：「四間房屋需過戶至美陸公司名下，自簽訂協議書日起至過戶完成之一切費用（含水電費、所有規費與房貸），均由乙方（即被上訴人）接手之美陸公司負擔，本協議需甲方（即上訴人）名下所有不動產與公司資產皆過戶完成才算完成轉讓」等語（見原審卷第53頁）。

8. 第一份協議書第12條約定：「轉移之不動產於100年6月起之房屋貸款需乙方（即被上訴人）負責，里港房舍5月份貸款

Exhibit 5 to Lee Declaration

Exhibit A to Petition - p. 108 of 146

與本年度房屋稅均計於乙方」等語（見原審卷第54頁）。

9. 被上訴人業依第一份協議書之約定，於100年6、7、8、9月均以簽發支票方式，每月繳納9萬8,000元房貸予上訴人，於同年12月6日，匯款9萬8,000元予上訴人繳納房貸（見原審卷第79至93頁）。另被上訴人於100年9月30日、同年10月4日各匯款5萬元、5萬元；於100年11月4日、7日各匯款6萬5,000元、3萬3,000元予上訴人（見原審卷第153頁）。被上訴人自101年1月即未繳納房貸給上訴人。陳永靜於101年2、3月均有繳納房貸給上訴人。

10. 上訴人於100年12月26日，寄發新營中山路郵局存證號碼599號存證信函予美陸公司，內容略以：「敬請美陸公司法定負責人謝孟珊，違反協議書第4條，請於收到本函14日內將剩餘的三間房屋完成轉讓包含過戶登記及貸款轉移於美陸公司，否則屬違反協議書內容，協議書失效且喪失一切權利，另需賠償違約金50萬元整」等語。上開存證信函並未寄給謝孟珊「個人」（見原審卷第105至107頁）。

11. 上訴人又於100年12月27日，寄發臺南地方法院郵局存證號碼1927號存證信函予美陸公司（見原審卷第109至113頁），上開存證信函並未寄給謝孟珊「個人」。

12. 三方另於101年2月6日，簽立原證7即第二份協議書（見原審卷第55至57頁）。

13. 第二份協議書第1條約定：乙方（即上訴人）應遵守其名下房屋（即系爭3戶房地）過戶予丙方（即陳永靜）前不得有贈與、買賣、設定抵押、讓與第三人等有損上開不動產所有權之行為，如有違背上開行為，乙方須賠償甲方（即被上訴人）500萬元，並自願放棄上訴權利」等語（見原審卷第55頁）。

14. 第二份協議書第2條約定：丙方（即陳永靜）取得房地產權後應善盡義務，於按時繳交貸款予乙方（即上訴人）至過戶前，不得有任何一期貸款遲繳或未繳，導致乙方信用有瑕疵或減損之虞，若丙方不按本約約定按時繳款，而有任

何一期貸款遲繳或未繳款，則甲方（即被上訴人）即取得
上開房地之所有權，丙方必須無條件陪同甲方辦理上開房
地過戶手續且不得有任何異議。屆時甲方與乙方另外再行
簽屬（署）新合約，丙方不得有異議，甲方亦不歸還期間
所繳之全部貸款」等語（見原審卷第55頁）。

15. 陳永靜因急需用錢，經與被上訴人協議，於簽立第一份協
議書後，由上訴人與訴外人梁裕昇於100年6月21日，簽立
不動產買賣契約書，以總價金460萬元，將里港A屋出售予
梁裕昇（見原審卷第263頁），並於100年7月6日，以買賣
為原因，移轉登記為梁裕昇所有（見原審卷第251至256
頁）。

16. 兩造同意第一份協議書中有關系爭房地部分之約定，已由
第二份協議書所取代（見本院卷第308、309頁）。

17. 陳永靜與上訴人於101年2月7日，分別曾書立如上證14、被
上證7之道歉聲明稿（見本院卷第299、373頁）。

18. 陳永靜前因涉犯放火燒燬現供人使用之住宅未遂罪，經原
法院刑事庭以100年度訴字第768號判處有期徒刑1年6月，
緩刑3年確定（見本院卷第39至47頁）。陳永靜放火燒燬現
供人使用之住宅，即係六甲B、C屋（見本院卷第251至252
頁）。

19. 上訴人與陳永靜於101年3月21日，簽立被證5即第三份協議
書（見原審卷第333頁）。

20. 第三份協議書第1條約定：甲方（即陳永靜）拋棄下列權
利：附件1（即第一份協議書）及附件2（即第二份協議
書）之不動產中之一切可主張之權利，該不動產坐落如下
（即系爭3戶房地，見原審卷第333頁）。

21. 第三份協議書第2條約定：前項不動產（即系爭3戶房地）
所有權歸屬於乙方（即上訴人），且乙方無須將所有權移
轉於甲方（即陳永靜，附件1、2之協議書簽署人）。

22. 上訴人與訴外人陳建發於101年8月8日，簽立不動產買賣合
約書，以總價金842萬元，將六甲B、C屋出售予陳建發（見

原審卷第267至268頁），上訴人於101年8月7日收受陳建發給付之定金10萬元，又於101年8月8日收受定金90萬元，並於101年9月4日，以買賣為原因，移轉登記予陳建發指定之訴外人姚吟姍所有，並於不動產買賣成交案件實際資訊申報書登記房地交易總價為1,030萬元（見原審卷第137至150、239至250、391至400頁）。

23. 上訴人與訴外人蔡秉芫於101年7月23日，簽立不動產買賣契約書，以總價金1,168萬元，將新營D屋出售予蔡秉芫（見原審卷第269至272頁），上訴人於同日收受蔡秉芫給付之定金100萬元，並於101年7月31日，以買賣為原因，移轉登記為蔡秉芫所有（見原審卷第227至238頁）。

24. 系爭3戶房地之買賣價金，均由上訴人單獨取得（見本院卷第255至256頁）。

25. 上訴人出售系爭3戶房地後，向土地銀行中途結清之貸款總額為1,753萬9,207元。

26. 上訴人於101年8月16日，寄發楠梓亞洲城郵局存證號碼107號存證信函予被上訴人（即附件五，見本院卷第63至65頁），並為被上訴人所收受。

㈡兩造之爭執事項：

1. 上訴人是否有違反第二份協議書第1條之約定？

2. 上訴人若有違反前項約定，被上訴人請求上訴人賠償500萬元懲罰性違約金，有無酌減必要？應如何酌減？

3. 被上訴人主張以其對上訴人之前項違約金債權抵銷系爭債權，有無理由？

4. 被上訴人依強制執行法第14條規定，請求撤銷系爭執行事件之強制執行程序，並命上訴人不得執系爭執行名義對其為強制執行，有無理由？

四、茲就兩造爭點及本院之判斷，分述如下：

㈠上訴人確已違反第二份協議書第1條之約定：

1. 被上訴人主張：上訴人擅自出售系爭3戶房地，已違反第二份協議書第1條之約定，上訴人對此則辯稱：三方簽立第二

第六頁

Exhibit 5 to Lee Declaration

Exhibit A to Petition - p. 111 of 146

份協議書之目的，係因擔心上訴人若不將系爭3戶房地移轉登記予陳永靜所有，陳永靜將繼續干擾被上訴對美陸公司之經營，而陳永靜自簽立第二份協議書後，即未再干擾、影響美陸公司之營運，第二份協議書之目的既已達成，上訴人即無違約情事云云。惟觀諸第一份協議書第1條係約定：「乙方（即上訴人）應遵守其名下房屋（即系爭3戶房地）過戶予丙方（即陳永靜）前不得有贈與、買賣、設定抵押、讓與第三人等有損上開不動產所有權之行為，如有違背上開行為，乙方須賠償甲方（即被上訴人）500萬元，並自願放棄上訴權利」等語（見原審卷第55頁），已明確載明上訴人於系爭3戶房地過予陳永靜前，不得為有損系爭3戶房地所有權之處分行為。而上訴人未將系爭3戶房地之所有權移轉登記予陳永靜，反於101年9月4日、同年7月31日，分別將系爭3戶房地出售予陳建發（指定登記給姚吟姍）、蔡秉芫所有，業如兩造不爭執事項22、23所示，並有建物、土地登記謄本、異動索引、不動產買賣合約書、臺南市麻豆地政事務所113年11月22日所地價字第1130108355號函暨檢送之買賣價格及相關課稅資料在卷可憑（見原審卷第137至150、227至238239至250、267至272、391至400頁；本院卷375至397頁），足認上訴人上開所為，顯已違反第二份協議書第1條之約定甚明。

2. 上訴人雖執前詞否認其有違約情事云云。惟按解釋契約，固須探求當事人立約時之真意，不能拘泥於契約之文字，但契約文字業已表示當事人真意，無須別事探求者，即不得反捨契約文字而更為曲解（最高法院114年度台上字第225號、113年度台上字第1377號判意旨參照）。本院細譯第一份協議書約定之內容係：上訴人於將系爭3戶房地移轉登記為陳永靜所有前，不得將之贈與、出售、設定抵押權及讓與第三人等語，其記載並無不明之處，自無須別事探求，將之曲解為陳永靜未再干擾美陸公司之經營，上訴人即得擅自處分系爭3戶房地，上訴人此部分所辯，尚非可採。

(二)被上訴人請求上訴人賠償足以抵銷系爭債權之違約金,有違
誠信原則,應酌減至零元:

1. 按約定之違約金額過高者,法院得依職權減至相當之數額,
民法第252條定有明文。又違約金有「賠償總額預定性質」
及「懲罰性質」之分,前者作為債務不履行所生損害之賠償
總額,債權人除違約金外,不得另行請求損害賠償;後者作
為強制債務履行、確保債權效力之強制罰,於債務不履行
時,債權人除得請求支付違約金外,並得請求履行債務,或
不履行之損害賠償。又約定之違約金額是否過高,前者目的
在於填補債權人因債權不能實現所受之損害,並不具懲罰色
彩,法院除衡酌一般客觀事實、社會經濟狀況及債權人因債
務已為一部履行所受之利益外,尤應以債權人實際所受之積
極損害及消極損害為主要審定標準;後者則非以債權人所受
損害為唯一審定標準,尚應參酌債務人違約時之一切情狀斷
之。是損害賠償預定性違約金及懲罰性違約金,二者效力及
酌減之標準各自不同,法院於衡酌當事人約定之違約金額是
否過高時,自應先就該違約金之約定予以定性,作為是否酌
減及其數額若干之判斷(最高法院109年度台上字第1013號
裁判意旨參照)。準此,法院酌減違約金至相當之數額,關
於是否相當,須依一般客觀事實、社會經濟狀況及當事人所
受損害情形,以為酌定標準,此不問違約金作用為「懲罰
性」抑為「損害賠償之預定」,均有其適用。倘違約金係屬
「損害賠償總額預定」之性質者,尤應衡酌債權人實際上所
受之積極損害及消極損害,以決定其約定之違約金是否過
高。倘「屬懲罰性」違約金者,應參酌債務人「違約之情
狀」,且於債務人不履行時,債權人除得請求債務人給付違
約金外,尚得請求履行債務或債務不履行之損害賠償,就債
權人之損害已有相當之填補,亦非不能以誠信原則予以檢
驗,當事人約定之違約金是否過高而顯失公平(最高法院11
3年度台上字第1857號裁判意旨參照)。

2. 被上訴人主張:上訴人明知其不得擅自處分系爭3戶房地,

Exhibit 5 to Lee Declaration

卻故意將之出售，至少獲利442萬8,114元，惡性重大，自應賠500萬元懲罰性違約金云云，上訴人則辯稱：三方簽立第二份協議書之目的，係為讓陳永靜不再騷擾被上訴人經營美陸公司，始協議由陳永靜取得系爭3戶房地之所有權，被上訴人既非系爭3戶房地之所有人，即未因上訴人處分系爭3戶房地而受有損害，且第二份協議書之目的已達成，被上訴人請求其應支付違約金，違反誠信原則等語。經查，系爭違約金之性質為「懲罰性」違約金，迭經兩造於原法院及本院所肯認（見原審卷第365、372頁；本院卷第455頁），應堪認定。再上訴人未依第二份協議書之約定，擅將系爭3戶房地出售予他人，固有債務不履行之情，惟參酌被上訴人於本院主張：第一份協議書履約過程發生檢舉問題，當時陳永靜雖將美陸公司出售給被上訴人，但陳永靜仍有暗股，後來又發生檢舉、競業問題，被上訴人為使陳永靜完全脫離美陸公司，才約定讓陳永靜取得系爭3戶房地作為離開美陸公司之代價，若上訴人不把系爭3戶房地移轉給陳永靜，被上訴人之後仍有受陳永靜騷擾之風險，才會課以上訴人高額違約金等語（見本院卷第249頁），核與上訴人於本院陳稱：第一份協議書簽立後，雙方確實產生爭議，為解決這些爭議，才簽立第二份協議書，讓陳永靜取得系爭3戶房地，代價是陳永靜要完全退出經營美陸公司等語（見本院卷第249頁），大致相符，且三方簽立第二份協議書之翌日，陳永靜、上訴人即分別立道歉聲明稿交予被上訴人，業如兩造不爭執事項17所示，並有道歉聲明稿在卷可證（見本院卷第299、373頁），可認三方簽署第二份協議書之目的，確係以讓陳永靜取得系爭3戶房地，而換取其不再干擾美陸公司之營運。嗣陳永靜與上訴人又於101年3月21日，簽立第三份協議書，將其依第二份協議書所取得系爭3戶房地之一切權利均讓與上訴人，業如兩造不爭執事項19至21所示，並有第三份協議書在卷可憑（見原審卷第333頁），且依第二份協議書約定之內容所示，三方均未限制陳永靜將系爭3戶房地指定登記為

其他人所有，復佐以陳永靜於101年4月13日死亡後，其全體
繼承人均聲明拋棄繼承，經原法院家事庭准予備查，此為兩
造所不爭（見本院卷第450、451頁），並有該院114年6月17
日南院揚家厚字101年度司繼1187字第1142001035號函在卷
可憑（見本院卷第323頁）。是上訴人主觀上認陳永靜死亡
前，已將系爭3戶房地之所有權利讓與上訴人，且陳永靜死
亡後，亦無可能再干擾被上訴人對美陸公司之經營，上訴人
始出售系爭3戶房地，難認上訴人違約情狀之惡性重大。

3. 被上訴人雖主張：系爭3戶房地係陳永靜所有，僅借名登記
   在上訴人名下，被上訴人給付上訴人220萬元後，依第一份
   協議書，上訴人對系爭3戶房地及美陸公司，已無權利可
   言，且依第二份協議書第2條之約定，陳永靜未依約繳納系
   爭3戶房地之貸款，系爭3戶房地即歸被上訴人所有，上訴人
   擅將系爭3戶房地出售，扣除已繳納之貸款餘額後，至少獲
   利442萬8,114元，上訴人至少受有同額之損害，其向上訴人
   請求500萬元懲罰性違約金，並無過高云云。惟查：

(1) 被上訴人主張系爭3戶房地係陳永靜所有，借名登記在上訴
    人名下乙節，為上訴人所否認，又未據被上訴人就此舉證以
    實其說，已難認可採。再依被上訴人於原法院陳稱：101年1
    月，我和陳永靜談公司問題，我們雙方有達成協議拆夥，公
    司歸我，房子歸他，我同意放棄房屋所有權，之前付出去的
    貸款、房屋所有開銷、雜支、裝潢、器材都歸陳永靜…我們
    三方於101年2月6日，簽署第二份協議書等語（見原審卷第2
    83至285頁），復佐以兩造不爭執事項16所示，兩均均同意
    第一份協議書中有關系爭房地部分之約定，已由第二份協議
    書所取代（見本院卷第308、309頁），是依第二份協議書之
    約定，三方既已重新約定由陳永靜取得系爭3戶房地之所有
    權，被上訴人再執第一份協議書之約定，主張其依該約定，
    仍得取得系爭3戶房地之所有權，上訴人擅自出售系爭3戶房
    地，致其受有損害云云，即屬無據。

(2) 再觀諸第二份協議書第2條約定：「丙方（即陳永靜）取得

房地產權後應善盡義務，於按時繳交貸款予乙方（即洪筠靚）至過戶前，不得有任何一期貸款遲繳或未繳，導致乙方信用有瑕疵或減損之虞，若丙方不按本約約定按時繳款，而有任何一期貸款遲繳或未繳款，則甲方（即謝孟珊）即取得上開房地之所有權，丙方必須無條件陪同甲方辦理上開房地過戶手續且不得有任何異議。屆時甲方與乙方另外再行簽屬（署）新合約，丙方不得有異議，甲方亦不歸還期間所繳之全部貸款」等語（見原審卷第55頁）。可見被上訴人取得系爭3戶房地所有權之前提，係陳永靜未繳交或未按時繳納房屋貸款。而第二份協議書係於101年2月6日簽署，再徵諸兩造不爭執事項9、2所示，陳永靜於簽署第二份協議書後，均有按時繳納101年2、3月之房屋貸款，嗣陳永靜於101年4月13日死亡，且其繼承人均拋棄繼承，足認陳永靜於死亡前，均有依約按時繳納貸款，並無違約情事；又陳永靜死亡後，系爭3戶房地之貸款皆由上訴人自行繳納，此為被上訴人所未爭執，並有臺灣土地銀行新營分行114年4月1日新營字第1140000845號函暨檢送之放款客戶歷史交易明細查詢在卷可稽（見本院卷第265至270頁）。準此，陳永靜未按時繳納房貸之條件既未成就，被上訴人即無從依第二份協議書第2條之約定，取得系爭3戶房地之所有權，是被上訴人主張其因上訴人出售系爭3戶房地而受有損害，亦非可採。

4. 被上訴人雖又主張：第二份協議書係三方秉持契約自由、私法自治精神共同簽訂，若酌減違約金，將使債務不履行之不利益分配由被上訴人承擔，除對被上訴人顯不公平，更妨礙交易安全及私法秩序，故無酌減違約金之必要云云，並援引臺灣高等法院107年度上易字第309號判決為據（見本院卷第484、485頁）。惟上開臺灣高等法院之判決乃各別法院對個案所為之認定，並不拘束本院。況違約金之約定，乃基於個人自主意思之發展、自我決定及自我拘束所形成之當事人間之規範，本諸契約自由原則之精神，契約當事人對於其所約定之違約金數額，原應受其約束。然倘債務人之債務已為一

部履行或當事人所約定之違約金過高者，為避免違約金制度
造成違背契約正義等值之原則，法院得比照債權人因一部履
行所受之利益或參酌當事人所受損害情形，減少違約金，此
觀民法第251條、第252條規定即明（最高法院103年度台上
字第2194號裁判意旨參照）。查三方簽署第二份協議書之目
的已達成，被上訴人已能完全不受陳永靜之干擾，獨自經營
美陸公司，業如前述，則第二份協議書有關此部分之債務已
為履行，倘未將此要素列入考量，完全使上訴人負擔賠償50
0萬元違約金之責任，恐使違約金制度違背契約正義等值原
則，是系爭違約金之約定雖為兩造本於私法自治原則所簽
訂，惟依上開說明，仍有酌減之必要，被上訴人此部分主
張，並非可採。

5. 按行使權利，履行義務，應依誠實及信用方法，民法第148
條第2項定有明文。而所謂誠信原則，係在具體的權利義務
之關係，依正義公平之方法，確定並實現權利之內容，避免
當事人間犧牲他方利益以圖利自己，自應以權利人及義務人
雙方利益為衡量依據，並應考察權利義務之社會上作用，於
具體事實妥善運用之方法（最高法院103年度台上字第576
號裁判意旨參照）。又違約金之約定是否過高，非不能以誠
信原則予以檢驗（最高法院113年度台上字第1857號裁判意
旨參照）。若約定之違約金過高涉及違反誠信原則與權利濫
用，已使違約罰喪失基礎，法院自得酌減至零。經查，上訴
人擅將系爭3戶房地出售，固已違反第二份協議書第1條之約
定，惟本院審酌兩造簽立第二份協議書之目的已達成，上訴
人違約之情狀輕微，且被上訴人並未因上訴人之違約而受有
損害，業如前述，被上訴人請求上訴人給付違約金之懲罰基
礎即不存在，倘仍讓上訴人承擔賠償違約金責任，將形成犧
牲上訴人之利益以圖利被上訴人，是上訴人辯稱被上訴人請
求其應給付違約金，有違誠信原則（見本院卷第21頁），核
屬有據，本院審酌上情，因認系爭違約金應酌減至零元，始
為公平、妥適。從而，被上訴人對上訴人既無可請求賠償之

Exhibit 5 to Lee Declaration

01　　　　違約金數額，則其主張以系爭違約金抵銷系爭債權，並依強

02　　　　制執行法第14條第1項規定，請求撤銷系爭執行事件程序，

03　　　　並命上訴人不得執系爭執行名義對其聲請強制執行，即無所

04　　　　據，難認可採。

05　五、綜上所述，被上訴人主張系爭債權已因抵銷而消滅，依強制

06　　　　執行法第14條第1項規定，請求撤銷系爭執行事件程序，併

07　　　　請求上訴人不得執系爭執行名義對其聲請強制執行，為無理

08　　　　由，均不應准許。原審遽為上訴人敗訴判決，尚有未洽，上

09　　　　訴意旨指摘原判決不當，求予廢棄改判，為有理由，爰由本

10　　　　院廢棄改判如主文第2項所示。

11　六、本件事證已臻明確，兩造其餘主張及攻擊或防禦方法並所提

12　　　　舉證資料，經本院斟酌後，認均不生影響本院所為上開論

13　　　　斷，自無再予逐一審論之必要，併此敘明。

14　七、據上論結，本件上訴為有理由，依民事訴訟法第450條、第7

15　　　　8條，判決如主文。

16　中　　華　　民　　國　　114　年　　8　　月　　14　　日

17　　　　　　　　　　民事第一庭　審判長法　官　王金龍

18　　　　　　　　　　　　　　　　　　　法　官　施盈志

19　　　　　　　　　　　　　　　　　　　法　官　曾鴻文

20　上為正本係照原本作成。

21　不得上訴。

22　中　　華　　民　　國　　114　年　　8　　月　　14　　日

23　　　　　　　　　　　　　　　　　　　書記官　葉宥鈞

24

| 附表： | | | | |
|---|---|---|---|---|
| 編號 | 門　牌　號　碼 | 簡　　稱 | 移轉登記日 | 買　受　人 |
| 1 | 屏東縣○○鄉○○路000○0號 | 里港A屋 | 100年7月6日 | 梁裕昇 |

第十三頁

Exhibit 5 to Lee Declaration

Exhibit A to Petition - p. 118 of 146

（續上頁）

01

| | | | | |
|---|---|---|---|---|
| 2 | 臺南市○○區○○路000巷00弄0號 | 六甲B屋 | 101年9月4日 | 陳建發指定登記予姚吟姍 |
| 3 | 臺南市○○區○○路000巷00弄0號 | 六甲C屋 | 同上 | 同上 |
| 4 | 臺南市○○區○○街000巷0號 | 新營D屋 | 101年7月31日 | 蔡秉芃 |

Civil Judgment of the Tainan Branch of the Taiwan High Court

Case No. 308 of the 113th Year, Appeal and

Review Division

Appeal    Appeal    Appellant    Hong Yun-liang, also known as Hong Yi-ting

Legal Representative        Attorney Chen Guanren

Attorney Meng Shimin

Appellee        Xie Mengshan

Legal Representative        Attorney Cai Wenjian

Wang Youzhen, Attorney at Law

Attorney Huang Xinhao

In the above-mentioned case concerning the parties' petition for objection to the debtor, the appellant appeals the

first-instance judgment of the Tainan District Court, Taiwan, dated August 21, 2023 (Case No. 1

(Case No. 112-Su-952), the appellants filed an appeal. This Court concluded oral arguments on July 16, 2015, and hereby

renders the following judgment:

) on August 21, 2012. Oral arguments concluded on July 16, 2015, and the court hereby renders the following

judgment:

Main        Text

The original judgment is reversed.

The defendant's claim in the first instance is dismissed.

The costs of both the first and second instances shall be borne by the appellee.

Facts and Reasons

I. The respondent in this case claims: Previously, both parties were involved in a case concerning the payment of the

purchase price, etc., which was decided by

the Court ruled in Judgment No. 41 of 111 Annual Appeal that the respondent should pay the appellant

NT$1,056,680

(hereinafter referred to as the "Disputed Claim"). The appellant subsequently applied to the original court's

civil enforcement division for enforcement of this final judgment (hereinafter referred to as the "Disputed

Enforcement Title").

the final judgment (hereinafter referred to as the "disputed enforcement title") to apply to the Civil

Exhibit 6 to Lee Declaration

Exhibit A to Petition - p. 120 of 146

Enforcement Division of the original court

24    (hereinafter referred to as the "Enforcement Court") to enforce against him in Case No. 112-Si-Zhi-Zi-33143

(hereinafter referred to as the "Enforcement Case").

25    Enforcement Case No. 33143 of 112). However, the respondent, the appellant, and the respondent's former

spouse, Chen Yongjing

26    (collectively referred to as the "three parties") had previously executed an agreement on May 10, 2011, as

evidenced by Exhibit 6 of the original record (hereinafter referred to as the "first agreement").

27    Agreement No. 6 (hereinafter referred to as the "First Agreement"), stipulating that he would acquire the

business of the third-party defendant Meilu Biotechnology Co., Ltd. (hereinafter referred to as "Meilu

Company") for a total consideration of

28    200,000 NT dollars to take over the operations of Meilu Biotechnology Co., Ltd. (hereinafter referred to as

Meilu Company),

29    and assume its claims and liabilities. The appellant was to transfer the ownership of the real estate listed in

the attached schedule

30    (each individually described in detail in the attached schedule, collectively referred to as the Disputed Real

Estate) to

31    Meilu Company. Subsequently, due to the appellant and Chen Yongjing's persistent interference with the

appellant's management of Meilu Company

**Exhibit 6 to Lee Declaration**

01       , the three parties entered into another agreement on February 6, 2012, as shown in Exhibit 7 (hereinafter referred to as the Second Agreement).

02       hereinafter referred to as the Second Agreement), stipulating that the Appellant shall transfer the real estate registered under the name of Chen Yongjing

03       under the appellant's name as listed in Schedule No. 2 to 4 (hereinafter referred to as the "Disputed Three Properties") to be registered

04       to Chen Yongjing. In the event of a breach, the appellant shall compensate her with a punitive liquidated damages of NT$500,000

05       (hereinafter referred to as the "Disputed Liquidated Damages"). However, the Appellant unexpectedly sold the Disputed Three Properties to a third party at the times indicated in the Schedule.

06       the disputed three properties to a third party at the times indicated in the appendix, thereby incurring liability to compensate her with NT$5 million in liquidated damages.

07       After offsetting this penalty against the disputed claim, the appellant no longer holds any disputed claim against her

08       , and the compulsory enforcement proceedings in the disputed enforcement case should be revoked. The appellant may no longer

09       enforce the disputed enforcement order against him. Therefore, he files this debtor's objection action,

10       and declares: **(1)** The compulsory enforcement proceedings in the disputed enforcement case shall be revoked. **(2)** The appellant

11       shall not enforce against it under the disputed enforcement title.

12   II. The appellant counters with the following arguments and seeks a judgment dismissing the respondent's petition in this case.

13       The purpose of the second agreement signed by the three parties was to enable Chen Yongjing to acquire the disputed

14       three properties in exchange for her complete withdrawal from the management of Meilu Company. The respondent subsequently

15       has fully acquired the operational rights of Meilu Company. The disputed three properties were contractually acquired by Chen

16       Yongjing. Furthermore, on March 21, 2012, Chen Yongjing executed Agreement No. 5 with the appellant

17       (hereinafter referred to as the Third Agreement), expressly waiving all rights to the disputed three properties

18       and stipulating that the respondent would acquire ownership. Chen Yongjing subsequently passed away on April 13, 2012

19    , and all of her heirs renounced their inheritance. It is now impossible to perform the Third Agreement.

20    The appellant then sold the disputed three properties without breach of contract, and the respondent

21    suffered no damages. The appellant's claim to set off the disputed penalty against the disputed debt

22    violates the principle of good faith. Moreover, the disputed penalty is punitive in nature; even if

23    even if she breached the agreement, the obligations she undertook under the first and second agreements

      were clearly greater than

24    the benefits obtained by the appellee. Moreover, the appellee suffered no damages whatsoever. Therefore,

25    should be appropriately reduced. [Original Judgment: The compulsory enforcement proceedings in the

      disputed enforcement case

26    shall be revoked; the appellant shall not enforce the disputed enforcement order against the appellee.

27    The appellant appealed, requesting: The original judgment be set aside, and the

28    appeal dismissed. The appellee sought a judgment dismissing the appeal.

29  III. After organizing the undisputed facts presented by both parties and applying Article 463 of the Civil Procedure

    Law in conjunction with

30    Article 270-1(1)(3) of the same Act, and agreed to simplify the points of contention between the parties.

31    The following are listed separately (see pages 520 to 524 of this court's case file):

Exhibit 6 to Lee Declaration

01   (1) Matters not in dispute between the parties:

02   1. The parties previously sought payment of the purchase price and related matters. This Court, in its judgment No. 111-Shang-Yi-

03   No. 41 of 2022, which became final and binding. The plaintiff subsequently applied to the enforcement court to enforce the disputed enforcement order against the respondent's property.

04   The appellant, based on the disputed enforcement order, applied to the enforcement court for compulsory execution against the respondent's property

05   (see pages 17 to 35 and 37 of the supplementary file). During the execution proceedings, the respondent

06   Subsequently, the respondent, after providing security pursuant to the court's

07   Court's 112 Annual Enforcement Case No. 135 ruling, the respondent was permitted to apply for suspension of the

08   the disputed enforcement case (pages 49 to 51 of the enforcement record).

09   2. Chen Yongjing was the appellant's former spouse. The two agreed to divorce on [Month] [Day], [Year].

10   (see restricted case file). Chen Yongjing died on April 13, 2012 (see this court's case file, p. 57).

11   ).

12   3. Meilu Company was established and registered by Chen Yongjing on January 14, 1996. The registered legal representative

13   was previously changed to the appellant and was changed to the respondent on May 16, 2011, where it remains to this day

14   (see original trial record pp. 337-338).

15   4. On May 10, 2011, the three parties executed Exhibit 6, i.e., the first agreement, stipulating that

16   the appellant shall transfer the disputed real estate (including the underlying land) to Meilu Company (see

17   Original Case File pp. 53-54).

18   5. At the time the first agreement was executed, the disputed real estate was registered as owned by the appellant

19   (See pages 242-243 of this Court's record).

20   6. Clause 2, first paragraph, of the First Agreement stipulated: "Party B (i.e., the Appellee) shall assume

21   the claims and liabilities transferred by Party A (i.e., the appellant) to Meilu Company

22   and liabilities of Meilu Company, totaling approximately NT$2.2 million (including unpaid goods and issued checks)," etc.

23   . The respondent has fully paid the appellant NT$2.2 million (see pages 245 of this court's record).

24   ).

Page Three

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 124 of 146**

25      7. Clause 4 of the first agreement stipulates: "The four properties shall be transferred to Mei Lu Company

26          . All expenses incurred from the date of signing this agreement until the completion of the transfer

            (including utility bills,

27           all regulatory fees, and mortgage payments) shall be assumed by Party B (i.e., the respondent) and borne by

            the Meilu Company

28          . This agreement requires the transfer to be completed only after all real estate and company assets under

            Party A (i.e., the appellant)

29           assets under Party A's (i.e., the appellant's) name shall be completed." (See original trial record, p. 53).

30      8. Clause 12 of the first agreement stipulates: "The mortgage payments for the transferred real estate property

        starting from June 2011

31          shall be borne by Party B (i.e., the respondent). The May loan payment for the Ligang property

01    and the current year's property tax shall be borne by Party B" (see p. 54 of the original trial record).

02    9. Pursuant to the first agreement, the respondent issued checks each month in June, July, August, and

September 2011

03    by issuing checks. On December 6 of the same year, the respondent remitted NT$98,000 to the appellant to

cover the mortgage payment (see page 54 of the original trial record).

04    On December 6 of the same year, the respondent remitted NT$98,000 to the appellant for mortgage

payment (see original trial record pp. 79-93).

05    pp. 79-93 of the original trial record). Additionally, the respondent remitted NT$50,000 and NT$50,000 on

September 30 and October 4, 2011, respectively

06    , and on November 4 and 7, 2011, he transferred NT$65,000 and NT$33,000 respectively to the appellant (see

page 153 of the original trial record). The respondent also transferred NT$10,000 to the appellant on

November

07    ,000 and 33,000 respectively to the appellant (see page 153 of the original trial record). The respondent

08    The respondent ceased making mortgage payments to the appellant as of January 2012. Chen Yongjing

made mortgage payments to the appellant in February and March 2012.

09    .

10    10. On December 26, 2011, the appellant sent a certified letter (No. 59) from the Xinyi Zhongshan Road Post

Office to Meilu Company, stating: "We kindly request Meilu Company to

11    9, stating: "We hereby request that the legal representative of Meilu Company,

12    Xie Mengshan, to comply with Clause 4 of the Agreement and complete the transfer of the

13    the remaining three properties to Meilu Company, including completing the transfer registration and

transferring the property funds to Meilu Company.

14    Company. Failure to do so shall constitute a breach of the agreement, rendering the agreement null and

void and forfeiting all rights and benefits.

15    and shall additionally pay liquidated damages of NT$500,000." The aforementioned registered letter was

not

16    addressed to Xie Mengshan "personally" (see pages 105-107 of the original trial record).

17    11. On December 27, 2011, the appellant also sent a registered letter with Tainan District Court Post Office

registration number

18    1927 to Meilu Company (see original trial record pp. 109-113

19    ), which was not addressed to Xie Mengshan "personally."

20    12. The three parties additionally executed Exhibit 7, i.e., the second agreement, on February 6, 2012 (see

Page Four

Exhibit 6 to Lee Declaration

21        pp. 55-57 of the original trial record).

22        13. Clause 1 of the second agreement stipulates: Party B (i.e., the appellant) shall comply with the transfer

of the property under its name

23        property (i.e., the disputed three real estate units) to Party C (i.e., Chen Yongjing)

24        any acts detrimental to the aforementioned real estate, such as gifting, sale, mortgage establishment, or

assignment to third parties.

25        If Party B violates the above, it shall compensate Party A (i.e., the appellee)

26        Appellant) NT$5 million and voluntarily waive the right to appeal" (see original trial record

27        Page 55 of the original trial record).

28        14. Clause 2 of the second agreement stipulates: Party C (Chen Yongjing) shall fulfill its obligations upon

acquiring the real estate rights

29        shall faithfully fulfill its obligations by making timely loan payments to Party B (i.e., the appellant) until

the transfer of ownership

30        the property is handed over. Party B shall not be subject to any credit risk of default or impairment.

31        or diminish Party B's credit standing. Should Party C fail to make timely payments as stipulated herein, and

any

01    any installment of the loan late or fails to make any installment payment, Party A (i.e., the appellee) shall immediately acquire

02    ownership of the aforementioned property. Party C must unconditionally assist Party A in handling the aforementioned property

03    Party A shall complete the property transfer procedures without objection. At that time, Party A and Party B shall execute a new contract separately.

04    sign a new contract, and Party C shall not raise any objection. Party A shall not repay

05    15. Chen Yongjing, due to urgent need for funds, agreed with the respondent to execute the first contract.

06    15. Due to urgent financial needs, Chen Yongjing, after negotiating with the appellee, executed the first agreement.

07    , the appellant and non-party Liang Yusheng executed a

08    a real estate sales contract on June 21, 2011, selling House A in Ligang to Liang Yusheng for a total price of NT$4.6 million

09    Liang Yu-sheng (see original trial record p. 263). Subsequently, on July 6, 2011,

10    (see pages 251-256 of the original trial record).

11    ).

12    16. Both parties agree that the provisions concerning the disputed property in the first agreement have been superseded by

13    second agreement (see pp. 308, 309 of this court's record).

14    17. On February 7, 2012, Chen Yongjing and the appellant respectively executed the aforementioned Statement 14 and

15    (see pp. 299, 373 of this Court's record).

16    18. Chen Yongjing was previously convicted of attempted arson of an occupied residence.

17    Criminal Division of the original court in Case No. 768 of 2011 to one year and six months of fixed-term imprisonment,

18    with a three-year probation period, which became final (see pp. 39-47 of this court's case file). The residential property

19    residential buildings in use, namely Houses B and C in Liujia (see pp. 251-252 of this court's case file).

20    pages).

21    19. On March 21, 2012, the appellant and Chen Yongjing executed Exhibit 5, the third agreement

22    (see original trial record p. 333).

23    20. Clause 1 of the third agreement stipulates: Party A (i.e., Chen Yongjing) waives the following rights

Exhibit 6 to Lee Declaration

24          : Attachment 1 (i.e., the First Agreement) and Attachment 2 (i.e., the Second Agreement

25          ), located as follows

26          (i.e., the disputed three properties, see p. 333 of the original trial record).

27     21. Clause 2 of the third agreement stipulates: Ownership of the aforementioned real estate (i.e., the disputed

three properties)

28          shall vest in Party B (i.e., the appellant), and Party B shall not be required to transfer

29          to Party A (i.e., Chen Yongjing, signatory of Annexes 1 and 2).

30     22. On August 8, 2012, the Appellant and non-party Chen Jianfa executed a real estate sale and purchase

agreement

31          for a total price of NT$8.42 million (see

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 129 of 146**

01   Original Trial Case File pp. 267-268). The appellant received a deposit of NT$100,000 from Chen Jianfa on
     August 7, 2012,

02   a deposit of NT$100,000 on August 7, 2012, and another deposit of NT$900,000 on August 8, 2012.

03   On September 4, 2012, based on the sale, the title was transferred to the non-party Yao Yinshan, designated
     by Chen Jianfa.

04   non-party Yao Yinshan as the transferee. The actual transaction information for the real estate sale

05   (see original trial volume pages 137-15

06   0, 239 to 250, 391 to 400 of the original trial record).

07   23. On July 23, 2012, the appellant and third party Tsai Ping-yuan executed a real estate sale contract

08   for a total price of NT$11.68 million, selling House D in Xinyi to Tsai Ping-yuan

09   (see pages 269 to 272 of the original trial record). On the same day, the appellant received a deposit of NT$1
     million from Cai Bingyuan

10   deposit of NT$1 million from Cai Bingyuan. On July 31, 2012, the title was transferred to Cai Bingyuan
     based on the sale (see pages 227 to 238 of the original trial record).

11   to Cai Bingyuan (see pages 227 to 238 of the original trial record).

12   24. The purchase price for the three disputed properties was received solely by the appellant (see this court's
     case file

13   pp. 255-256).

14   25. After selling the three disputed properties, the appellant settled the outstanding loan with Land Bank in full.

15   amounted to NT$17,539,207.

16   26. On August 16, 2012, the appellant mailed a certified letter with Nanzi Asia City Post Office registration
     number 107

17   (Attachment 5, see pp. 63-65 of the court record), which was received by the respondent.

18   ), which was received by the respondent.

19   (2) Disputed Issues Between the Parties:

20   1. Did the appellant breach the agreement under Article 1 of the second agreement?

21   2. If the appellant violated the aforementioned agreement, is there a necessity to reduce the respondent's claim
     for NT$5 million

22   as a punitive penalty for breach of contract? If so, how should the amount be reduced?

23   3. Is the respondent's assertion of set-off against the disputed debt based on its claim for the
     aforementioned liquidated damages against the appellant justified?

24   4. Is the respondent's request to rescind the disputed enforcement case pursuant to Article 1

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 130 of 146**

25    4. Is the respondent's request to revoke the enforcement proceedings of the disputed case pursuant to

Article 14 of the Enforcement Act

26    and prohibit the appellant from enforcing the disputed enforcement order against the respondent.

27    Enforcement of the disputed enforcement order against the defendant. Is this claim justified?

28  IV. The disputed issues between the parties and this Court's determinations are set forth as follows:

29  (1) The appellant has indeed violated the agreement in Article 1 of the second agreement:

30   1. The respondent claims: The appellant sold the disputed three properties without authorization, violating

the agreement in Article 1 of the second agreement.

31    Article 1 of the Second Agreement. The appellant countered that the purpose of the three parties executing

the Second Agreement

Exhibit 6 to Lee Declaration

01        was motivated by concerns that if the appellant failed to transfer the disputed three properties

02        Registered to Chen Yongjing, who will continue to interfere with the operations of the American-Land

            Company.

03        operations. Since signing the second agreement, Chen Yongjing has not interfered with or affected

04        Meilu Company's operations. Since the purpose of the second agreement has been achieved, the appellant

05        no breach of contract. However, Article 1 of the first agreement stipulates: "Party B

06        Party (i.e., the Appellant) shall not transfer

07        to Party C (i.e., Chen Yongjing), Party B shall not engage in any acts of gifting, sale, mortgage establishment,

            assignment,

08        to third parties that would impair the ownership of the aforementioned real estate. If Party B violates the

            above provisions,

09        Party B shall compensate Party A (i.e., the appellee) NT$5 million and voluntarily waive

10        right to appeal" (see page 55 of the original trial record). This clearly stipulates that the appellant

11        disposing of the disputed three units of real estate in a manner detrimental to their ownership

12        . The appellant failed to register the transfer of ownership of the disputed three properties to Chen Yongjing

13        to Chen Yongjing. Instead, on September 4, 2012, and July 31, 2012, respectively, the appellant sold the

            disputed

14        to Chen Jianfa (designated for registration to Yao Yinshan) and Cai Bingyuan

15        as indicated in Undisputed Facts 22 and 23. Supporting evidence includes building and land registration

16        , change indexes, real estate purchase contracts, and the letter dated November 22, 2014, No. 1130108355,

            from the Madou Land Administration Office of Tainan City

17        Land Price Letter No. 1130108355 dated November 22, 2014, and the submitted purchase price

18        price and related taxation data are on file (see original trial records pp. 137-150, 227

19        to 238, 239 to 250, 267 to 272, 391 to 400; this court's case file pages 375 to 397

20        ), sufficiently demonstrating that the appellant's aforementioned actions clearly violated the provisions of

            Article 1 of the second agreement

21        of the second agreement.

22        2. Although the appellant maintains his previous stance denying any breach of contract,

23        the true intent of the parties at the time of contracting must be ascertained, and one cannot be bound by the

            literal wording of the contract. However, if the contract

24        the contractual language already expresses the parties' true intent and requires no further inquiry, it is

            impermissible to disregard

Page 7

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 132 of 146**

25    (See Supreme Court Judgment No. 225 of 114 Tai Shang and No. 1377 of 113 Tai Shang).

26    3, Case No. 1377, Supreme Court). This Court carefully examines the content of the first agreement

27    : The appellant shall not gift, sell, mortgage, or assign to any third party the three disputed properties until

the transfer registration has been completed in the name of Chen Yong

28    , he shall not gift, sell, mortgage, or assign them to any third party.

29    . The wording is unambiguous and requires no further interpretation. It cannot be misinterpreted to mean

that

30    Chen Yongjing ceasing to interfere with Meilu Company's operations would allow the appellant to arbitrarily

dispose of the disputed

31    The appellant's argument in this regard is not acceptable.

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 133 of 146**

01    (2) The respondent's claim for compensation from the appellant in an amount sufficient to offset the disputed debt violates the principle of good faith.

02    principle of good faith and should be reduced to zero yuan:

03    1. Where the agreed penalty amount is excessively high, the court may, ex officio, reduce it to a reasonable amount,

04    as explicitly provided in Article 252 of the Civil Code. Furthermore, liquidated damages possess both a "predetermined nature of total compensation"

05    and "punitive nature." The former serves as the predetermined total amount of compensation for damages arising from non-performance of the obligation

06    and the creditor may not seek additional damages beyond the liquidated damages. The latter

07    a coercive penalty to enforce performance and secure the creditor's rights.

08    the creditor may, in addition to claiming payment of the liquidated damages, also claim performance of the obligation or

09    compensation for damages arising from non-performance. Furthermore, whether the agreed penalty amount is excessive: the former aims

10    is to compensate the creditor for damages incurred due to the unenforceability of the claim and is not punitive in nature.

11    . Courts shall evaluate the penalty amount by considering general objective facts, socioeconomic conditions, and the creditor's benefit from partial performance of the obligation.

12    partial performance of the obligation. The primary criteria for determining the amount of liquidated damages are the actual positive and negative damages suffered by the creditor.

13    and negative damages as the primary criteria for determination. The latter, however, does not take the creditor's

14    The court should not solely rely on the creditor's damages as the sole criterion for determination. It should also consider all circumstances surrounding the debtor's breach when making its decision.

15    . Thus, the predetermined liquidated damages and punitive liquidated damages differ in their effects and

16    reduction criteria differ. When assessing whether the agreed penalty amount is unreasonably high, the court must first determine the nature of the penalty clause before considering its reduction.

17    excessive, they must first determine the nature of the agreed penalty. This classification serves as the basis for deciding whether to reduce the penalty and by how much.

18    and the extent of such reduction (refer to the Supreme Court's ruling in Case No. 1013 of the 109th Year,

19    ). Accordingly, when a court reduces a liquidated damages amount to a reasonable level,

Exhibit 6 to Lee Declaration

20    whether the reduced amount is appropriate must be determined based on general objective facts,

socioeconomic conditions, and the extent of damage suffered by the parties

21    and the nature of the damages suffered. This applies regardless of whether the liquidated damages serve as

"punitive damages"

22    or "predetermined damages." If the liquidated damages constitute

23    "predetermined total damages," particular consideration should be given to the actual positive and negative

damages suffered by the creditor

24    positive and negative damages actually suffered by the creditor to determine whether the agreed liquidated

damages are excessive.

25    excessive. For "punitive" liquidated damages, the debtor's "circumstances of breach"

26    . Moreover, when the debtor fails to perform, the creditor may, in addition to demanding payment of the

liquidated damages,

27    , but also may claim performance of the obligation or damages for non-performance.

28    The creditor's damages are thus adequately compensated, and the principle of good faith can be applied to

29    whether the agreed liquidated damages are excessively high and manifestly unfair (refer to the ruling of the

Supreme Court,

30    3 Annual Tai-Shang No. 1857).

31    2. The respondent argues: The appellant knowingly disposed of the disputed three properties without

authorization,

Exhibit 6 to Lee Declaration

01      yet intentionally sold them, profiting at least NT$4,428,114. This constitutes a grave breach of good faith, warranting

02      5 million yuan in punitive liquidated damages. The appellant counters that the purpose of the tripartite agreement

03      The purpose of executing the two agreements was to prevent Chen Yongjing from further interfering with the respondent's operation of Mei

04      Lu Company. Thus, it was agreed that Chen Yongjing would acquire ownership of the disputed three properties. Since the Appellants are not the owners of the disputed three properties, they did not

05      Since the appellant is not the owner of the disputed three properties, the respondent has not suffered any loss due to the appellant's disposition of the disputed three properties.

06      property. Moreover, since the purpose of the second agreement had been fulfilled, the respondent's demand

07      violates the principle of good faith. Upon examination, the disputed liquidated damages

08      is punitive in nature, as repeatedly acknowledged by both parties in the original court and this court

09      (see pages 365 and 372 of the original trial record; page 455 of this court's record), and should be deemed

10      . The appellant failed to comply with the second agreement and arbitrarily sold the disputed three units of real estate

11      to others without authorization, constituting a breach of contract. However, considering the respondent's argument in this court

12      argued that during the performance of the first agreement, a whistleblowing issue arose. Although Chen Yongjing

13      sold Meilu Company to the respondent, Chen Yongjing still held hidden shares. Subsequently,

14      subsequent whistleblowing and non-compete disputes. To ensure Chen Yongjing's complete separation from Meilu Company

15      , it was agreed that Chen Yongjing would acquire the disputed three properties as compensation for leaving Meilu Company.

16      If the appellant fails to transfer the disputed three properties to Chen Yongjing, the respondent

17      There remains a risk of continued harassment by Chen Yongjing, which is why the appellant was imposed a substantial penalty for breach of contract

18      (see p. 249 of this Court's record). This is consistent with the appellant's statement before this Court that disputes did indeed arise after the execution of the first agreement. To resolve these disputes,

19      After the first agreement was executed, disputes did indeed arise between the parties. To resolve these disputes,

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 136 of 146**

20    the second agreement was executed, allowing Chen Yongjing to acquire the disputed three properties in

exchange for Chen

21    completely withdrawing from the management of Meilu Company.

22    which is largely consistent. Moreover, the day after the tripartite signing of the second agreement, Chen

Yongjing and the appellant

23    submitted written statements of apology to the appellee, as evidenced by the uncontested record

24    as indicated in Item 17 of the uncontested facts, with the apology statements on record (see pp. 299, 373 of this

Court's case file).

25    ), confirming that the purpose of the second agreement was indeed to allow Chen Yongjing

26    obtain the disputed three properties in exchange for her ceasing to interfere with Meilu Company's

operations. Subsequently,

27    On March 21, 2012, Chen Yongjing and the Appellant executed a third agreement,

28    all rights to the disputed three units of real estate acquired under the second agreement to the appellant

29    , as evidenced by the uncontested facts 19 to 21. The third agreement is also documented in the case file

30    is on file (see original trial file, p. 333). As stipulated in the second agreement,

31    , none of the three parties restricted Chen Yongjing from designating the registration of the disputed three

units of real estate to

**Exhibit 6 to Lee Declaration**

Exhibit A to Petition - p. 137 of 146

01    other persons. Furthermore, after Chen Yongjing's death on April 13, 2012, all

02    heirs declared renunciation of inheritance, which was approved for record by the Family Division of the

original court. This constitutes an undisputed fact between the parties

03    uncontested facts (see pp. 450, 451 of this court's record), and the court's letter dated June 17, 2015

04    (see p. 323 of this court's case file).

05    (see p. 323 of this court's case file). Thus, the appellant subjectively believed that prior to Chen Yongjing's

death

06    had already transferred all rights to the disputed three properties to the appellant prior to her death.

Furthermore, after Chen Yongjing's death,

07    , it was impossible for her to interfere with the respondent's management of Meilu Company after her death.

The appellant

08    subsequently sold the disputed three properties. It is difficult to conclude that the appellant's breach of

contract was of a particularly serious nature.

09    3. Although the appellee contends that the disputed three properties belonged to Chen Yongjing and were

merely registered under the appellant's name,

10    in the appellant's name, and that after the respondent paid the appellant NT$2.2 million, pursuant to the

first agreement

11    the appellant had no further rights to the three properties or Meilu Company.

12    . Furthermore, pursuant to Article 2 of the second agreement, if Chen Yongjing failed to make the agreed

loan payments for the disputed three properties,

13    the disputed three properties would revert to the respondent's ownership. The appellant

14    The appellant arbitrarily sold the disputed three properties and real estate. After deducting the remaining

loan balance already paid, the appellant obtained at least

15    profit of at least NT$4,428,114. The appellant suffered damages of at least the same amount. The

respondent's claim for

16    for NT$5 million in punitive damages is not excessive. However, upon examination:

17    (1) The respondent claims the disputed three properties belong to Chen Yongjing and were registered under the

appellant's name as a nominee

18    , which the appellant denies. Moreover, the respondent failed to substantiate this claim with credible

evidence. Furthermore, based on the respondent's statement in the original court that the property was

"actually owned by the appellant," it is difficult to accept this argument.

19    to substantiate this claim, making it difficult to accept. Furthermore, according to the respondent's

Exhibit 6 to Lee Declaration

Exhibit A to Petition - p. 138 of 146

statement in the original court: In January 2012,

20 , I discussed company matters with Chen Yongjing, and we reached an agreement to dissolve the partnership.

21 The company would be mine, and the property would be his. I agreed to relinquish ownership of the

property, and all previous expenditures

22 loans, property expenses, miscellaneous costs, renovations, and equipment would all belong to Chen

Yongjing...

23 On February 6, 2012, the three parties signed a second agreement, etc. (see original trial record pp. 2

24 83 to 285 of the original trial record), further supported by Undisputed Fact 16, wherein both parties agreed

that

25 that the provisions concerning the disputed real estate in the first agreement had been superseded by the

second agreement

26 (see pp. 308-309 of this court's record). Pursuant to the second agreement,

27 , the three parties had renegotiated that Chen Yongjing would acquire full ownership rights to the disputed

three units of real estate

28 , the respondent, relying on the terms of the first agreement, claims that he

29 entitles him to ownership of the disputed three properties. The appellant's unauthorized sale of the disputed

three properties

30 and caused him damages, is unfounded.

31 (2) Furthermore, Article 2 of the second agreement stipulates: "Party C (i.e., Chen Yongjing) shall fulfill its

obligations after acquiring the real estate rights by timely paying the loan to Party B (i.e., Hong Yun)."

Exhibit 6 to Lee Declaration

Exhibit A to Petition - p. 139 of 146

01    shall fulfill her obligations by making timely loan payments to Party B (i.e., Hong Yunliang)

02    Liang) until the transfer of title is completed. Party C shall not be late in paying or fail to pay any installment

of the loan, thereby causing Party B

03    credit standing. Should Party C fail to make timely payments as stipulated herein, resulting in

04    any installment is late or unpaid, Party A (i.e., Xie Mengshan) shall immediately acquire

05    ownership of the aforementioned property. Party C must unconditionally accompany Party A to complete

the transfer procedures for the aforementioned property

06    without objection. At that time, Party A and Party B shall execute a new contract separately

07    (sign) a new contract, to which Party C shall have no objection. Party A shall not refund any

08    (see page 55 of the original trial record). It is evident that the prerequisite for the appellee's acquisition of

09    the prerequisite for the respondent acquiring ownership of the disputed three properties was that Chen

Yongjing failed to pay or failed to pay on time the

10    The second agreement was signed on February 6, 2012. Furthermore, as indicated in

11    undisputed facts 9 and 2, Chen Yongjing made timely payments for the February and March 2012 mortgage

installments after signing the second agreement.

12    made timely payments for the February and March 2012 mortgage installments. Subsequently, Chen

Yongjing passed away on April 1, 2012

13    and all of her heirs renounced their inheritance. This sufficiently demonstrates that prior to her death,

14    made all loan payments on time as stipulated in the agreement without any breach of contract. Furthermore,

after Chen Yongjing's death,

15    the appellant has personally paid all loans for the disputed three properties and land parcels, a fact

uncontested by the appellee

16    uncontested by the appellee. The Taiwan Land Bank, Xinyi Branch's letter dated April 1, 2015 (Ref. No. XY-

140000845) and the submitted historical transaction details of the loan customer are on

17    140000845 dated April 1, 2015, and the attached loan customer historical transaction details query on file

18    (see pages 265 to 270 of this court's case file). Accordingly, since Chen Yongjing's failure to make timely

mortgage payments

19    the conditions for the loan were not met, and the respondent could not acquire ownership of the disputed

three properties under Article 2 of the second agreement

20    and acquire ownership of the disputed three units of real estate. The respondent's claim that it

21    The appellant's claim that he suffered damages from selling the three disputed properties is also not

admissible.

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 140 of 146**

22    4. Although the respondent further argued that the second agreement was jointly executed by the three parties in accordance with the principles of contractual freedom and private autonomy,

23    and autonomy of contract, and that reducing the liquidated damages would render the consequences of non-performance

24    distribution of benefits from non-performance would be borne by the respondent. This would not only be manifestly unfair to the respondent but would also undermine

25    transaction security and private law order, thus rendering a reduction unnecessary. This argument is based on

26    Taiwan High Court Judgment No. 309 of 2018 (see pages 484-485 of this court's case file).

27    484, 485 of this Court's case file). However, the aforementioned Taiwan High Court judgment represents the determination of a particular court in a specific case

28    and does not bind this Court. Moreover, the agreement on liquidated damages is based on the

29    the development of autonomous will, self-determination, and self-restraint, forming a set of rules between the parties.

30    and, in accordance with the principle of freedom of contract, the parties to the contract should be bound by the amount of liquidated damages they agreed upon.

31    . Nevertheless, if the debtor has partially performed the obligation or the liquidated damages agreed upon by the parties are excessive,

Exhibit 6 to Lee Declaration

01    partially performed or the liquidated damages agreed upon are excessive, to prevent the liquidated damages system from

02    from violating the principle of contractual justice and equivalence, the court may reduce the liquidated damages by analogy to the creditor's benefit from partial performance

03    or by considering the actual damages suffered by the parties. This

04    This is explicitly provided for in Articles 251 and 252 of the Civil Code (refer to the ruling intent of Supreme Court Case No. 103 Tai Shang

05    2194 of 2014). The purpose of the second agreement signed by the three parties

06    The defendant has been able to operate

07    Meilu Company without any interference from Chen Yongjing, as previously stated. Therefore, the obligations pertaining to this aspect in the second agreement have been

08    considering this factor, imposing the entire liability of 500,000 NT dollars in liquidated damages on the appellant risks undermining the contractual justice inherent in the liquidated damages system.

09    0 million in liquidated damages, it risks undermining the fundamental principle of contractual justice and equivalent value inherent in the liquidated damages system.

10    . Although the disputed liquidated damages clause was agreed upon by both parties based on the principle of private law autonomy

11    , it remains necessary to reduce it appropriately based on the above explanation. The respondent's argument in this regard

12    is not acceptable.

13    5. The exercise of rights and performance of obligations must be conducted in good faith and with integrity, as explicitly stipulated in Article 148, Paragraph 2 of the Civil Code. The principle of good faith requires that rights be exercised and obligations fulfilled in a

14    The principle of good faith requires that the content of rights be determined and realized through just and equitable means within the specific relationship of rights and obligations.

15    , to determine and realize the content of rights in a just and equitable manner, and to prevent

16    parties from sacrificing the other's interests for their own gain. The interests of both the right holder and the obligor

17    and the societal function of the rights and obligations,

18    (Refer to the ruling intent of Supreme Court Case No. 103 Tai Shang 576).

19    ). Furthermore, whether a contractual penalty is excessive may be examined under the principle of good faith

Page Twelve

**Exhibit 6 to Lee Declaration**

20      (See the rationale of the Supreme Court's Judgment No. 1857 of 113).

21      ). If an excessively high liquidated damages clause violates the principle of good faith and constitutes an
abuse of rights

22      , thereby depriving the penalty of its basis, the court may reduce it to zero at its discretion. Upon
examination, the appellant

23      The appellant's unauthorized sale of the disputed three properties clearly violated Article 1 of the Second
Agreement.

24      . However, this Court considers that the purpose of the Second Agreement between the parties has been
achieved, the appellant's breach was minor, and the respondent did not suffer any loss due to the appellant's
breach.

25      and the respondent suffered no damages as a result of the appellant's breach

26      As previously stated, the basis for the appellee's claim for punitive liquidated damages against the appellant
is absent.

27      . If the appellant were still held liable for paying liquidated damages, it would constitute sacrificing the
appellant's interests to benefit the respondent.

28      the appellant's interests to benefit the respondent. Therefore, the appellant's argument that the respondent's
request

29      violates the principle of good faith (see p. 21 of this Court's record).

30      is well-founded. This Court, having considered the circumstances, finds that the disputed liquidated
damages should be appropriately reduced to zero

31      fair and appropriate. Consequently, since the respondent has no claimable

Page Twelve

**Exhibit 6 to Lee Declaration**

01    amount of liquidated damages, and thus its claim to set off the disputed liquidated damages against the

disputed claim and to request the revocation of the disputed enforcement proceedings pursuant to Article 14,

Paragraph 1 of the Enforcement Act is also unfounded.

02    Article 14, Paragraph 1 of the Enforcement Act, to revoke the disputed enforcement proceedings,

03    and to prohibit the appellant from enforcing the disputed enforcement order against him, lacks

04    grounds and cannot be accepted.

05   V. In summary, the respondent's claim that the disputed claim has been extinguished by set-off and that, pursuant to

Article 14, Paragraph 1 of the Enforcement Act, the disputed enforcement proceedings should be revoked and the

appellant prohibited from enforcing the disputed enforcement title

06    Enforcement Act, and to prohibit the appellant from enforcing the disputed enforcement order against him,

is unfounded and cannot be accepted.

07    and that the appellant be prohibited from enforcing the disputed enforcement title against it, are unfounded

08    and should not be granted. The trial court's abrupt judgment against the appellant is still inadequate. The

appellant's appeal argument that the original judgment was improper and requests its reversal and a new

judgment is well-founded. Therefore,

09    The appellant's claim that the original judgment was improper and should be reversed and remanded is well-

founded. Therefore, this

10    this Court sets aside the original judgment and renders a new judgment as stated in Item 2 of the Disposition.

11   VI. The evidence in this case is now sufficiently clear. The parties' remaining arguments, methods of attack or

defense, and

12    evidence submitted by the parties, after careful consideration by this Court, are deemed to have no bearing

on the aforementioned

13    and thus do not warrant further individual examination. This is hereby clarified.

14   VII. Based on the foregoing reasoning, this appeal is well-founded. Pursuant to Articles 450 and 7

15    8 of the Civil Procedure Law, the judgment is as

stated in the main text.

16   China      China      Republic    Republic      114            8        August        14          17

Yea

r

17                                          Civil Division I          Presiding Judge      Wang Jinlong

Judge

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 144 of 146**

18                        Law    Judge    Shi Yingzhi

19                      Judge    Judge    Tsang Hung-man

20 This is the original copy, made in accordance with the original.

21 No appeal shall be permitted.

22 Chinese    China     Republic    Republic    114        8        August      14      14

                                Year

23                        Clerk     Ye Youjun

24

| Appendix: | | | | |
|---|---|---|---|---|
| No. | Gate Plate Number Code | Abbreviation<br><br>Name | Transfer Registration Date | Purchase Acquirer Purchaser |
| 1 | No. 000○0, ○○ Road, ○○ Township, Pingtung County | Ligang A House | July 6, 2011 | Liang Yu-sheng |

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 145 of 146**

(Continued from previous page)

01

| 2 | ○○ District, Tainan City<br><br>00 Lane 00 Alley 0 | Liujia B Building | September 4, 2012 | Chen Jianfa Designated Registration<br><br>Yao Yinshan |
|---|---|---|---|---|
| 3 | No. 0, Lane 00, Alley 000, Road ○○, ○○ District, Tainan City | Liujia C Building | Same as above | Same as above |
| 4 | Tainan City, ○○ District, ○○ Street, Lane 000, No. 0 | Xinying D House | July 31, 2012 | Tsai Ping-Yuan |

**Exhibit 6 to Lee Declaration**

**Exhibit A to Petition - p. 146 of 146**